# EXHIBIT B

SUPERIOR COURT OF NEW JERSEY
CHANCERY DIVISION,
GENERAL EQUITY PART
ESSEX COUNTY
DOCKET NO. ESX-C-000248-16
APP. DIV. NO. _____

SCOTT PHILLIPS,                     :
                                    :
          Plaintiff,                :          TRANSCRIPT
                                    :
     v.                             :              OF
                                    :
ARCHDIOCESE OF NEWARK and  :    DECISION OF THE COURT
ST. THERESA'S SCHOOL,               :
                                    :
          Defendants.               :

                         Place:  Wilentz Justice Complex
                                 212 Washington Street
                                 Newark, NJ 07102

                         Date:   August 14, 2017

BEFORE:

     HONORABLE DONALD A. KESSLER, J.S.C.

TRANSCRIPT ORDERED BY:

     CHRISTOPHER H. WESTRICK, ESQUIRE (Carella, Byrne,
     Cecchi, Olstein, Brody & Agnello, P.C.)

APPEARANCES:

     SUSAN B. McCREA, ESQUIRE (Sole Practitioner)
     Attorney for the Plaintiff

     CHRISTOPHER H. WESTRICK, ESQUIRE
     JOHN V. KELLY, III, ESQUIRE (Carella, Byrne,
     Cecchi, Olstein, Brody & Agnello, P.C.)
     Attorneys for the Defendants


          Transcribers:  Terry L. DeMarco, AD/T 566
                         Holly Tisseyre, AD/T 682

          Agency:        KLJ Transcription Service, LLC
                         P.O. Box 8627
                         Saddle Brook, NJ  07663
                         (201) 703-1670
                         (201) 703-5623 (fax)

                         Digitally Recorded
                         Operator - Patricia Jackson

2

<u>I N D E X</u>

<u>BY THE COURT</u>:                                    <u>PAGE</u>

   Findings of Fact & Conclusions of Law.. . . . . . . 3

3

```
 1                      (Trial commenced at 1:51 p.m.)
 2                 THE COURT:  Please be seated.
 3                 Okay.  This is the matter of Phillips versus
 4      The Archdiocese of Newark.
 5                 Counsel, your appearances for the record?
 6                 MS. McCREA:  Good afternoon, Your Honor.
 7      Susan McCrea on behalf of plaintiff.
 8                 MR. WESTRICK:  Good afternoon, Your Honor.
 9      Christopher Westrick and John Kelly from Carella Byrne
10      on behalf of defendants.
11                 THE COURT:  Okay.  Everyone can be seated.
12                 Okay.  The Court is going to deliver its
13      opinion now.  It is my hope that I won't have to step
14      off the bench for a break, but it's possible I may.
15      We'll see how it goes.
16                 Okay.  For the purpose of my decision, the
17      pertinent facts are, as follows:
18                 Saint Theresa's R.C. Church is a New Jersey
19      religious corporation, incorporated under Title 16 of
20      the New Jersey Statutes and it is located at 541
21      Washington Avenue, Kenilworth, New Jersey.  Saint
22      Theresa's operates as a catholic parish, fulfilling
23      the spiritual needs of parishioners.  Saint Theresa's
24      was formed exclusively for religious, charitable and
25      educational purposes.
```

4

```
 1                 Saint Theresa's operates a religious school,
 2      STS -- Saint Theresa's School, which will be referred
 3      to as STS -- which educates primary school children
 4      with respect to their academic and spiritual
 5      educational needs.  STS educates children from
 6      kindergarten through 8th grade, and also operates a
 7      preschool program.
 8                 The Roman Catholic Archdiocese of Newark is
 9      a not-for-profit corporation comprised of parishes,
10      schools and other related entities operating in Essex,
11      Bergen, Hudson and Union Counties.  The Archdiocese
12      was formed exclusively for religious, charitable and
13      educational purposes.  Saint Theresa's Church and its
14      operations, including STS, are governed by the
15      Archdiocese of Newark.  The Archdiocese of Newark
16      provides pastoral services for approximately 1.3 to
17      1.6 million parishioners.
18                 Plaintiff Scott Phillips, his wife Theresa
19      Mullen, their two children, S.P. -- two daughters,
20      S.P. and K.P., and son, B.P., are parishioners of
21      Saint Theresa's parish.  Mr. Phillips and his wife
22      have been parishioners at Saint Theresa's for 17
23      years.  They have -- their three children -- B.P., age
24      15; S.P., age 13; and K.P., age 11 -- have all
25      attended primary elementary school at SPS -- I'm sorry
```

5

1   -- STS from preschool through their entire elementary
2   school education.  B.P. now attends Seton Hall Prep.
3   S.P.  has completed the 7th grade and K.P. has
4   completed the 5th grade last June.
5            Mr. Phillips and Ms. Mullen were married 17
6   years ago at Saint Theresa's.  They have been active
7   members of the parish regularly attending services and
8   having developed a personal relationship with a
9   recently-retired pastor, Father Joe Bejgrowicz.
10            The Phillips children were baptized at the
11   church and have volunteered to be alter servers
12   throughout the years.  S.P. and K.P. have a number of
13   friends, relationships with teachers, and a
14   comfortable familiarity with Saint Theresa's School.
15   They have volunteered to participate in many school
16   activities.  In S.P.'s case, she has been elected
17   student council treasurer and has played on sports
18   teams in the CYO league with other STS children in
19   sports, such as basketball, volleyball and softball.
20            On December 2, 2016, plaintiff Scott
21   Phillips, on behalf of his daughter, S.P., and his
22   son, B.P., filed a complaint before this Court
23   alleging several claims against the defendants.  The
24   complaint alleges bullying and harassment of S.P.,
25   failure by STS administrators to address sexually

6

1   inappropriate behavior, threat of violence with a
2   knife, exclusion of S.P. and another child at a school
3   sponsored trunk-or-treat event, and victimization of
4   S.P.
5            Plaintiff's complaint also alleges that his
6   son, B.P., was an outstanding student at STS.  He
7   claims his son was in the running to become
8   valedictorian of his class.  Both Mr. Phillips and his
9   wife, Ms. Mullen, testified at trial that B.P.
10   received a subjective grade from S.P.'s home room
11   teacher, the lowest grade he received during his
12   education at STS.  They claim the grade was lowered,
13   because S.P. was mistreated and bullied by the
14   teacher.  They complained that the grade by S.P.'s
15   biased home room teacher affected B.P.'s ability to
16   become valedictorian and, therefore, he became the
17   salutatorian, rather than the valedictorian of his
18   class.  Ms. Mullen testified that she sought a
19   justification of this grade so she could explain these
20   circumstances to B.P., but never got a satisfactory
21   response.
22            Plaintiff's complaint further alleges that,
23   beginning in early 2016, S.T. [sic] made numerous
24   complaints to her home room teacher about
25   inappropriate sexual behavior and harassing behavior

7

taking place in the classroom.  According to plaintiff and Ms. Mullen, S.P. was thwarted for a period of time by her home  room teacher from reported this behavior. Somewhat later, another teacher allowed S.P. to report her complaint about the sexual and harassing misconduct to the principal.  Plaintiff claims that S.P. continued  to report ongoing inappropriate behavior, principally by other male students, and claims that she was taunted  by STS personnel, parents and other students.

Plaintiff and Ms. Mullen also testified at one point S.P. was threatened with a weapon and shown a picture of a non-STS student holding a gun. Plaintiff and Ms. Mullen also reported that they believed that she was taunted by another STS parent and excluded from participating in the school -- STS parents' school sponsored trunk-or-treat event at one of the  car locations for that event.

Mr. Phillips and Ms. Mullen claimed during their testimony that SPS -- that S.P. was re-victimized by STS and Archdiocese personnel, who did nothing to respond to her complaints.  At trial, Mr. Phillips and Ms. Mullen testified they went to Saint Theresa's School on a number of occasions to address the improper conduct and the actions against their children

8

at the school.

Ms. Mullen testified that she obtained -- attempted to obtain resolution of her concerns from STS administrators.  After her perceived failure of school administrators to address these concerns, she worked her way up the chain of Archdiocese personnel to address her concerns and have them appropriate -- appropriately remedied.  She testified that she wrote, had meetings, and/or telephone conversations with the Archdiocese superintendent of school, Dr. Margaret Dames, and the assistant superintendent overseeing STS school, Sister Patricia Butler.  She also wrote to Cardinal Tobin, the archbishop of Newark, to seek his aid in addressing her concerns.

Plaintiff claims that defendants, through their authorized representatives, engaged in a pattern of retaliatory activity as a result of efforts by S.P. and her parents to protect S.P. in school and from abuse by teachers and other parents.  They further believe that appropriate steps had not been taken to address their concerns which affected S.P.'s education, as well as the education of their other children.

The Archdiocese operates a CYO basketball league.  The league has over 100 teams and 1,000

9

1  participants in separate boys and girls leagues for
2  the 2016-2017 season.  At the beginning of the season,
3  an insufficient number of girls volunteered to play on
4  the girls' basketball team in S.P.'s age group.
5  Therefore, STS was unable to field a girls' team in
6  that age group for the CYO league.
7         Ms. Mullen requested the league officials
8  allow S.P. to play on the boys' team in her age group,
9  since there was no girls' team in that age group.  She
10 also requested, based on seniority as a coach, that
11 she be appointed head coach of the boys' team and that
12 the team's coach assume the role of assistant coach.
13 Her request was denied by Richard Donovan, the
14 administrator of the league.  Plaintiff and Ms. Mullen
15 asked other Archdiocese representatives to reverse Mr.
16 Donovan's decision, but they refused.
17         Plaintiff and Ms. Mullen testified that the
18 decision to exclude S.P. from the basketball team was
19 also retaliation for their complaints and S.P.'s
20 complaint about the bullying and harassing behavior
21 she experienced.  They also argue that S.P.'s exclusion
22 from the boys' basketball team was discriminatory and
23 was not prohibited by league rules.
24         At the time that the complaint was filed,
25 December 2, 2016, plaintiff sought an interlocutory

10

1  injunction allowing defendants -- compelling
2  defendants to allow S.P. to play on the STS CYO boys
3  basketball team.  The complaint also sought removal of
4  unspecified personnel, damages and recision of federal
5  funding of Saint Theresa's sports program if such
6  funding was made under Title 9 of the federal anti-
7  discrimination laws.
8         On February 1, 2017, STS expelled S.P. and
9  K.P. from STS.  The Appellate Division stayed the
10 expulsion on February 2, 2016 and remanded this matter
11 to this Court for a determination as to whether the
12 expulsion should be permitted.
13         On February 15, 2017, Cardinal Tobin
14 rescinded the expulsion.
15         On February 17, 2017, this Court ordered
16 that S.P. be allowed to play on the boys basketball
17 team.
18         Discord arose between many members of the
19 STS community and the Phillips family, resulting in an
20 online petition seeking their removal.  There were
21 also various Facebook posts in which various members
22 of the community objected to their participation in
23 the STS community.
24         On March 1, 2017, plaintiff and Ms. Mullen
25 made a motion to amend the complaint in this case to

11

1   have more than 80 defendants affiliated with the STS
2   community joined as a part of the complaint and adding
3   Ms. Mullen as a complaint -- plaintiff.  This Court
4   dismissed most of the amended complaint.  In the time
5   it arrived before this Court, there was actually a
6   third amended complaint.  And that denial was made
7   without prejudice to repleading and refiling that
8   pleading.
9           On April 2, 2017, the Archdiocese issued a
10  letter through Dr. Dames refusing to re-enroll S.P.
11  and K.P. at STS for the 2017-2018 school year.
12          Plaintiff amended his lawsuit claiming
13  breach of contract and that the non-re-enrollment was
14  retaliation for his efforts to seek to protect his
15  children.
16          Defendants, the Archdiocese of Newark and
17  Saint Theresa's, claim the non-re-enrollment of the
18  children was an ecclesiastical decision which was
19  based on the inability of Saint Theresa's School to
20  function peacefully.  Specifically, they claim the
21  aggression of Mr. Phillips and Ms. Mullen, as parents,
22  interfered with the peace and tranquility of the
23  school community and inhibited the school from
24  realizing its ecclesiastical mission.
25          Defendants further claim that they had a

12

1   secular right to deny re-enrollment to the children
2   because of disruptive behavior of their parents.
3   Defendants point out that the enrollment contracts
4   between the defend -- between Saint Theresa's School
5   and other parents are one-year contracts which are
6   separately entered into each year and they would be
7   the same contract that would also be offered to Mr.
8   Phillips and Ms. Mullen.  Defendants claim they had no
9   legal obligation to enter a new one-year contract with
10  Mr. Phillips and Ms. Mullen to re-enroll S.P. and K.P.
11  for the upcoming academic year starting on September
12  6th.
13          In analyzing this case, the more detailed
14  factual -- a more detailed factual background is
15  necessary and warrants consideration.  Specifically,
16  the following:
17          In or around May 2016, S.P. complained to
18  her mother that she witnessed inappropriate behavior,
19  such as gyrating and sexually offensive comments by
20  boys in her class.  She also indicated she was
21  threatened with a knife.  S.P. told her mother about
22  inappropriate words and classroom talk, much of which
23  was of an inappropriate sexual nature.  Ms. Mullen set
24  up a meeting with the school's principal, Sister
25  Hélène Godin.

13

1       Sister Hélène had been a Catholic school
2   principal for nearly 30 years and was a member of the
3   Salesian order.  The Salesian educational philosophy
4   under which Sister Hélène administered STS was, quote,
5   "reason, religion and kindness," unquote.  She
6   understood her mission to develop the whole child body
7   and soul.
8       At the time of the meeting, Sister Hélène
9   served as principal for approximately six years.  She
10  testified that as soon as this issue was brought to
11  her, she spoke to the teacher involved and she also
12  contacted the local police to report the threat of the
13  use of the knife.  Plaintiff scheduled -- Mr. Phillips
14  scheduled appointments with Sister Hélène later that
15  month.  Sister -- as did Ms. Mullen.  Sister Hélène
16  investigated the sexual allegations, imposed what she
17  deemed to be appropriate discipline upon the offending
18  students.  Because discipline upon the offending
19  students was confidential to that minor and the
20  student's family, the discipline taken was not shared
21  with Ms. Mullen.
22      Later that month, Ms. Mullen had an
23  interaction with B.P.'s teacher, home room teacher,
24  Sister Juliet (phonetic), who was also -- Ms. Mullen
25  complained that, as a result of the interaction, that

14

1   S.P. had with Sister Juliet (phonetic), her son B.P.
2   received a grade of 74 on a test and he also received
3   an 85 percent score on a test in which he answered 14
4   out of 15 questions correctly.
5       Ms. Mullen acknowledged that the mathematical
6   difference on the 85 percent test grade may be
7   attributable to the weight of the answers.  Ms. Mullen
8   claims she was compelled to pursue the grading issue,
9   because she could not get an adequate response to
10  enable -- to explain -- her to explain to B.P. why the
11  grade was not higher.
12      Sister Hélène met with Ms. Mullen about this
13  issue at the end of may.  On June 1, 2016, Mr. Phillips
14  then met with Sister Hélène about B.P. achieving the
15  status of valedictorian of his class.  Mr. Phillips
16  claimed that he wanted to know in advance how the
17  valedictorian calculation would be arrived at, since
18  the previous year there was a .01 percent difference
19  between the valedictorian and the salutatorian.  He
20  also claimed that he told Sister Hélène that he needed
21  this information advanced of the announcement of the
22  valedictorian since his son and the son of close
23  friends were the top students.  He, therefore, wanted
24  to avoid conflict with the other family, who were
25  personal friends.

15

1      Sister Hélène testified that Mr. Phillips
2  threatened her that if B.P. was not named
3  valedictorian, Ms. Mullen would analyze every grade
4  and the school better have a good explanation for that
5  decision.  Sister Hélène agreed that B.P. was a strong
6  student, but pointed out that there were other bright
7  students in the class.  She testified that the meeting
8  ended with Mr. Phillips stating he hoped the
9  conversation was not useless.  Mr. Phillips claims
10 Sister Hélène promised to let him know in advance of
11 the announcement of the valedictorian award.
12      On June 3rd, two days later, the grades were
13 tabulated and B.P. earned the honor of salutatorian.
14 Sister Hélène called Mr. Phillips about his son
15 receiving the honor of salutatorian.  According to
16 Sister Hélène, plaintiff responded by voicing his
17 outrage that he did not get notice in advance and
18 called her a son of a bitch.  Sister Hélène indicated
19 that she found the words, tone and content of the June
20 3 conversation to be threatening, bullying and
21 demeaning.  Plaintiff denied the use of the phrase son
22 of a bitch, but indicated he was upset.
23      During her testimony, Sister Hélène was
24 visibly shaking -- shaken when she was recalling the
25 events in the entirety of the discussions about the

16

1  valedictorian issue.  Her demeanor on the stand
2  indicated that her feelings of being intimidated were
3  credible, because, as the Court indicated, she did
4  seem, even while testifying about it, to be shaken.
5  Sister Hélène testified that she stepped down as
6  principal and claimed that she lost confidence as a
7  result of this hostility.
8      Mr. -- plaintiff offered testimony to
9  minimize his conduct, claiming that Sister Hélène did
10 not keep her word and he admitted he was angry.  His
11 testimony seemed to be contradictory.  He said she
12 broke her word, but said she was not a liar.  Her --
13 his -- Mr. Phillips' efforts to parse words in
14 explanation supported Sister Hélène's view of his
15 hostility.
16      On June 3, 2016, Ms. Mullen had another
17 meeting with Sister Hélène in which she -- in which
18 Sister Hélène explained the decision.  Ms. Mullen was
19 not satisfied with the efforts of Sister Hélène to
20 address her concerns.
21      On June 6, 2016, Ms. Mullen wrote to Dr.
22 Margaret Dames, superintendent of the Archdiocese
23 schools.  Dr. Dames acts as the chief administrator of
24 the network of Archdiocese schools, overseeing more
25 than 90 primary and secondary schools which the

17

1 Archdiocese operates.  The Archdiocese educates over
2 30,000 students.  Dr. Dames reports directly to the
3 Archbishop, Cardinal Tobin, about the operation of the
4 Archdiocese schools.  Cardinal Tobin relies on her
5 management and is rarely involved in individual student
6 decisions, because of the number of issues that he
7 needs to oversee.
8         Ms. Mullen complained in her June 6th letter
9 referenced above that there was a pattern of behavior
10 that negatively affected S.P., resulting in S.P. being
11 re-victimized and her son, B.P., being negatively
12 affected.  In her letter, she -- both Dr. Dames and
13 Sister Hélène explained how they resolved each of
14 these issues.
15         The first issue raised was that a picture
16 was shown to S.P. of a gun by a non -- a male non-
17 student at STS who was frequenting STS property.  In
18 her testimony, Dr. Dames explained that the incident
19 was reported to the local police immediately.  In
20 contrast, Ms. Mullen testified that neither she nor
21 her husband, a retired Kenilworth police captain,
22 reported the matter to the Kenilworth Police
23 Department.  Dr. Dames appears to have taken
24 appropriate steps in her discretion to resolve the
25 problem and there was no testimony at trial that this

18

1 problem ever resurfaced.
2         The second issue was Ms. Mullen reported
3 that there were sexually inappropriate behavior of
4 boys gyrating on desks and boys making sexually
5 inappropriate statements to girl students.  Ms. Mullen
6 testified that the boys made offending sexual comments
7 and were the perpetrators.  Ms. Mullen testified that
8 other parents also made appointments with Sister
9 Hélène to express outrage about this behavior.  At
10 trial, Ms. Mullen clarified that two boys were
11 involved.  Sister Hélène and Dr. Dames testified that
12 appropriate discipline was imposed.  The boys are
13 minors.  The discipline was not discussed with Ms.
14 Mullen.
15         Ms. Mullen was asked for an interview with
16 S.P. by the administration, but that interview was
17 refused, claiming that it would re-victimize her.  And
18 she also refused to identify the offending boys,
19 saying that information was already known to Sister
20 Hélène.  It escapes the Court to understand why, if
21 this information was known, it couldn't be provided to
22 make sure there was no error.  Ms. Mullen agreed in
23 her cross-examination that the offending conduct did
24 not occur during the following school year and,
25 therefore, that conduct likewise appeared to be

19

1    appropriately remedied.
2            In her letter, as a third grievance, Ms.
3    Mullen complained about a substitute teacher's
4    inappropriate conduct.  That conduct was likewise
5    addressed by the teacher being removed from the
6    substitute teacher's list.
7            The fourth issue addressed, which was the
8    heart of a series of letters, complained about B.P.'s
9    grade and plaintiff and Ms. -- and Mr. Phillips and
10   Ms. Mullen's dissatisfaction that they were not
11   informed of the valedictorian selection prior to its
12   announcement.  In that letter, contrary to Mr.
13   Phillips' testimony, Ms. Mullen stated that plaintiff
14   could not believe that Sister Hélène lied to her --
15   lied to him.  In his testimony, Mr. Mullen
16   specifically -- Mr. Phillips specifically said --
17   refused to say that he was lied to.  Ms. Mullen
18   indicated that she  and her husband met with Sister
19   Hélène, but were not satisfied with the answer.  Ms.
20   Mullen concluded her June 6th letter stating, quote:
21           "By way of this letter, I am requesting an
22        immediate meeting with the Archdiocese before
23        graduation tomorrow evening.  I am requesting the
24        written policy of how the
25        valedictorian/salutatorian is computed be

20

1        provided to me, including how the advanced math
2        class is weighted, together with exactly how it
3        was calculated this year, with backup figures, so
4        that I can confirm that it was accurately done."
5            And that letter is, I believe, P-23A in
6    evidence.
7            Ms. Mullen couched her request in terms of
8    giving closure to her son for not being named
9    valedictorian.  However, the demand of an immediate
10   meeting, the otherwise argumentative remarks made by
11   Mr. Phillips in his meeting and phone call with Dr. --
12   with Sister Hélène, were an effort to control the
13   grading process and to change the valedictorian award.
14   The Court is satisfied that Dr. Dames and Sister
15   Hélène were exercising appropriate judgment and were
16   not required to respond to angry micro management.
17           Parenthetically, the Court notes that the
18   Phillips' complaints about these matters were rooted
19   in advancing their son's best interests.  Their
20   complaint about S.P.'s experiences were likewise
21   rooted in S.P.'s best interests.  However, Mr. Phillips
22   and Ms. Mullen appeared to lost objectivity and sought
23   the resolution of their grievances by taking an
24   extremely confrontational approach, rather than a
25   conciliatory approach.

21

1    In response to Ms. Mullen's letter, Dr.
2 Dames assigned the investigation of Ms. Mullen's June
3 6th complaints to one of her superintendents, Sister
4 Patricia Butler.  Dr. -- as mentioned above, Dr. Dames
5 oversees the education of approximately 30,000
6 students.  Therefore, she relies on associate
7 superintendents, including Sister Butler.
8    Ms. Mullen spoke to Sister Butler on June 7,
9 2016.  Ms. Mullen sent a further letter to Sister
10 Butler on June 8, 2016 and that letter likewise
11 complained about the valedictorian selection.  In her
12 letter, Ms. Mullen stated, quote:
13    "Once again, I am requesting the written
14    policy of how the valedictorian/salutatorian is
15    computed to be provided to me, including how the
16    advanced math class is weighted, together with
17    exactly how it was calculated this year, with
18    backup figures, so that I can confirm that it was
19    accurately done."  Unquote.
20    Ms. Mullen's letter went on to state, quote:
21    "If the Archdiocese refuses to give me this
22    information, I remind STS and the Archdiocese by
23    way of this letter that both have been put on
24    notice to preserve all requested materials, in
25    the event they are not voluntarily given to me,

22

1    and that additional action needs to be taken."
2    This letter characterizes actions of Saint
3 Theresa's School as being bullying and harassment of
4 her family and characterizes that behavior as, quote,
5 "deplorable," unquote, and that is -- that letter is
6 joint ex -- Plaintiff's Exhibit 23-2B, I believe.
7 However, in making such claims, Ms. Mullen failed to
8 appreciate the way in which her words would be
9 received by religious educators and did not consider
10 that her efforts to protect her son had gone too far.
11    Sister Butler requested on June 13th the
12 students' names responsible for the inappropriate
13 behavior and, as mentioned before, Ms. Mullen would
14 not provide that information.
15    On June 15, 2016, Ms. Mullen wrote to Dr.
16 Dames complaining she did not have closure on the
17 valedictorian issue.  At the end of her letter, she
18 stated, quote:  "Please be advised that if no response
19 by week's end, I will have no other choice than to
20 take this matter to the next level.  I hope this is
21 not necessary."  Period, unquote.  And that's P-23-2C.
22    On June 27, having received Sister Butler's
23 June 13th correspondence, Ms. Mullen wrote to Sister
24 Butler stating she would not provide the names of the
25 boys who engaged in sexually inappropriate behavior,

23

even though she said the information could be obtained
from Sister Hélène and was obviously known to her.
      In the fall of 2016, at the beginning of the
school year, the registration period for CYO basketball
began.  Several girls who were on S.P.'s basketball
team in the prior year at STS had graduated and there
were not enough girls to form a girls' team at STS for
S.P.'s age group for the season -- for the 2016-2017
league year.
      Applications for participation were sent to
students on September 19, 2016.  Richard Donovan, the
associate director of the league, claimed he advised
Ms. Mullen on September 28, 2016 that the roster
submission deadline for the league was October 25th
and that if there were not enough applicants to form a
STS girls' team, efforts would be made to place Saint
Theresa's girl students on a neighboring team.
      Ms. Mullen denied this conversation ever
took place and claimed she was not advised of a
deadline.  Ms. Mullen claimed that she first learned
from another parent that the deadline from -- to form
a girls' team had passed and she immediately asked
that she be permitted to solicit the late formation of
a girls' team, as she was allowed to do in the prior
year.  Her request was refused and she then requested

24

that S.P. be placed on the Saint Theresa's 7th grade
boys' team.  Ms. Mullen requested S.P.'s placement on
the boys' team, because of S.P.'s deep sense of
loyalty to STS and because of her desire to
participate in the school spirit of STS.  She did not
want S.P. to play for a neighboring girls' school
team.
      Ms. Mullen claimed that applications were
accepted from two boys to play on the boys' team after
the deadline and that CYO rules did not prohibit S.P.
from playing on the boys' team.  Mr. Donovan, the
league director, denied her request.  Mr. Donovan also
was an STS parent, but was functioning in the capacity
as league director, an entirely different role.
      On October 18, 2016, S.P.'s sister, K.P.,
received a written warning notice from her gym
teacher, Brittany Dvorscak.  According to Ms. Dvorscak,
students were told to stop talking in the hallway or
they would receive a warning notice.  While Ms.
Dvorscak was not -- did not testify at trial, the
Court got testimony from witnesses on both sides about
this incident.  On her way back from gym class, Ms.
Dvorscak advised Deacon Joe that K.P. continued to
talk.  She received a written warning notice for
excessive talking.

25

1       Mr. Phillips testified that K.P. never
2   received a prior warning and was very upset.  Ms.
3   Dvorscak met with Mr. Phillips and explained the
4   events.  Mr. Phillips challenged her and asked the
5   warning notice to be withdrawn.  A discussion ensued
6   and Mr. Phillips and Deacon Joe also discussed -- with
7   the principal, discussed the situation and at Deacon
8   Joe's request, the warning notice was withdrawn and
9   Ms. Dvorscak agreed that if K.P. received another
10  notice, that she would hand it directly to Mr.
11  Phillips.  And this is yet another example of
12  grievances that the Phillips family had that the
13  school responded to.
14      On October 28, 2016, there was an STS-
15  sponsored, quote, trunk-or-treat, unquote, event.
16  This annual event revolves around parents decorating
17  their cars and dispensing candy, having their personal
18  cars function as the equivalent of a Halloween home.
19  According to Ms. Mullen, S.P. came home from the
20  trunk-or-treat car event complaining that she was
21  belittled at one location by one of the parents,
22  reducing her to tears.
23      On November 4, 2016, Ms. Mullen wrote a
24  letter to the principal, Deacon Joe Caporaso, claiming
25  -- complaining about the actions of the parent at the

26

1   trunk-or-treat event and also complaining about the
2   rejection of S.P.'s basketball registration forms.  In
3   her correspondence, she pointed out that she had met
4   with Deacon Joe earlier in October to discuss the
5   difficulty of fielding a girls basketball team the
6   prior year.  Deacon Joe characterized this meeting as
7   a history lesson on STS's girls basketball.  Based on
8   that information that she previously provided to
9   Deacon Joe, Ms. Mullen expressed her belief that the
10  late registration should be accepted and also
11  complained about STS's [sic] treatment at the trunk-or-
12  treat.
13      After receiving the e-mail, Deacon Joe met
14  with Ms. Mullen and suggested she try to work out the
15  trunk-or-treat problem with the offending parent via
16  direct conversation with that parent.  In fact, at
17  trial, Deacon Joe testified that the two parents had
18  different versions of the story and he believed that
19  it would be more appropriate for the parents to work
20  this out between themselves.  He also indicated he had
21  no knowledge about the sports program and no interest
22  in sports programs, and that Ms. Mullen should reach
23  out to league officials.
24      On November 8, 2016, Ms. Mullen wrote to Dr.
25  Dames and Sister Butler complaining that S.P. had been

27

1    re-victimized at the trunk-or-treat event and
2    requested an immediate investigation into CYO -- into
3    the CYO basketball league director's conduct in
4    thwarting S.P's participation on the boys' team, since
5    there was no girls' team.  She also indicated she
6    wanted to be named as head coach of the boys' team.
7    She demanded a written response from STS and the
8    Archdiocese.  At the end of the letter, she stated,
9    quote:  "If I fail to receive a response by the close
10   of business tomorrow, I will have no other choice but
11   to take all the aforementioned to the next level,"
12   unquote.  P-23-2E.
13           On November 18, 2016, Ms. Mullen wrote to
14   Dr. Dames stating she would -- she was making a final
15   request for a meeting and concluded the letter by
16   saying, quote:  "If a meeting is not scheduled by the
17   close of business today, I will have no choice but to
18   file the appropriate legal work on Monday, which I
19   hope is not necessary," unquote.
20           On November 22, 2016, plaintiff and Ms.
21   Mullen met with Sister Butler and Dr. Dames.  At the
22   meeting, in view of the impending litigation, Dr. Dames
23   recommended the Phillips' attorney reach out to the
24   Archdiocese attorney to attempt to come to the res --
25   to a resolution.  It appeared at the meeting that a

28

1    resolution was not possible and that the matter may
2    well come to litigation.  It was the hope that if the
3    attorneys were to talk to each other, the litigation
4    could be avoided.
5            On December 2, 2016, plaintiff filed the
6    initial complaint in this matter, seeking, among other
7    things, that S.P. be permitted to play basketball on
8    the boys' team.
9            Shortly after the complaint, Mr. Phillips
10   called his boyhood friend, Kevin Kernan, a sports
11   writer for the New York Post.  Plaintiff testified
12   that he thought that S.P.'s desire to play on  the
13   boys' team was a human interest story which would
14   appeal to the press.  He stated he wanted the story to
15   get out accurately and, therefore, contacted his
16   boyhood friend, Mr. Kernan.
17           In his testimony, Mr. Phillips conceded that
18   Mr. Kernan is a highly respected and widely read
19   sports writer.  Mr. Phillips denied contacting the
20   newspaper to obtain leverage; however, he admitted
21   that he freely made himself and his children available
22   to other media outlets for interviews.  Mr. Phillips
23   refused to acknowledge that the press attention could
24   have a negative effect on the Saint Theresa's community
25   and that the public attention from the basketball

29

```
 1   dispute was a cause for concern for the community,
 2   including the administrator -- its teachers, the
 3   administrators and families.
 4          The information that defendants received
 5   from parents and/or administrators was that the press
 6   coverage initiated by Mr. Phillips was disrupting the
 7   peaceful operation of the school -- Catholic school
 8   community.
 9          During this case, the Court agreed it would
10   not hear testimony of individuals communicating about
11   this matter with the defendants.  Rather, this Court
12   said it would hear testimony about this information to
13   obtain evidence as to the perception that defendants
14   had about these complaints and the action that was
15   resulted from those reports.  And in so doing, this
16   Court relied on Carmona v. Resorts International Hotel,
17   189 N.J. 354, 376 (2007) and Toto versus Princeton
18   Township, 404 N.J.Super. 604, 619 (Appellate Division
19   2009).
20          On February 1, 2016, defendants made a
21   decision to expel the children from Saint Theresa's
22   School.  The expulsion letter was delivered to
23   plaintiff by defendants' counsel by an e-mail sent
24   after office hours.  Defendants' counsel advised
25   plaintiff's counsel that he children were expelled and
```

30

```
 1   should not return to school the next day.
 2          The February 1 letter was issued by Dr. Dames
 3   and indicated that S.P. and K.P. would be asked not to
 4   return to the school.  In her letter, Dr. Dames stated
 5   that on August 30, 2016, plaintiff executed an
 6   acknowledgment accepting the rules and regulations of
 7   the school.  Dr. Dames' letter pointed out that the
 8   student handbook stated that, quote:  "If a parent
 9   implicates Saint Theresa's in a legal matter or names
10   Saint Theresa's School as defendants in a civil
11   matter, the parents/guardians will be requested to
12   remove their children immediately from the school."
13   Period, unquote.  Exhibit J-1.
14          Plaintiff and Ms. Mullen received the e-mail
15   from their attorney while they were attending a New
16   York Liberty Basketball Team practice with S.P. and
17   one of her friends.  They claim that the manner and
18   timing of the expulsion was a further act of
19   retaliation precipitated by plaintiff actively
20   pursuing a litigation seeking S.P.'s right to play
21   basketball on the boys' team.
22          The next morning, plaintiff and Ms. Mullen
23   brought the children to Saint Theresa's School.  Mr.
24   Phillips left Ms. Mullen, S.P. and K.P. at the school.
25   He then brought B.P. to Seton Hall Prep.  Shortly
```

31

1    thereafter, Deacon Joe, the principal, asked Ms.
2    Mullen to meet with him in the office to discuss the
3    expulsion, since he did not want to address the matter
4    publicly, but preferred to do so in private.  He was
5    accompanied at the meeting by Father Joe, the pastor
6    of Saint Theresa's Church, and Father Vincent.
7            Ms. Mullen was asked to leave the by Deacon
8    Joe.  She refused.  Deacon Joe then read a statement
9    to Ms. Mullen prepared by defendants' counsel stating
10   that the children were expelled from school, that Ms.
11   Mullen must leave the school grounds, and that if she
12   did not leave the building, that trespass charges
13   would be brought against her.  Ms. Mullen refused to
14   leave the building, stating, among other things, that
15   she would not leave without a court order and without
16   an explanation upon which the expulsion was based.
17   Ms. Mullen did not leave the building immediately, but
18   left the building eventually.  A trespass complaint
19   was signed by Father Joe.
20           Plaintiff presented testimony from Mark
21   Bergamotto, a close personal friend and STS parent,
22   about the events of February 2.  Mr. Bergamotto's
23   testimony was wholly incredible.  He testified he
24   parked his car strategically to watch the events of
25   February 2.  His testimony appeared to be calculated

32

1    and could not be believed.
2            On February 2, 2016 [sic], the Archdiocese
3    issued a press release indicating the student handbook
4    contained a provision that students would be expelled
5    immediately if the parents initiated litigation
6    against STS and that Mr. Phillips agreed in writing to
7    this term in the handbook.
8            The trespass incident is a truly unfortunate
9    part of this case.  There is little doubt that, in
10   this instance, both parties could have exercised
11   better judgment.  Neither side took the initiative to
12   first discuss this matter off the school grounds.
13   Sadly, the Phillips children, S.P. and K.P., were
14   brought to school by her [sic] parents that day and
15   witnessed some of these unfortunately events.  Both
16   parties should have taken responsibility for the
17   position in which the Phillips children were placed.
18           Plaintiff filed an application with the
19   Court to stay the expulsion of S.P. and K.P.  The
20   removal of the children from the school was enjoined
21   by the entry of a stay issued by the Appellate
22   Division.  That order enjoined the removal pending a
23   hearing by this Court and remanded the matter to this
24   Court to determine whether the removal should be
25   authorized or should be vacated.

33

```
 1            On February 2, 2016 [sic], the Phillips
 2   children  -- or February 3, 2016 [sic], the Phillips
 3   children returned to school.
 4            Cardinal Tobin was installed as Archbishop
 5   of Newark beginning in January 2017.  He read about
 6   the expulsion of the Phillips children in a newspaper
 7   and also read that some girls had been playing on a
 8   boys CYO team, resulting in that team's exclusion from
 9   further play in the boys basketball league.  Cardinal
10   Tobin perceived S.P.'s expulsion to be based on her
11   desire to play basketball.  He believed that decision
12   was misplaced.  He expressed sympathy for S.P., due in
13   part to the fact that he has eight sisters and several
14   nieces.  He also learned that the coed team forfeited
15   games in the boys' league for violation of the league
16   rules.  He reversed the exclusion of the coed team
17   from playing in the boys' league.  He further learned
18   that S.P. and K.P.'s expulsion was based on a student
19   handbook provision that a student could be expelled if
20   parents are bringing a lawsuit against the defendants.
21   He did not agree with that policy and asked the
22   handbook provision to be eliminated.
23            On or about February 17, 2017, this Court
24   entered an order compelling the addition of S.P. to
25   the 7th grade boys' team, a decision founded in large
```

34

```
 1   part on the fact that the Court -- this Court learned
 2   that girls were permitted to play on another boys'
 3   team in the CYO league.  Initially, this Court had
 4   been advised that there were only separate boys' and
 5   girls' teams participating in the CYO league.  Based
 6   on this evidence, the Court denied the initial
 7   application to allow S.P. to play on the boys' team.
 8   After the additional information was provided to the
 9   Court that girls were playing on a boys' team in the
10   league, this Court changed its ruling and ordered that
11   S.P. be allowed to play basketball on the boys' team
12   for the remainder of the current season.
13            Plaintiff points out that this Court was
14   provided with false submissions in and around December
15   2016 that no girl played on any boy team -- boys' team.
16   However, the individual responsible for this
17   information, Mr. Donovan, was not a witness in this
18   case, thus whether [sic] the incorrect information
19   provided with this -- with respect to an earlier issue
20   was not the subject matter of testimony in the hearing
21   on the re-enrollment issue.
22            On February 15, 2017, Cardinal Tobin issued
23   a press release in which he rescinded the expulsion of
24   S.P. and K.P.  The press release also state the coed
25   team would be allowed to finish its play in the boys'
```

35

1    league for the current season.
2            Deacon Joe testified at trial that a
3    disruptive atmosphere at STS intensified dramatically
4    after S.P. and K.P. returned to school in February.
5    He received verbal and written communication from STS
6    parents expressing concerns about the disruptive
7    atmosphere at school, which other STS parents perceived
8    was caused by the Phillips family.
9            The STS parents were concerned about the
10   disruption caused by the lawsuit over basketball, the
11   intense media attention that followed, and the
12   disruptive effect of the reinstatement of the children
13   by the Court.  Some of the parents who wrote to Deacon
14   Joe complaining that [sic] the Phillips family wanted
15   to remain anonymous out of alleged fear of retribution
16   by the Phillips family.
17           As mentioned previously, the Court did not
18   consider this evidence as to whether or not it was
19   truthful, this -- rather, this evidence was reviewed
20   to determine what action was taken by the defendants
21   as a result of this information.
22           Deacon Joe testified that on the day of the
23   expulsion, news vans had been parked adjacent to the
24   school grounds of the church and had also been parked
25   there on other occasions.  He stated that a 2nd grader

36

1    -- all because of this case, the Phillips' case.  He
2    stated that a 2nd grader expressed her desire not to
3    attend STS in the future because of the presence of
4    news vans.  Another student asked to be dismissed
5    through the back door, rather than the front door,
6    because of the news vans' presence.
7            He also pointed out that several parents
8    signed an online petition voicing their concerns about
9    the uproar created by this information -- by this
10   litigation.  The petition itself, which was placed in
11   evidence by the plaintiffs, was signed by dozens of
12   individuals who complained about comments to the media
13   and what they perceived to be disparaging remarks
14   about the school and its students, and the overall
15   disruption that they felt the public attention of this
16   litigation was causing.
17           Plaintiffs stated that -- or were of the
18   belief that the petition was endorsed by STS, but I
19   will get to it a little later.  Actually, Sister --
20   Dr. Dames specifically tried to stop the petition and
21   neither STS nor the Archdiocese have any power to take
22   down that petition.  What they did about is, Dr. Dames
23   asked members of the community not to sign it anymore
24   and teachers were told by Deacon Joe and by Dr. Dames
25   that they were not to sign such a petition going

37

1  forward.  So, they did try to act.  They were also
2  told that any Facebook -- the teachers were told not
3  to post negative facebook posts and members of the
4  community were likewise asked to stop such behavior.
5          Given the controversy which arose at the
6  time the Phillips children returned to school, Dr.
7  Dames, as superintendent of schools, decided to hold
8  parent meetings at STS to calm down the situation and
9  to refocus all the parents on the mission of the
10  school to educate the children in a loving and
11  nurturing environment.  Dr. Dames wanted to restore a
12  tranquil and cooperative environment.  For that
13  reason, she scheduled listening sessions for February
14  22, 2017.  Dr. Dames first met with approximately 14
15  teachers.  The -- she then met with parents in groups
16  of ten.  It was her goal to bring the focus of the
17  school back to joy and optimism, consistent with its
18  ecclesiastical mission.
19          Ms. Mullen attended the first listening
20  session on February 22.  At those -- the listening
21  sessions, Dr. Dames asked for the online petition to
22  be stopped from everyone who was at the -- at those
23  listening sessions, and when -- and she also learned
24  at those sessions for the first -- time that there were
25  Facebook posts, and she also asked for the negative

38

1  Facebook posts to stop.
2          It was her aim in having this meeting to
3  calm tensions and restore harmony in the school
4  between all parents and teachers, including Ms. Mullen
5  and Mr. Phillips.  She asked for the cooperation of
6  the school community on refocusing their attention to
7  create a positive environment.  Dr. Dames urged the
8  parents to be positive and to stop negative
9  interactions, so the educational mission could move
10  forward.
11          On the very next day, February 23, 2017, Ms.
12  Mullen wrote to Cardinal Tobin complaining that she
13  and her family had been victims of negative statements
14  by Mr. Donovan, the director of the CYO, negative
15  Facebook posts by STS parents and the online petition
16  by various STS parents and teachers.  Ms. Mullen asked
17  for an opportunity to meet privately with Cardinal
18  Tobin to discuss her concerns and, quote, "if at all
19  possible, before the new set of legal papers are to be
20  filed on March 1, 2017."  Thus, she gave Cardinal
21  Tobin an ultimatum that if he did not meet with her
22  within the next six days, and presumably satisfy her
23  concerns, further litigation would follow.  Cardinal
24  Tobin claimed he never saw this letter prior to trial.
25          Plaintiff and Ms. Mullen filed the motion to

39

1    amend the complaint, seeking to add Ms. Mullen as a
2    plaintiff and suing at least 80 individuals associated
3    with the STS community and Archdiocese personnel,
4    including Father Joe and Dr. Dames.
5         `         Dr. Dames testified that the filing of the
6    lawsuit showed that there was not going to be an easy
7    resolution of the dispute between the parties.  Her
8    testimony subjected [sic] that her objective to calm
9    the controversy was undermined by Mr. Phillips and Ms.
10   Mullen filing this amended lawsuit.
11                  After the filing of the lawsuit, the uproar
12   at STS intensified.  Deacon Joe observed the new
13   lawsuit and ongoing presence of the press continued to
14   cause disruption at the school and interfered with its
15   normal functioning.  He understood that parents,
16   teachers and students were fearful because of their
17   interactions with the Phillips family and were fearful
18   of reprisals.
19                  Again, as I indicated, this testimony was
20   not considered for the truth of the matter, but in
21   terms of the conduct that it caused on the part of
22   Deacon Joe.
23                  Deacon Joe likewise testified that he was
24   intimidated by the Phillips family.  He recommended to
25   Dr. Dames, superintendent of the schools, and Reverend

40

1    Monsignor Thomas Nydegger, the vicar general and
2    moderator of the curiae of the Archdiocese, that the
3    Phillips family not be allowed to re-enroll S.P. and
4    K.P. for the following school year.
5                  Reverend Monsignor Nydegger acts as second
6    in command in the administration of the ecclesiastical
7    and secular activities of the Archdiocese.  It is
8    hardly unusual -- highly unusual for Monsignor Nydegger
9    or Cardinal Tobin to be consulted about school
10   decisions.
11                  Both Dr. Dames and Monsignor Nydegger
12   concluded that the actions taken by Mr. Phillips and
13   Ms. Mullen escalating the lawsuit and by adding new
14   claims against the Archdiocese, suing STS employees
15   and volunteers -- and this was more -- I'm sorry.  I
16   take that back.  This was more about Monsignor
17   Nydegger's testimony, not Dr. Dames.  And that suing
18   80 individuals for expressing their opinion was
19   inconsistent with the Catholic mission of STS and
20   undermined its pastoral objectives.  He, therefore,
21   recommended to Cardinal Tobin that he decide -- that
22   he endorsed the decision not to re-enroll S.P. and
23   K.P.  Dr. Dames, likewise, made such a recommendation.
24                  Cardinal Tobin testified that he learned
25   about the proposed expansion of the lawsuit.  He also

41

1  learned from Sister Hélène of the incredible pressure
2  she and faculty were under as a result of the conduct
3  of the Phillips family.  Cardinal Tobin stated that he
4  did not know about the extent of the controversy at
5  the school when he rescinded the February expulsion
6  and at this later time, after the recommendation was
7  made to him not to re-enroll, he -- he got -- he
8  received much more information about what happened
9  earlier.
10          At the time that Cardinal Tobin rescinded
11 the expulsion, he assumed the expulsion was because of
12 a dispute over basketball.  He learned in the recent
13 meetings that the problem was not basketball, but
14 rather that plaintiff's actions had upset the
15 tranquility of the school.  When he saw the litigation
16 expanded, Cardinal Tobin was astounded.  He became
17 aware of letters written by parents complaining about
18 the Phillips family and came to understand the
19 detrimental effect of the aggressive steps taken by
20 Mr. Phillips and Ms. Mullen.
21          In reinstating the children earlier, it was
22 Cardinal Tobin's aim that the children would be
23 integrated in the school and everyone would move on.
24 He was -- he felt that the profoundly expanded
25 litigation was inconsistent with his decision to

42

1  rescind the expulsion.
2          Cardinal Tobin does not get involved in day-
3  to-day decisions of the Archdiocese school.  He
4  testified that it is impractical or impossible for him
5  to oversee more than 90 Catholic primary and secondary
6  schools.  Therefore, there is a school superintendent,
7  Dr. Dames, who oversee the operations.
8          Cardinal Tobin believed in making his
9  decision, the peace and tran -- that the tranquility
10 and well-being of the STS community necessitated his
11 decision.  He indicated that the decision was not
12 intended to be punitive and he was considering the
13 well-being of the entire community.  He emphasized
14 that only a serious reason would get him to approve
15 the decision.
16          On March 22, 2017, the Archdiocese issued a
17 press release indicating a lawsuit had been filed
18 against the Archdiocese and STS and they intended to
19 defend, quote, "this baseless lawsuit," unquote.  The
20 statement was placed in the backpack of each student.
21 Plaintiff and Ms. Mullen claimed that this -- the
22 placement of the press release in the backpacks was an
23 effort to target and embarrass their children.
24 Archdiocese witnesses indicate that the statement was
25 sent out to members who wanted to know how the issue

43

1  was being handled.  The statement was also posted on
2  the wall of the church, which the plaintiff and Ms.
3  Mullen claimed was embarrassing and traumatizing to
4  their children.  However, other press releases were
5  also posted in the church.
6          Further, more significantly, the Court is
7  puzzled how Mr. Phillips and Ms. Mullen could not see
8  that their escalation of this controversy would not
9  generate a reaction.  Defendants were in need to let
10 the parishioners know how it will respond to a very
11 controversial matter.  Based on the credible testimony
12 of Deacon Joe and Dr. Dames's sincere concerns about
13 the uproar in the STS community, it is evident that
14 the press release was aimed at letting the STS
15 community know that the defendants would protect the
16 members of that community.
17         It should be noted that Deacon Joe was
18 forthright in his testimony and his testimony also
19 indicated that he was visibly shaken by these events.
20 He testified that in his many years as a school
21 administrator he had not witnessed such an intense
22 controversy.
23         Dr. Dames, a seasoned administrator with 30
24 years of experience, likewise testified her perception
25 of the uproar caused by the Phillips family by writing

44

1  letters and expressions was the most extreme
2  controversy she had ever witnessed.
3          On June 29, 2017, plaintiff filed a motion
4  to compel defendants to re-enroll S.P. and  K.P. at
5  STS.  A hearing was held before the Court on June 29th.
6  After the hearing, the Court entered an order
7  scheduling a plenary hearing.
8          On June 29th, the Archdiocese issued a press
9  release referencing the motion and the attacks made by
10 plaintiff and Ms. Mullen in the court papers.
11         On June 29th, the Archdiocese issued a
12 further press release reflecting its disappointment of
13 the scheduling of a plenary hearing and expressing
14 optimism that it would prevail in defeating plaintiff's
15 re-enrollment application.
16         The statements -- these statements were
17 published in the Archdiocese bulletin.  Plaintiff
18 claims that publication of these documents, in which
19 the Archdiocese publicly defended itself against the
20 plaintiff action, re-victimized their family.
21 Unfortunately, blinded by the desire to protect their
22 children, the plaintiff and Ms. Mullen could only see
23 their point of view and did not consider the reaction
24 that their actions would cause.  They also failed to
25 see how the confrontational manner in which they

45

```
 1    voiced their concerns would be perceived.
 2            It is important to emphasize that the
 3    decision not to re-enroll S.P. and K.P. had nothing to
 4    do with the successful efforts of plaintiff to allow
 5    S.P. to play basketball for the team.  That decision
 6    was a product of the controversy.  And I will address
 7    that specifically later in my decision the reasons why
 8    I believe that the refusal to re-enroll the children
 9    was totally unrelated to the Court's decision on the
10    basketball issue.
11            On June 11, 2017, Deacon Joe wrote a letter
12    indicating that Saint Theresa's School fully agrees
13    with and endorses the ecclesiastical decision regarding
14    the denial of S.P. and K.P.'s re-enrollment for the
15    2017-2018 school year, as set forth in the April 3
16    correspondence written by Dr. Dames which indicated
17    the children would not be re-enrolled.  Both letters
18    were sent to Mr. Phillips and Ms. Mullen.
19            The Court is convinced that Mr. Phillips and
20    Ms. Mullen were attempting to act in their children's
21    best interests.  Unfortunately, Mr. Phillips and Ms.
22    Mullen, out of love for their children, chose an
23    extremely confrontational approach and did not
24    evaluate the circumstances objectively.  Sister Hélène,
25    Deacon Joe, Sister Butler, and Dr. Dames all attempted
```

46

```
 1    to respond to their concerns.  Both Mr. Phillips and
 2    Ms. Mullen did not objectively absorb the efforts
 3    being made to address their concerns.  They
 4    intensified, rather than resolved problems.  In fact,
 5    many of the complaints they referenced were about
 6    previously resolved issues.  Rather than moving on
 7    from resolved issues, they piled issues on top of
 8    resolved issues.
 9            On April 3, 2017, as the Court indicated, an
10    ultimate decision was made to decline to re-enroll
11    them in the school.  The STS community has about 80
12    families and about 200 students.  The Archdiocese and
13    STS determined the need to be mindful of the pastoral
14    needs of the entire STS community.  Defendants
15    ultimately took steps to control the disruptive
16    atmosphere that Mr. Phillips and Ms. Mullen created.
17            Now, I'd like to turn to the applicable
18    legal principles.  And to get to those, I also need to
19    do somewhat of a -- some legal analysis.
20            On or about March 1, 2017, plaintiff filed
21    an amended complaint.  Thereafter, the Court directed
22    plaintiff to amend and supplement its complaint to
23    address the non-re-enrollment issue which came up
24    after the filing of the amended complaint.  As
25    indicated previously, in that complaint plaintiff and
```

47

```
 1      Ms. Mullen, who was to be added as a plaintiff, sought
 2   to add approximately 80 individuals, including STS
 3   employees, parents of STS students, and members of the
 4   STS community for expressing opinions concerning the
 5   lawsuit.
 6            On April 3, 2016 [sic], Dr. Dames,
 7   superintendent of schools, wrote a letter informing
 8   Ms. Mullen and Mr. Phillips that K.P. and S.P.'s
 9   re-registration application would not be accepted for
10   the upcoming 2017-2018 school year.  Her letter
11   states, as follows:
12            "Dear Mr. Phillips and Judge [sic] Mullen:
13            The Saint Theresa's School mission statement
14      provides Saint Theresa's School -- Catholic
15      School and the Archdiocese of Newark is dedicated
16      to the cultivation of academic excellence and the
17      spiritual social and emotional growth of each
18      student.  Our school nurtures an environment of
19      cultural diversity in which a caring faculty,
20      through the implementation of the education
21      system of Saint John Bosco, based upon reason,
22      religion and love and kindness, seeks to develop
23      each student to his/her potential.  With Christ
24      and Mary as our examples, the Saint Theresa's
25      community grows [sic] in a family atmosphere in
```

48

```
 1      which each individual experiences respect,
 2      challenge, responsibility and exceptional love.
 3            Actions and events initiated by you over
 4      the last several months have directly interfered
 5      with the fulfillment of this mission, not only
 6      for Saint Theresa's School, but for also for its
 7      administrators, staffs, students and parents.  In
 8      order to restore the promise of a 'family
 9      atmosphere' characterized by 'respect, challenge,
10      responsibility and exception love,' Saint
11      Theresa's School will not be able to accept
12      enrollment for the 2017-18 school year.
13            The decision has been made in this time in
14      order to allow sufficient time for you to make
15      alternate arrangements for -- alternative
16      arrangements for next year.  We wish good luck
17      with -- the children good luck with their future
18      endeavors.  Thank you."
19            And that is, I believe, J-3 in evidence.
20            The non-re-enrollment decision was made
21   after the February 22nd listening sessions and after
22   efforts had been made to return to a spirit of peace
23   and tranquility in the community.  And the lawsuit
24   that ensued and the ongoing press coverage that was
25   generated upset that peace and tranquility.
```

49

1        Religious educational institutions have a
2   constitutionally protected right to be free from civil
3   court interference.  This argument is rooted in the
4   United States Supreme Court's decision in Watkins v.
5   Jones, 80 U.S. 679 (1871).  In Watson, the Supreme
6   Court considered judicial involvement in a church's
7   property dispute.  The court was asked to determine
8   whether a certain sect of the church had control over
9   church property.  The Supreme Court said that civil
10  courts were not allowed to interfere in this property
11  dispute and this case resulted in the following
12  landmark principle.  And this is a quote.
13       "All who unite themselves to such a body do
14       so with an implied consent to this government,
15       and are bound to submit to it.  But it would be a
16       vain consent and would lead to the total
17       subversion of such religious bodies if anyone
18       aggrieved by one of their decisions could appeal
19       to the secular courts and have them reversed.  It
20       is of the essence of these religious unions, and
21       of their right to establish tribunals for the
22       decision of questions arising among themselves,
23       that those decisions should be binding in all
24       cases of ecclesiastical cognizance, subject only
25       to such appeals as the organism itself provides

50

1       for."
2       And I believe that's from page 729 of that
3   decision.
4       The rule announced by the court in Watson
5   was, unless neutral principles of law apply, judicial
6   decisions of ecclesiastical doctrine is banned under
7   the First Amendment.  The -- this rule was diluted in
8   Gonzalez versus Roman Catholic Archbishop of Manila,
9   280 U.S. 1, where the court stated -- the Supreme --
10  the United States Supreme Court stated, quote:
11       "In the absence of fraud, collusion, or
12       arbitrariness, the decisions of the proper church
13       tribunals on matters purely ecclesiastical,
14       although affecting civil rights, are accepted in
15       litigation before the secular courts as
16       conclusive, because the parties in interest made
17       them so by contract or otherwise."
18       The -- this ruling was later modified by the
19  Supreme Court in Serbian Eastern Orthodox for the
20  United States of America and Canada versus
21  Milivojevich, 426 U.S. 696 (1976).  In that case, the
22  Court modified the way it looked at these cases and
23  said, quote:
24       "Whether or not there is room for 'marginal
25       civil court review' under the narrow rubrics of

51

1          'fraud' or 'collusion' when church tribunals act
2          in bad faith for secular reasons [sic], no
3          'arbitrariness' exception -- in the sense of an
4          inquiry whether the decisions of the highest
5          ecclesiastical tribunal of a hierarchical church
6          complied with church laws and regulations -- is
7          consistent with the constitutional mandate that
8          civil courts are bound to accept the decisions of
9          the highest judicatories of a religious
10         organization of hierarchical polity on matters of
11         discipline, faith, internal organization, or
12         ecclesiastical [sic], custom, or rule [sic]."
13              Essentially, that -- unquote.  That's at
14    page 713 of that case.
15              As a result, the Supreme Court eliminated
16    the arbitrariness exception to the rule that civil
17    courts are prohibited from adjudicating religious
18    disputes.  The Court has not revisited whether
19    ecclesiastical -- whether civil courts can review
20    ecclesiastical decisions for fraud or collusion, but
21    they can't review them for arbitrariness.  That's what
22    the case says.
23              Since then, there has been further
24    litigation about this issue before the various circuit
25    -- federal Circuit Courts of Appeals and in many state

52

1     courts.  A split of authority has developed with
2     respect to state breach of contract and tort claims.
3     Some courts have held that if an ecclesiastical issue
4     underlies some of  the claims, such a breach of
5     contract claim, all of the claims should be dismissed,
6     thereby precluding civil courts from exercising
7     jurisdiction over any of those claims.  Gaston versus
8     Diocese of Allentown, 712 Atlantic Second. 757, which
9     is, I believe, a Pennsylvania Supreme Court case from
10    1998.
11              In that case, students at a Catholic school
12    were expelled.  The archdiocese and the -- were --
13    were sued and the principal were sued in tort for
14    negligence and intentional infliction of emotional
15    distress.  And the court dismissed the complaint on
16    jurisdictional grounds, stating that the action was an
17    attempt to involve civil courts in an ecclesiastical
18    custom or rule, as upheld by the bishop of the Roman
19    Catholic Church.
20              There are cases in which personnel decisions
21    can be reviewed by civil courts and there are cases
22    where an employment matter can be looked at as a
23    secular matter.  One of such cases is Scharon v. Saint
24    Luke's Episcopal Presbyterian Hospitals, 929 Fed.
25    Second 360 (8th Circuit 1991).

53

1         In this case, there are two counts in the
2  amended -- in the third amended complaint which
3  survived the motion to dismiss.  The second count
4  indicated that the defendants, Archdiocese and STS, in
5  refusing to re-enroll the children were in breach of
6  contract, it violated the handbook.  And that count
7  eight of the complaint indicated that they were
8  wrongfully and improperly expelled in April 2017 in
9  retaliation for the verified complaint, and in breach
10  of contract, and that they also waived the provisions
11  of the handbook.
12         The case law throughout the country seems to
13  support the notion that Catholic high schools for the
14  most part should be -- that their ecclesiastical
15  decisions should be followed.  Following -- and
16  recently, the -- there is a Pennsylvania case,
17  Chestnut Hill College v. Pennsylvania Human Relations
18  Commission, 158 Atlantic Third 251, which is a
19  decision made by the Commonwealth Court of Pennsylvania
20  on April 7, 2017.  In that case on page 259, the court
21  stated as follows:
22      "Following Lemon versus Kurtzman, 403 U.S.
23      602 (1971), this Court was persuaded that
24      parochial high schools were an integral part of
25      the Catholic mission, as 'a powerful vehicle for

54

1      transmitting the Catholic faith to the next
2      generation.'  In so doing, we emphasized that the
3      religious" --
4         And in that case, they cited from Roman
5  Catholic Archdiocese versus Pennsylvania Human
6  Relations Commission, 548 Atlantic Second 328, which
7  is also a Pennsylvania Commonwealth decision from
8  1988.  It went on to say that:
9      "In so doing, we emphasized that the
10      religious character of the parochial school --
11      schools based on" -- "they [sic] emphasized the
12      religious character of parochial schools based on
13      several factors.  They [sic] noted non-Catholic
14      students were required to take religious [sic]
15      classes and to attend Catholic services as a
16      condition of attending [sic].  We reasoned that
17      'parochial schools constituted an integral part
18      of the religious mission of the Catholic church
19      and this process of inculcating religious
20      doctrine, is, of course, enhanced by the
21      impressionable age of the pupils, in primary
22      schools particularly."
23         And in the Chestnut Hill case, the court
24  indicated that the principles relating to Catholic
25  high schools did not apply to colleges, but in drawing

55

the contrast between these two organizations, they --
the court said that, while there are material
differences between parochial primary and secondary
schools and college:
            First, parochial schools educated children,
not students who typically reach the age of majority,
such which is the case with colleges.
            Second, parochial schools were governed and
operated by the Roman Catholic Archdiocese of
Philadelphia, college is by one-fifth, plus one,
comprised of the Sisters of Saint Joseph's.
            Third, Catholic instruction was a required
part of the curriculum at the parochial schools and
attending Catholic classes and masses was a condition
of attending the schools.  College, by contrast, does
not require attendance at religious services and
religious instruction is available, but not required.
            And the essence of the reasoning of that
case and of other cases is that Catholic high schools,
because they are unique in their mission, are of a
religious nature.
            The establishment clause of the First
Amendment provides that Congress, quote, "shall make
no law respecting an establishment of religion."
            Pursuant to Lemon versus Kurtzman, 403 U.S.

56

602 (1971), the stated action must have -- must (1)
have a secular purpose; (2) have a primary effect that
neither advances nor inhibits religion; and (3) not
foster excessive government entanglement with
religion.
            With respect to this third criterion, the
determination of whether there is excessive
entanglement with church and state is conducted
through both substantive and procedural context.
            Substantive entanglement -- McKelvey v.
Pierce, 173 N.J. 26, 41 to 42 (2002).  Subjective [sic]
entanglement occurs when courts intrude into a
church's freedom to select, discipline or terminate
its ministers.  Procedural entanglement occurs when
the state and church are matched against each other in
a protracted adversarial proceeding.  Procedural
entanglement recognizes a church's substantive
freedoms and the impact of judicial intervention,
including extensive oversight of church activities.
            In her letter, Dr. Dames articulated that
the re-enrollment decision was made for religious
reasons.  This Court does not have the authority to
meddle in that decision, as it was based upon
ecclesiastical considerations.  Cardinal Tobin
testified he was the ultimate decision-maker of the

57

1    non-re-enrollment decision.  He made that decision
2    because he felt it was necessary to restore the peace
3    and tranquility of the school community, an
4    ecclesiastical decision made for the benefit of
5    achieving the school's mission.
6            In making this decision, he had the input of
7    Dr. Dames and Reverend Nydegger.  These trusted
8    administrators consulted with him in making this
9    decision for faith-based reasons.  As discussed
10   earlier, he explained his faith-based rationale at
11   trial.  On cross-examination, plaintiff's counsel
12   asked Cardinal Tobin if he was aware of the sexual
13   issues and the alleged harassment and bullying,
14   harassment and -- and the harassment and intimidation
15   of S.P.  A number of these issues were resolved prior
16   to Dr. Dames meeting with Cardinal Tobin, albeit not
17   to Mr. Phillips' and Ms. Mullen's satisfaction.
18           If Cardinal Tobin did not make his decision
19   on correct information, plaintiffs' remedy would be to
20   go back to Cardinal Tobin as reflected in the
21   handbook, J-3.  Specifically, the handbook states on
22   page 16 that with respect to an appeal to an expulsion
23   decision, quote, "The written request must be made to
24   the principal within five business days from the date
25   of official communication by school administrators of

58

1    the disciplinary decision.  Failure to request a
2    hearing within these five business days forfeits the
3    right to a hearing," unquote.  And this is in the
4    expulsion section of the handbook.  This faith-based
5    decision was made by church officials, and any appeal
6    of that should have been made to church officials, not
7    to this Court.
8            Plaintiff cites no case law which would
9    allow this Court to interfere with the church's
10   ecclesiastical mission.  The Court knows there's no
11   case law that would give this Court the authority to
12   intrude upon such a decision because the ecclesiastical
13   decision-maker did not know all the facts which
14   plaintiff wanted the decision-maker to know.
15           The Court would be remiss if it did not
16   emphasize that the plaintiffs' 2016 issues were
17   resolved as to sexual misconduct and bullying, thus,
18   plaintiffs' position, to the extent that it raises
19   these issues time and again, seems to serve little
20   purpose.  While plaintiff and Ms. Mullen feel bullied
21   and harassed by the reaction of the St. Theresa's
22   community by posting the online petition, Facebook
23   posts and the like, they ignore that they chose to air
24   this matter out publicly.  They now complain about the
25   reaction it has caused.

59

```
 1              Cardinal Tobin, Reverend Monsignor Nydegger,
 2     Dr. Dames, Principal Deacon Joe, and former principal
 3     Sister Helene testified credibly that their efforts
 4     were rooted in an effort to maintain peace and
 5     tranquility in the faith-based community.  Dr. Dames
 6     wanted to stop this controversy on all sides, and on
 7     February 22nd she met with everyone, including Ms.
 8     Mullen, for that specific purpose.  Plaintiff chose to
 9     pursue their grievances aggressively and in the most
10     confrontational manner.  The church officials' decision
11     was based in attempting to restore its faith-based
12     mission, the faith-based mission of its community.
13     The Court does not have the jurisdiction to question
14     these faith-based decisions.
15              This Court's view of this matter is
16     supported by a number of out-of-state cases, various
17     out-of-state cases.  For example, in Calvary Christian
18     Schools v. Huffstutler, 367 Arkansas 117 (2006), a
19     student was dis-enrolled from a religious school due
20     to the actions of his parents.  The Supreme Court of
21     Arkansas held that the Court were without jurisdiction
22     to rule on any of these claims arising out of this
23     enrollment.  Specifically, the Court found that this
24     enrollment was due to the parents' failure to comply
25     with Matthew 18 principles in the school's handbook.
```

60

```
 1              The reasons included in the dis-enrollment
 2     letter reflected the school's ecclesiastical
 3     philosophy.  The Court held that any and -- claims
 4     arising out of a dis-enrollment would therefore
 5     require the Court to determine whether the plaintiff --
 6     the plaintiffs did or did not comply with Matthew 18.
 7     This Court dis -- therefore, the Court dismissed the
 8     claims for lack of jurisdiction.  In this case, the
 9     decision was based upon following the educational
10     system of Saint John Bosco, based upon reason,
11     religion, and loving kindness, and on the philosophy
12     imparted upon the Catholic-based community by Christ
13     and Mary, and that is not a decision for this Court to
14     make.
15              Likewise, in Gaston v. Diocese of Allentown,
16     which was discussed earlier, 712 A.2d 757, Pennsylvania
17     Superior Court 1998, a Catholic school expelled the
18     plaintiff's son and daughter after the principal felt
19     threatened during an interaction with the plaintiff's
20     father regarding a curriculum dispute.  The plaintiffs
21     brought the claim intentional and negligent infliction
22     of emotional distress.  The Court held, quote, "The
23     question here, however, is not a property or
24     contractual dispute.  It is a claim that hits a tort
25     law but is based upon an expulsion decision.  Ratified
```

61

1   by the Bishop, it is our opinion not receptive to
2   application of neutral principles of law.  The
3   Catholics' disciplinary code and review of expulsion
4   involves matter of church doctrine."  Likewise, in
5   this case, the expulsion decision involved matters of
6   church doctrine.
7           Similarly, in In re St. Thomas High School,
8   495 SW.3d 500, Texas Appellate Court 2016, a Texas
9   appeals court ruled that the Court lacked jurisdiction
10  to hear a case whether parents of a student's alleged
11  sexual harassment against their son's teacher along
12  with other highly charged, slanderous accusations
13  after a dispute over a low grade.  The school
14  investigated and found the claims to be unfounded, and
15  the parent later admitted they were unfounded.
16          As a result, the school expelled the child
17  because it would have been impossible -- difficult if
18  not impossible for the teachers to educate the student
19  without fear of similar retribution by the parents.
20  The parents then sued for breach of contract, specific
21  performance and injunctive relief.  The Court
22  determined the decision was a result of a Catholic
23  school's management of its internal affairs and held,
24  quote, "If judicial resolution as a claim will
25  interfere with a church's management of its internal

62

1   affairs or encroach upon the church's internal
2   governance, the Court may not exercise jurisdiction
3   over the claim."
4           It bears emphasizing in this case that the
5   children in this case were expelled because -- not
6   because of their conduct but because of the conduct of
7   their parents, which interfered with the mission of
8   the church, and this Court is not authorized under law
9   to meddle in such activities.
10          In addition to the ecclesiastical reasons,
11  which standing alone would be a sufficient basis for
12  this Court to deny the request to rescind the non-re-
13  enrollment, there are also secular reasons to do this.
14  Either of these reasons on their own would be
15  independent reasons to uphold the non-re-enrollment
16  decision.  Plaintiff seeks an order compelling the re-
17  enrollment of S.P. and K.P. for the academic year
18  commencing September 6, 2017.
19          In the third amended complaint, the factual
20  basis for this request is made starting with paragraph
21  88 of the amended complaint.  The complaint reads as
22  follows: 88.  On or about January 2017, after this
23  lawsuit was pending, plaintiffs were invited to return
24  to STS and were given registration packets for the
25  2017/2018 school year.  On or about February 17, 2017,

63

```
 1    and after the expulsion was rescinded, the Court ruled
 2    that S.P. had the settled legal right to play
 3    basketball.
 4              On or about March 22, 2017, STS handed every
 5    student another press release from defendant
 6    Archdiocese regarding the instant lawsuit.  This press
 7    release -- in 91 -- this press release was also
 8    published and remains on the Archdiocese website and
 9    was done to intimidate, bully, harass, shame,
10    humiliate, and/or embarrass the plaintiffs and were
11    retaliatory.
12              92.   Plaintiff, S.P. and K.P. registered for
13    the 2017/2018 school year.  93.  The registration
14    application was rejected by STS by a letter dated
15    April 7th, 2017, and received by Scott Phillips on
16    April 11th, 2017, stating in pertinent part, quote,
17    "Your registration is being returned to you pursuant
18    to the letter which you received most recently by
19    certified mail," unquote.
20              94.   The letter in question was sent by the
21    Archdiocese months after the lawsuit was pending, and
22    it refers to the mission statement in the STS handbook
23    and states in pertinent part, "Actions of -- and
24    events initiated by you over the past several months
25    have directly interfered with the fulfillment of the
```

64

```
 1    mission, not only for St. Theresa's School, but also
 2    for many of its administrative staff, students, and
 3    parents," unquote.  95.  No specific actions are
 4    described.  96.  The only actions taken by plaintiffs
 5    were to file the instant lawsuit and amendments to
 6    same.
 7              97.   These letters by the Archdiocese,
 8    church, and/or STS, after the Court ruled that S.P.
 9    would -- had settled legal rights to play basketball
10    and among other things after the Court ruled, that the
11    settled legal right arose under Title IX.
12              98.   Defendant, Archdiocese, church, and/or
13    STS, by waiting months before sending this April
14    letter and by inviting K.P. and -- S.P. and K.P. to
15    return, waived its right to refuse admission to S.P.
16    and K.P. for the 2017/2018 year.  This April letter
17    from the Archdiocese is another form of expulsion for
18    filing the instant lawsuit, which violates public
19    policy despite the fact that there is no mention of
20    expulsion in the letter.
21              In count two of the complaint, it is alleged
22    that the defendants Archdiocese and/or STS, in refusing
23    to properly address the issues raised by plaintiff and
24    by expelling S.P. and K.P., are in breach of contract
25    and/or in violation of the provisions of the STS
```

65

```
 1   handbook and have acted in bad faith.  That count asks
 2   for specific performance, monetary sanctions, and
 3   other relief.
 4            Paragraph eight of the complaint indicates
 5   that the Archdiocese and/or STS improperly expelled
 6   S.P. and K.P. in -- (who was not a plaintiff in this
 7   action at the time in February 2017), close
 8   parentheses, and again, in April 2017, in retaliation
 9   for filing the verified complaint and are in breach of
10   contract.  Defendant also waived the provision in the
11   STS handbook, and this provision is against public
12   policy.  And this count also seeks specific performance
13   and damages.
14            Plaintiffs' application essentially seeks an
15   injunction for specific performance of an agreement to
16   re-enroll the children.  Equitable relief in the form
17   of a permanent injunction is an extraordinary remedy.
18   Quote, "Permanent injunction requires proof that the
19   applicant's legal right to such legal right has been
20   established and the injunction is necessary to prevent
21   a continuing irreparable harm," Verna v. Links at
22   Valleybrook Neighborhood Association, 371 NJ Super. 77,
23   89 (App. Div. 2004).
24            "Whether a permanent injunction should be
25   granted is within the sound discretion of the trial
```

66

```
 1   court," Sheppard v. Township of Frankford, 261 NJ
 2   Super. 5, 9 (App. Div. 1992).  "Such relief, though,
 3   must not be more extensive than is reasonably required
 4   to protect the parties' interest in whose favors it is
 5   issued," Verna v. Links, 371 NJ Super. at 89.
 6            An injunction -- the circumstances in which
 7   an injunction may be issued is discussed extensively
 8   in Van Name v. Federal Deposit Insurance Corporation,
 9   130 NJ Eq. 433 (Ch. Div. 1941).  Although this case is
10   an old case, it sets out time-honored precepts which
11   have been followed by this Court and other courts of
12   equity.  At pages 442 to 443, the Court lays out the
13   following principles.
14            An injunction is not granted as a matter of
15   right, but is -- its granting or refusal rests in the
16   sound discretion of the Court under the circumstances
17   and the facts of the particular case.  It is a strong
18   arm of equity.  There is no power the exercise of
19   which is more delicate, which requires greater
20   caution, deliberation, and sound discretion, and which
21   is more dangerous in a doubtful case than the issuing
22   of an injunction.
23            The remedy of an injunction is an
24   extraordinary one and may not be awarded to any suitor
25   unless and until his right to it is established by
```

67

1  clear and convincing testimony free of all reasonable
2  doubts.  If the complain -- a complainant's asserted
3  right is doubtful or disputed, equity will move
4  cautiously before determining to grant remedy by
5  injunction.
6          In determining an application for a
7  permanent injunctive relief, the Court should be
8  guided by the following comprehensive list of factors,
9  and in this case some of these factors but not all of
10  them applied to this case.  Those factors set forth in
11  the Sheppard case are, one, the character of the
12  interest to be protected; two, the relative adequacy
13  of the injunction to the plaintiff as compared to --
14  with other remedies; the unreasonable delay in
15  bringing the suit for any unrelated misconduct by
16  plaintiff by the comparison of the hardship to
17  plaintiff if release is denied and hardship to
18  defendant if relief is granted; six, the interests of
19  others, including the public; and seven, the
20  practicality of framing in order for judgment,
21  Sheppard, 261 NJ Super. at 10, reciting the
22  restatement of 27.
23          In this case, the plaintiff seeks, in
24  paragraphs two and eight, specific performan -- a
25  decree of specific performance of the -- of what they

68

1  perceive to be the right to re-enrollment.  In the --
2  granting specific performance by a decree of
3  injunction is also addressed in Van Name v. FDIC, 130
4  NJ Eq. 433 at page 443.  There, the Court says an
5  injunction to restrain a breach of contract often
6  operates as and affects all the purposes of a decree
7  for a specific performance.  As a general rule, to
8  enjoin one from violating a contract is an indirect
9  method of enforcing its affirmative provisions.  The
10  jurisdiction exercised in the substance is the same,
11  and the general rules apply in one case as the other.
12          Courts of equity will not interfere to
13  decree specific performance except in cases where it
14  would be strictly equitable to make such a decree.
15  The power of injunction committed to this Court is a
16  delicate and a most important power and should always
17  be exercised with caution, to prevent, not to do
18  mischief, to protect and sustain, not to render
19  enjoyment of property, of rights in property which are
20  uncertain.
21          Specific performance is a discretionary
22  remedy resting on equitable principles and requiring
23  the Court to appraise the respective conduct of
24  parties, Friendship Manor, Inc. v. Greiman, 244 NJ
25  Super. 104, 113 (App. Div. 1990), cert. denied 126 NJ

69

```
 1     321 (1991).  Thus, it is explained by the Supreme
 2     Court in Stehr v. Sawyer, 40 NJ 352, 357 (1963), that
 3     the party asking the aid of the Court must stand in
 4     conscientious relation to his adversary.  His conduct
 5     in the matter must be fair, just, and equitable, not
 6     sharp or aiming at unfair advantage.  The relief itself
 7     must not be harsh or oppressive.  In short, it must be
 8     clear that the claim is an equitable one.
 9                 Here, the Court cannot ignore the conduct of
10     the defendants.  The defendants, as previously stated
11     by the Court, decided to make -- take the most
12     confrontational approach, an approach inconsistent
13     with the goals and objectives of the -- a faith-based
14     community.  They made the affirmative choice to go to
15     the press and to make this matter public.  They made
16     the affirmative choice to sue 80 -- more than 80
17     individuals in a community that has approximately 80
18     families.
19                 And their actions are harsh and oppressive,
20     and they are not entitled to specific performance.
21     And there is no automatic right to specific
22     performance.  The -- a court must make a complete
23     evaluation of the complaint, of the claims asserted,
24     the defenses raised, the hardships imposed on the
25     parties, the fairness and reasonableness of both
```

70

```
 1     parties' conduct, and the availability of other
 2     remedies before determining whether to grant such
 3     relief, Marioni v. 94 Broadway, Inc., 374 NJ Super.
 4     588, 598 to 99 (App. Div. 2005), cert. denied 183 NJ
 5     591 (2005).  And quoting from that case at that page,
 6     in general, to establish a right to the remedy of
 7     specific performance, a plaintiff must demonstrate
 8     that the contract is valid and enforceable at law and
 9     that an order compelling specific performance will not
10     be harsh or oppressive.
11                 In Cohen, Estate of Cohen ex rel. Perelman v.
12     Booth Computers, 421 NJ Super. 134, 149 to 50, (App.
13     Div.), cert. denied 208 NJ (2011), the Court stated,
14     quote, "To establish a right of specific performance,
15     the party seeking relief must demonstrate that the
16     contract in question is valid and enforceable and that
17     the terms of the contract are clear."
18                 Here, there is no binding contract between
19     the plaintiff and the defendants for the 2017/2018
20     school year.  Thus, because there is no contract,
21     there is no legal contractual right to specifically
22     enforce.  Plaintiffs do not cite -- plaintiff does not
23     cite any case which requires defendants to enter into
24     a new contract for the 2017/2018 school year to educate
25     S.P. and K.P.  Defendants have refused to enroll S.P.
```

71

```
 1      and K.P. for the next academic year starting September
 2      6.  This Court cannot specifically enforce a contract,
 3      because there is no contract to enforce.  Even if a
 4      contract could be found by a review of the 2016/2017
 5      student handbook, no enforceable right for re-
 6      enrollment could be developed based on that agreement
 7      under the facts of this case, and I will explore that
 8      next.  It should be observed at the outset -- okay,
 9      that's fine.  That's all I need.
10                  THE CLERK:  Okay.
11                  THE COURT:  It should be observed at the
12      outset that the children were re-enrolled not because
13      of the conduct -- of their conduct, but because of the
14      conduct of their parents.  There is no dispute that
15      the children's behavior in any way caused the non-re-
16      enrollment decision.  An examination of the contract
17      demonstrates that there are several provisions which
18      give defendants the right not to re-enroll S.P. and
19      K.P.
20                  In analyzing this principle, the Court first
21      turns to the fact that there is an acknowledgment and
22      receipt of the parent student handbook by Mr. Phillips.
23      In that acknowledge -- in that acknowledgment, Mr.
24      Phillips acknowledged that the handbook is binding on
25      students and parents during the current academic year.
```

72

```
 1      Thus, the terms of this contract were binding on him
 2      and he agreed that that would be the case.  He further
 3      signed the statement saying I understand my
 4      responsibility to support the school policies it has
 5      established.
 6                  Looking at the contract itself, the contract
 7      states -- the handbook states on page 14, "Actions
 8      that violate the law, threaten or cause harm to
 9      another student or staff, disrupt or impede the
10      welfare and progress of the school community, or bring
11      discredit to the school will not be tolerated."
12                  Clearly, there was an agreement.  Although
13      it applied students, it certainly is a fair implication
14      applied to parents that they would not disrupt or
15      impede the welfare and progress of the school
16      community and the publicity, which was started with
17      Mr. Kernan, and which no one has -- no one in this
18      case has testified in any way that the defendants did
19      anything to encourage this publicity.  Deacon Joe
20      specifically testified they didn't, and the -- but
21      those wheels were set in motion by the plaintiffs, and
22      the plaintiffs also chose to appear publicly in
23      various media outlets, making their children available
24      for such interviews.  And thus, at least in the minds
25      of the school community -- and it's in letters, it's
```

73

1    in the petition which the plaintiff put in evidence,
2    and in other documents, that this generated a concern
3    on the parents' behalf that it was interfering with
4    the school's mission and it was disrupting the school.
5          The further disruption of -- which caused
6    further controversy is suing 80 individuals in the
7    school community also.  While it's -- certainly, an
8    individual has the right to sue, lawsuits can have
9    consequences, and there is no case law that says that
10   I -- that this Court knows of that seeking damages
11   from 80 individuals in the school community would not
12   -- could not result in some kind of reaction to that
13   if it creates an uproar in that community.
14        The handbook goes on to say on page 14, "If
15   a student's behavior is generally disruptive or -- and
16   uncooperative, it will be necessary to ask the parents
17   to choose another school for the child.  We cannot
18   sacrifice the education of the whole class because of
19   the disruptive behavior of one student.  And the same
20   would apply as to the disruptive behavior of parents.
21        Now, in this case there is a continuum of
22   conduct with meetings with various school individuals,
23   Sister Helene, Deacon Joe and others where they were
24   shaken by the aggressive conduct of the plaintiffs.
25   So there were actions far beyond just the publicity

74

1    that caused this.  And one only need to look at the
2    letters written by Ms. Mullen which threatened time
3    and time again that if she didn't get her way, that
4    there would be consequences.  And those -- the tone of
5    those letters, as well as the tone of Mr. Phillips'
6    meeting with Sister Helene when he was very
7    confrontational with her, was to control the
8    situation.
9         One has to wonder why it was so important
10   for an eighth grader to be valedictorian of the class
11   that you would upset several people in the school
12   community over this issue.  And while it was all
13   framed in terms of giving closure to B.P. that's
14   disingenuous.  It's just plainly disingenuous, all of
15   which has to weigh in the decision.
16       And what's most important of all is that, if
17   you turn to the statements of Cardinal Tobin, what he
18   was ultimately concerned about -- and he was the
19   ultimate decision-maker -- he was concerned about the
20   peace and tranquility of the community being upset,
21   and he had to make a difficult decision, one family
22   which was disrupting the community versus the welfare
23   of the entire community.  And this Court is not --
24   even on a secular basis, that is a matter within the
25   discretion of the school.

75

1            There are other provisions in the handbook
2    that likewise apply.  The handbook goes on, on page 14,
3    to say, "It is expected that the judgment of school
4    authorities concerning the discipline of the students
5    will be respected and supported by parents and
6    guardians."  The decisions of this school were not
7    respected by parents and guardians.  In fact, rather,
8    they were met with letters threatening consequences if
9    the decisions weren't changed.  It wasn't enough to
10   discuss them, and there were many times when a
11   discussion led to a change, but if the discussion
12   turned out the way that these plaint -- that Mr.
13   Phillips or Ms. Mullen didn't like, then the
14   individuals who made those decisions were threatened.
15           The handbook goes on to say, quote, on page
16   14 -- I'm quoting this -- "If conflict arises, parents
17   and guardians are expected to discuss the problem
18   privately, and those concerned, and not in front of
19   students or other parents or guardians."  Here, it was
20   more than just private.  There was an airing out of
21   this matter in the press and making very public, which
22   was contrary to the faith-based purpose of this school
23   educating Catholic youth.
24           Turning to page 16 of the handbook, with
25   reference to expulsion, the handbook says, "Expulsion

76

1    is a permanent removal of the student from school.
2    However, if in the sole determination of the school a
3    student's conduct or activity reflects such grave
4    discredit on the school or otherwise presents a
5    definite impediment to the welfare and progress of the
6    school community, the student may be expelled without
7    the school's having taken prior disciplinary measures."
8            In this case, while the actions weren't by
9    the student, those concepts apply equally to the
10   parents, and these parents -- these issues were so
11   grave in the judgment of the school, in the judgment
12   of Reverend Monsignor Nydegger, Dr. Dames, Sister
13   Helene, Deacon Joe, and ultimately the Cardinal, that
14   they had to take steps.  And, as I indicated earlier,
15   there was an appellate mechanism in the handbook.  So
16   from a procedural basis, the plaintiffs waived that
17   process and did not exhaust the remedies.
18           Because in that paragraph, it says, quote,
19   "A written request must be made to the principal within
20   five business days from the date of official
21   communication by the school administrators of the
22   disciplinary decision.  Failure to request a hearing
23   within these five business days forfeits the right to
24   a hearing."  So, and that is in the expulsion
25   paragraph.  So they forfeited their right to a hearing

77

```
 1    under the terms of the contract which the plaintiffs
 2    want to enforce.  So even if that is a contract, they
 3    don't have any contractual rights.  And even if they
 4    do have the rights, they have violated numerous
 5    portions of the contract.
 6           The contract also indicates at the very
 7    beginning in the purpose and use of this handbook,
 8    states specifically, "The principal has discretion to
 9    take actions other than those specified in the
10    handbook."  So the principal would have the power to
11    recommend expulsion based on the conduct of the
12    parents because this -- the handbook itself is --
13    provides him with such discretion.  So when viewed
14    from a contractual perspective, just looking at the
15    very terms of the contract itself, there is a
16    contractual basis for the non-re-enrollment, if one
17    was required.
18           The plaintiff has taken the position that
19    there was a pretext, there was a smokescreen, that the
20    -- this decision was made because of basketball,
21    because of bullying and harassment and intimidation of
22    the plaintiffs and the children and Ms. Mullen, and
23    this Court is persuaded, and I can't emphasize this
24    enough, that the decision to not re-enroll the
25    children has nothing at all to do with basketball.  It
```

78

```
 1    is plainly not related.  And I'll give that reason in
 2    a moment.
 3           But in order to get to that decision, I need
 4    to break down the events in this case into various
 5    phases, because I think by looking at the phases one by
 6    one it allows better analysis of the circumstances.
 7    The first phase is the phase prior to any controversy
 8    regarding basketball, and in that phase there were
 9    issues about the alleged inappropriate sexual behavior
10    which was addressed, the substitute teacher that was
11    addressed, the issue with a gun which was addressed,
12    and the valedictorian issue, which was addressed but
13    not to the satisfaction of the plaintiffs.
14           But everything doesn't have to be to the
15    plaintiffs' satisfaction.  Somehow there's a
16    suggestion if it's not the plaintiffs' way, it's not
17    the right way.  And that's not the way any institution
18    has to operate.  The second phase is the basketball
19    phase.  The -- in the basketball phase the action was
20    taken by Mr. Donovan as commissioner, and there is no
21    doubt that there was a certification filed, which was
22    wrong.  It was false.  But that did not have a bearing
23    on this hearing.  I don't -- and there should not be
24    confusion between the two.
25           I don't know why Mr. Donovan gave false
```

79

testimony.  That's not an issue in this case.  He did
give false testimony, and this Court took action
because of it and change -- as the Court originally
would not allow S.P. to play basketball, when it got
the correct information, this Court allowed her to
play basketball.  So that problem was remedied.  But
then in that time, this Court -- Mr. Phillips made the
decision that he had an interesting human interest
story and he wanted his side to get out publicly.  To
this -- at this time, I still don't understand why he
had to get it out publicly.  He didn't even tell the
Court why it had to be gotten out publicly in a news
story.
        This Court can certainly say that its
decision would not be affected by the press, because
this Court only makes decisions based what -- on
what's presented to it in this courtroom.  And when it
was told -- when this Court learned in this courtroom
that there were other girls playing on boys' teams,
this Court didn't need to know anymore and was able to
make its own independent decision with the facts.  And
that's how this Court's supposed to decide cases, on
the facts that occur in this courtroom.
        So the Court has not had it explained to it
why this had to be aired out publicly.  And given the

80

nature of the various letters that were written by Ms.
Mullen threatening the school, it at least seems that
the argument that the public attention was done for
leverage, because there has been no other applic --
explanation.  But if you link those letters or the
publicity, it leads to an inescapable conclusion.
        The next phase was the expulsion and
reinstatement.  The expulsion letter came out on
February 1.  The Appellate Division ordered the re-
enrollment of the children, I think it was on February
2.  It may have been the first.  A press release was
issued by the Archdiocese on that day, saying that
they had the right to expel under the terms of the
handbook for bringing litigation.  Ultimately, that
issue was sent back to this Court.
        But what is significant is even while the
basketball issue was pending before this Court,
regardless of how it was decided, Cardinal Tobin
ordered the children be re-enrolled in the school.  So
it had nothing to do with basketball, because if
Cardinal Tobin was concerned that the pending motion
about basketball was going to be decided, he wouldn't
have re-enrolled the children.  So it totally escapes
the Court and defies the Court's imagination how, in
the slightest way, the decisions that were made by

81

Cardinal Tobin could have been related to the
basketball.  In fact, he did the opposite.  When he
found out that there were girls playing on a boys'
team, he said, "I don't want the league games
forfeited."  So that argument is just not supported by
the record.
　　　　So then, when the children returned to
school -- and this is probably the most significant
phase to me -- there was an immediate uproar at the
school.  There were Facebook posts, there was the
online petition.  There was a fair amount of discord
and upset in the school community because of all of
what individuals in the school viewed as negative
publicity.
　　　　This Court would be the first to acknowledge
that not everyone joined in the sentiments of those
individuals who felt that the Phillips family went too
far.  There were families who supported the family,
and there was a witness before this Court, although I
didn't accept his testimony, was clearly supportive of
the family.  And I accept the fact that there were
families that supported the Phillips family.  Ms.
Mullen testified about those families, and that does
strike the Court as being believable.
　　　　But the one inescapable conclusion for the

82

Court is that this was a very polarizing event.  And
the polarizing event became worse when 80 individuals
in the school community were sued.  But that didn't
happen -- the context in which that happened is very
important.  When the children returned to school, the
Court, two days after Cardinal Tobin made the decision
on the 15th to avoid this Court making any decision on
the -- on whether the expulsion could stand or not, he
said -- essentially said to this Court, "You don't
have to bother.  I'm going to let them stay this
year."  This Court then, on the 17th, two days later,
made the decision to let S.P. play basketball on the
boys' team.
　　　　Dr. Dames -- and this is the most significant
event to me, most significant of all -- Dr. Dames
scheduled a series of listening sessions with STS
parents on February 22.  Those listening sessions were
scheduled for five days after this Court made its
decision on the basketball.  Now let's look at what
Dr. Dames wanted to do with those listening sessions.
Did she want to kick the Phillips family out?  No.
She wanted to do the opposite.  She wanted everyone in
the community to stop attacking each other.  She
specifically told -- five days after the basketball
decision, she told parents, "Don't post on the online

83

1   petition."  Teachers were forbidden from posting on it.
2   She told parents, "Don't make the Facebook posts."
3           So the idea that this had anything to do with
4   basketball is derailed by the very conduct that was
5   taken.  At those meetings, and Ms. Mullen attended the
6   first meeting, Dr. Dames said, let's move on, let's
7   move back to peace and harmony and tranquility.  Let's
8   make this the same faith-based community that's made
9   this a wonderful place for all the children.  Let's
10  make it, continue -- these are my words, not hers.
11  But let's continue to make it this wonderful community
12  that the children can enjoy and thrive in and get the
13  benefit of the faith-based mission that we have.
14          So what happens the next day?  What happens
15  the very next day?  The very next day, Ms. Mullen
16  hand-delivers to the Cardinal a letter saying, if you
17  don't meet with me in six days, I'm going to sue the --
18  I'm going to sue everybody.  So you've got six days,
19  Cardinal.  Now, you know, not taking into consideration
20  how busy his schedule is and the responsibilities that
21  he has for somewhere in the neighborhood of 1.3 to 1.6
22  million Catholic lives.  To demand that the Cardinal
23  meet with her in six days or it -- or a lawsuit would
24  be filed is relevant to the Court in the sense that it
25  is a reflection of an overly aggressive approach where

84

1   a family has a range of alternatives to solve a
2   problem and they choose, of all the range of
3   alternatives, the most controversial, the most
4   incendiary alternative.
5           Now, I'm mindful of the fact that the
6   Cardinal did not get that letter, did not see that
7   letter.  But it bespeaks an intent and a purpose by
8   the -- by Mr. Phillips and Ms. Mullen.  And this case
9   is all about stopping that intent and purpose.  Then,
10  six days later, the lawsuit was filed, on March 1, as
11  promised.  80 -- more than 80 individuals in the
12  community were sued in this very small community,
13  creating a further uproar.
14          At that point, Reverend Monsignor Nydegger,
15  who doesn't function in this area, he doesn't oversee
16  the schools, he's got a lot more responsibility,
17  starts paying attention to this and comes to the
18  conclusion that this is a threat to the mission of the
19  community, and that's one of his central purposes as
20  vicar general and -- and I might get this wrong
21  because I'm doing it from memory -- keeper of the
22  curiae.  But he's got this religious mission that he's
23  trying to make certain will be honored by the
24  community.  And for that reason, for those faith-based
25  reasons he testified about why he got involved.  Dr.

85

1    Dames was likewise motivated by that, and certainly
2    the Cardinal's testimony cannot be refuted, that that
3    is -- that he felt he had to react.
4             But the point is that if they wanted to do
5    it for these reasons, the Cardinal wouldn't have
6    reinstated and Dr. Dames wouldn't hold the meeting to
7    calm everyone down to get to the sense of community.
8    But essentially, what the Phillips family did by
9    writing a letter the next day and suing a few days
10   letter is saying, "We're not interested in calming
11   things down.  We're going to keep the controversy
12   going."  So, and I think the tone is what's important
13   to look at.  Not the substance, the tone.
14            Now, there has been discussions during this
15   case that the plaintiff has taken the position that
16   the expulsion letter, which was written by -- or the
17   non-re-enrollment letter, which was written by Dr.
18   Dames, is not proper because the Archdiocese does not
19   have standing .  The testimony of Monsignor Nydegger,
20   of Dr. Dames about ACES, about the nature of the
21   agreement between the Archdiocese and how they oversee
22   the community of -- does this individual need some
23   water?  Ask him if he needs some water.
24            UNIDENTIFIED SPEAKER:  Oh.  Oh, no.  Thank
25   you, sir.  Sorry, Your Honor.

86

1             THE COURT:  you want to get him some water?
2    Somebody get him some water.  You --
3             Anyway, so the ACES agreement gives
4    authority to the Archdiocese, the courts consider.
5    But even if ACES doesn't, there's a superintendent of
6    schools, there's a structure, it's a de facto
7    structure.  To say that that's not the structure is to
8    defy reality.
9             But in an abundance of caution, this Court
10   had that letter written by the -- asked that a letter
11   be written by the school to verify that this had the
12   school's endorsement, and such a letter was written.
13   I've gotten and I received an objection to allow that
14   change many times in this case, and I indulged the
15   plaintiffs on a number of issues so that I could get
16   to the substance of this case and I'd get to the
17   merits.
18            Certainly, I overlooked the -- on a few
19   occasions their non-cooperation in depositions.  I
20   allowed the initial order to show cause to be amended
21   without the necessity of further papers, and did other
22   things to accommodate the plaintiffs.  And so I've
23   been criticized for giving the same consideration to
24   the defendants, but I always tried as best I could to
25   be fair to everybody, and I've said that several times.

87

```
 1              MR. WESTRICK:  Judge, would it be possible to
 2    take five minutes before we continue?
 3              THE COURT:  Yeah, we can.  I'm not that far
 4    from being finished --
 5              MR. WESTRICK:  Okay.
 6              THE COURT:  -- but we can take five minutes.
 7              MR. WESTRICK:  Thank you very much.
 8              THE COURT:  That's fine.  Okay, I'll be back
 9    in five minutes and I'll --
10              MR. WESTRICK:  Thank you, Judge.
11              THE COURT:  -- I'll wrap up then.
12         (Off the record from 4:32 p.m. to 4:43 p.m.)
13              COURT OFFICER:  Okay, everyone can be seated.
14              THE COURT:  So we're back on the record in
15    Phillips v. Archdiocese of Newark, C-248-16.  And I'll
16    hopefully now finish my opinion.  And I only have a
17    court reporter until six o'clock, so I need to try to
18    get this done.  So I think that the principal last
19    remaining issue is the issue of due process.
20              In Hernandez v. Don Bosco Preparatory School,
21    322 NJ Super. 1 (App. Div. 1999), plaintiff was a
22    student at Don Bosco Preparatory High School, a private
23    Catholic boys' school in Ramsey.  The student was
24    expelled for alleged misconduct which violated the --
25    the student was expelled for alleged misconduct which
```

88

```
 1    violated the student-parent handbook while the
 2    plaintiff was on disciplinary probation.  The
 3    misconduct included vandalism of a teacher's home,
 4    slashing of a teacher's tires, making prank calls to a
 5    teacher, allegedly selling illegal steroids, and
 6    allegedly urinating in a student's locker.
 7              The plaintiff, who was the student, and his
 8    parents met with the Don Bosco administration to
 9    discuss these incidents.  Thereafter, the Don Bosco
10    disciplinary committee convened to review the matter
11    and agreed that the student should be dismissed after
12    seeking an appeal.  The Don Bosco representatives met
13    again and plaintiff was asked to withdraw, and a letter
14    was written to that effect.
15              In Don Bosco, the Court established a two-
16    prong fundamental fairness test which private high
17    schools must follow when expelling students for
18    misconduct.  One, the private high school must adhere
19    to its own established procedures for dismissal, and
20    two, in executing the dismissal, the school must follow
21    a procedure that is fundamentally fair, Don Bosco, 322
22    NJ at 31 to 21.
23              In Don Bosco, the procedure that was followed
24    was a series of various meetings with the student and
25    the administration, and then a committee meeting of
```

89

various representatives of the school and then with the
appeal, a further meeting of that committee.  There was
not a trial-type hearing where witnesses testified, and
that kind of hearing, which is akin to the kind of
process in this case, was found to be proper and to be
a proper hearing, and it was also found to be
fundamentally fair, as I indicated earlier.

The parents aren't entitled to a hearing
under the student handbook.  There is nothing in the
handbook that entitles the parents to a hearing for
their conduct.  And certainly, there are cases, both in
the ecclesiastical decisions, and I'll deal with a
secular decision in a moment, which -- fourth court,
fourth state -- which says that the parents -- the
expulsion based on parent conduct is not reviewable,
and doesn't require -- essentially, require due
process.

But even assuming that due process was
required, there was certainly a fair hearing of the
Phillips family grievances.  I've gone through all
those various meetings with Deacon Joe, Sister Helene,
Dr. Dames, Sister Butler.  They were able to talk to
people at all levels.  The -- there was a further
meeting, and I realize others attended the meeting, but
there was a meeting that Ms. Mullen attended where Dr.

90

Dames asked everyone to restore the community to peace
and tranquility, and in effect that request was
ignored.

And I think it's important, and probably the
most important part of this, what Dr. Dames said is
that the subsequent filing of the litigation showed
that with respect to the continuum of conduct that the
Court has addressed in its opinion, that it wasn't
going to change.  And since it wasn't going to change,
the decision had to be made for the benefit of the
entire community.  And this decision had nothing to do
with the children.  It was all because of the parents.

So, essentially, Dr. Dames' efforts to
restore peace and tranquility in the community fell on
deaf ears.  You know, Dr. Dames was concerned that the
spiritual aspects of the community were being
destroyed.  And she wanted everyone, not just the
plaint -- Mr. Phillips and Ms. Mullen, but everyone in
the community, to stop.

And in terms of fundamental fairness,
everything has been heard.  But assuming that for the
sake of argument due process was not totally followed,
there was an appellate mechanism in the handbook, and
that remedy was not exhausted prior to coming to this
Court, so that any procedural right which the plaintiff

91

1  may have had was waived.  They had five days to do it,
2  they decided instead to come here.
3          In -- now, in the Don Bosco case, starting on
4  page 14, the Court said Don Bosco was clearly acting as
5  a private organization, not as a state agency.  On page
6  18, it went on to state a private primary or secondary
7  school is generally considered a private association
8  rather than the function of the state.  The procedural
9  rights inherent in membership with private association
10 and the termination of membership are substantially
11 less than those of a public school or public university
12 student.  Membership in private organization attaches
13 somewhat different rights than, quote, "membership,"
14 unquote, in a private university.
15          The quote went on to say that membership in a
16 private organization receives the least procedural
17 protection in our judiciary.  Under all of these
18 circumstances, the Court finds that the manner in which
19 the Phillips grievances were addressed time and again
20 are fundament -- were fundamentally fair, and there was
21 an effort always to ameliorate their concerns, even up
22 to February 22nd, which was rejected -- which effort
23 was rejected the very next day.  And even though it may
24 have been in a meeting with others, it was rejected.
25          In Allen versus Casper, 87 Ohio App.3d 338,

92

1  62 NE 367, Appellate District of Ohio (1993), an
2  appeals court in Ohio affirmed the grant of summary
3  judgment dismissing a parent's action against a private
4  elementary school and officials because the school
5  officials did not violate the parent's contractual
6  rights and acted within its discretion when they
7  expelled a child midyear -- oh, actually, children
8  midyear based on the parent's failure to comply with
9  the terms of the handbook.
10          In Allen, the plaintiff's daughter complained
11 of classmate's inappropriate behavior and conduct.  The
12 alleged improper behavior involved male classmate
13 inappropriately touching plaintiff's daughter and a
14 student with dental malformation inadvertently spraying
15 saliva on plaintiff's daughter.  Plaintiff's mother,
16 after contacting school administrators, was
17 dissatisfied with the private school's internal
18 handling of these incidents.  Plaintiff became angry
19 and called school administrators, quote, "un-Christian,
20 and accused them of working with the devil," unquote.
21 And that's -- during a meeting with the school
22 administrator, the pastor and the plaintiff, the mother
23 conceded that she insulted the administrator.  As a
24 result of the foregoing, the school administrator
25 determined that the parties could no longer develop a

93

1    working relationship with plaintiff's family, and
2    plaintiff was asked to remove the children from school.
3            In affirming the trial court's grant of
4    summary judgment, the Appellate Court ruled that the
5    relationship between the plaintiff and the defendant
6    private Catholic school and its administrators was a
7    contractual relationship pursuant to the school's
8    handbook and policies, and that those express terms may
9    govern the circumstances under which a student may be
10   expelled.  The Court opined, quote, "because contracts
11   for private education have unique qualities, they are
12   to be construed in a manner which leaves school board
13   broad discretion to meet its educational and doctrinal
14   responsibilities.  Absent a clear abuse of discretion
15   by the school and the enforcement of its policies and
16   regulations, courts will not interfere with these
17   matters."
18           And the Allen case bears substantial
19   similarity to this case.  It would bear noting in this
20   case that when Reverend Monsignor Nydegger was about to
21   make his recommendation to the Cardinal, he spoke to
22   Deacon Joe, he spoke to Reverend Joe, he spoke to Dr.
23   Dames, and by speaking to all of these people, he was
24   convinced that the school's ecclesiastical mission had
25   been upset and that it had to be remedied.  And

94

1    ultimately, when he and Dr. Dames went to the Cardinal,
2    each and every event doesn't need to be known to the
3    Cardinal.
4            What was known to the Cardinal was that he
5    extended his, as he put it, his mercy to this
6    situation.  And as he said, he was astonished that it
7    resulted in the reaction of the plaintiffs.  That's
8    what he really needed to know.  And that reaction to
9    the Cardinal was within a period of two weeks from the
10   time he did it.  There was no effort to be conciliatory
11   in that time period, there was only an effort to be
12   incendiary.  There was an effort -- there was a letter
13   written on the -- the decision was made on the 23rd.
14           A week later, on the -- I mean on the 15th.
15   A week later, on February 22nd, Dr. Dames had her
16   meeting, and then one day later, eight days from the
17   time the Cardinal extended his mercy, rather than
18   trying to find a way to be conciliatory, a threat of a
19   lawsuit was made, and -- even though he didn't know a
20   letter was written to him threatening that lawsuit, and
21   it was ultimately filed.
22           And it's really -- and in terms of his --
23   this is -- he didn't know about that letter.  So -- but
24   what he did know is he did know about the lawsuit being
25   filed two weeks after his decision was made, and he was

95

```
 1    truly disturbed that the peace and tranquility of the
 2    community was being upset so -- and these are my words,
 3    not his, but -- so soon after he made his decision.
 4    And the position that he would need to know more under
 5    these circumstances, when this circumstance was created
 6    by Mr. Phillips and Ms. Mullen, rings hollow.
 7              An issue was raised with respect to a waiver
 8    of the right to not -- of -- by the plaintiffs not to
 9    re-enroll the children.  And factually, that waiver
10    argument has no merit.  The application for re-
11    enrollment was sent out in January.  The application --
12    after the application was sent out, Cardinal Tobin
13    allowed the children to be re-enrolled.
14              But what also happened after that application
15    was sent out is that there were actions taken by the
16    publicizing of this case, at least according to what
17    the state of mind is of the Archdiocese
18    representatives, and there were actions taken with the
19    lawsuit, but -- and other action, and that the upset of
20    the community was intensified long after the
21    application was sent to the plaintiffs.  So the facts
22    had changed since the offer was extended.  And when the
23    re-enrollment application came to the attention of the
24    defendants' representatives under the circumstances
25    that existed then, they declined to accept that
```

96

```
 1    application.  There -- so there was no waiver by
 2    sending out the application, because it was sent out
 3    before all these activities.
 4              Now, there are some other equitable
 5    considerations which the Court would like to touch on
 6    briefly.  First of all, even if there was a legal right
 7    to success on the merits, which, by the way, as I said
 8    earlier, would have to be established both under the
 9    law of specific performance as well as under the law of
10    injunctive relief by clear and convincing evidence, and
11    the -- that the existence of a contractual right can't
12    be sustained by a preponderance of the evidence, no
13    less the clear and convincing evidence standard.  But
14    there are also other bases on which an injunction would
15    not be appropriate.
16              It is axiomatic -- quote, "It is axiomatic
17    that injunctive relief should not be entered except
18    when necessary to prevent substantial, immediate, and
19    irreparable harm," unquote, Garden State Equality v.
20    Dow, 433 NJ Super. 347, 351 (Law Division 2013), aff'd
21    216 NJ 214 (2013).  It is -- in the Don Bosco case, the
22    Court indicated that a student removed from a private
23    high school had immediate access to public schools for
24    education, thereby in effect mitigating any irreparable
25    harm, 322 NJ Super. at 614.  The Court would note that
```

97

```
 1    beyond just having the availability of public
 2    education, to the extent that religion is important,
 3    CCD and other religious outlets are available, so there
 4    are ways to avoid any irreparable harm in this case.
 5              In terms of balancing the equities in this
 6    case, because that's one of the things the Court should
 7    also look at, the comparison of the hardship to
 8    plaintiff if relief is denied and hardship to the
 9    defendant if relief is granted, the Court is mindful of
10    the fact that St. Theresa's is the only school the
11    children have known.  The Court is troubled that it is
12    put in the position where the children, according to
13    Mr. Phillips -- and I accept this part of his testimony
14    -- would be heartbroken that they could not participate
15    in the only school community that they've ever known.
16              But I have to weigh against that the
17    disruption and the fracture of the community.  And when
18    I look at this from just a practical perspective, in
19    essence, the administration was on edge because of all
20    of these events.  The students were on edge.  The
21    parents were on edge.  If I allow the children to go
22    back, it is only going to continue to upset the peace
23    and harmony in this community.
24              And I also bear in mind that if the children
25    prefer not to go to public school, and I recognize this
```

98

```
 1    is the last year of S.P.'s education at the school and
 2    she's got her dance and her trip to Hershey Park and
 3    all these events that she's been so looking forward to
 4    for a period of time, that she may go to a different
 5    Catholic school if she could, which would offer the
 6    same kind of activities.  And, you know, she, from
 7    everything that I've been told during this case, she
 8    has adjusted to what's happened in this case, and I
 9    would hope she would be able to adjust elsewhere, as
10    would K.P.  So that's an issue to me.
11              One of the other issues I have to look at is
12    whether an injunction would be adequate.  And in terms
13    of the adequacy of the injunction, the Court is
14    concerned about what's called the continuing
15    superintendents doctrine.  It's a doctrine that applies
16    in specific performance cases, and essentially what
17    that doctrine states is specific performance of a
18    contract will not be awarded, quote, "where the
19    execution of its decree for specific performance would
20    entail continuing and constant superintendence over a
21    considerable period of time," period, unquote,
22    Fleischer v. James Drug Stores, 1 NJ 139, 149 (1948).
23              How that's relevant in this case is the
24    following.  I have served on the bench for a
25    considerable period of time.  This is the single most
```

99

contentious case in which I have ever been involved.  I
have had more applications in this case then any other
case I've been involved.  And before here, I sat in the
Family Division, which is known for contentious
litigation, because it has such a profound effect on
people's lives.  But this too has a profound effect on
children's lives, and it's something that I've always
taken very seriously about this case.
        Before the trial in this case, there were
five applications for a stay of the Appellate Division.
Or there were three that were actually made, five that
were requested.  There have been other applications of
the Appellate Division in this case.  I've had numerous
applications.  I have taken phone call after phone call
after phone call in this case, during vacations of both
counsel, and there always seems to be a sense of
urgency about this case.  There is nothing that leads
this Court to believe that that, for lack of a better
word, hysteria is going to end once -- if I sent the
children back.  And I cannot -- this Court cannot be in
the position where it has to continually supervise what
goes on.
        The brief filed by the plaintiff -- I
unfortunately brought all my papers back in chambers --
you know, characterized the defendants' conduct as

100

deplorable.  You know, I believe the word "shameful"
was used.  There were a number of incendiary words
used.  I don't have any confidence that if I sent the
children back that the contentious litigation would
end.  So -- and it would be very difficult, and this
also is in accordance with what's -- one of the things
I have to decide -- would be very difficult for this
Court to fashion an order that would prevent it.
        So, for all of the reasons that I've just
gone through, I am going to deny the application for
re-enrollment.  To -- stop.  Let me rephrase that.  I
am going to deny the application to restrain the re-
enrollment decision, and I'm going to allow the non-re-
enrollments decision to stand.  So I will enter an
order to that effect.  My law clerk is out today but
I'll get that order out quickly.  I'll have to get
somebody to help me with it tomorrow.  Okay.  With
that, the record's -- anything else, counsel?
            MR. WESTRICK:  No, Your Honor.
            THE COURT:  Okay.  With that, the record's
now closed.
            MR. WESTRICK:  Thank you.
            MS. McCREA:  Thank you.
                (Trial concluded at 5:12 p.m.)

101

CERTIFICATION

I, TERRY L. DeMARCO, the assigned transcriber, do hereby certify the foregoing transcript of proceedings from pages 1 through 56, line 19, on CourtSmart, Index No. from 1:51:18 to 3:30:07, is prepared to the best of my ability and in full compliance with the current Transcript Format for Judicial Proceedings and is a true and accurate compressed transcript of the proceedings, as recorded.

| | |
|---|---|
| /s/ Terry L. DeMarco | AD/T 566 |
| Terry L. DeMarco | AOC Number |
| | |
| KLJ Transcription Service | 08/30/17 |
| Agency Name | Date |

102

CERTIFICATION

I, HOLLY TISSEYRE, the assigned transcriber, do hereby certify the foregoing transcript of proceedings on CourtSmart, Index Nos. from 3:30:07 to 5:12:34, is prepared to the best of my ability and in full compliance with the current Transcript Format for Judicial Proceedings and is a true and accurate compressed transcript of the proceedings, as recorded.

| | |
|---|---|
| /s/ Holly Tisseyre | AD/T 682 |
| Holly Tisseyre | AOC Number |
| | |
| KLJ Transcription Service | 8/30/17 |
| Agency Name | Date |