# EXHIBIT D

# SUPERIOR COURT OF NEW JERSEY
## CHANCERY DIVISION – GENERAL EQUITY

CHAMBERS OF
HONORABLE DONALD A. KESSLER



Wilentz Justice Complex
212 Washington Street, 8th Floor
Newark, New Jersey 07102
973-776-9521

January 18, 2017

Hon. Amy O'Connor, J.A.D. and Hon. Mary Gibbons Whipple, J.A.D.
Superior Court of New Jersey, Appellate Division
Hughes Justice Complex
25 West Market Street, 5th Floor, North Wing
Trenton, New Jersey 08625

Dear Judge O'Connor and Judge Whipple:

I enclose a statement of reasons supplementing the record. Please note that the Court made an initial decision in this matter on January 5, 2017. The Court had a further telephone hearing on January 6, 2017, which resulted in some changes to the Court's previous opinion delivered on the record. The within submission provides my complete opinion as modified as result of the further hearing.

Very Truly Yours,

Hon. Donald A. Kessler, J.S.C.

## STATEMENT OF REASONS SUPPLEMENTING THE RECORD

## PRELIMINARY STATEMENT

On December 2, 2016, Plaintiff, Scott Phillips, on behalf of his daughter, S.P., and his son, B.P., filed a Complaint alleging several claims against Defendants St. Theresa's School, a Roman Catholic School in Kenilworth, New Jersey, offering parochial education for students in grades kindergarten through 8th grade, and the Archdiocese of Newark. S.P. is 12 years old and in 7th grade.

Plaintiff, on behalf of S.P., sought an interlocutory injunction compelling Defendants to allow S.P. to play on the St. Theresa boy's basketball team in a parochial school league organized by the Archdiocese. The Archdiocese league has over 100 teams and 1000 student participants in separate boy's and girl's leagues. Because several of the schools in the league are small, league rules provide that if a school is too small to host a CYO team, a student will be placed on the geographically closest neighboring school team. See Certification of Richard Donovan ("Donovan Cert."), Ex. 2 CYO Athletics Handbook Section 1, page 1.

From 2013-2015, St. Theresa's encountered difficulties in fielding enough female students to organize a girl's team in S.P.'s age group. In those years, S.P.'s mother, Theresa Mullen, was successful in encouraging the individuals running the league to solicit other St. Theresa School girl students to play on a girl's team at St. Theresa's after the registration deadline established by the CYO league. For the season beginning in 2016, applications for participation in the league were sent to students on September 19, 2016. According to Richard Donovan, the Associate Director of the League, he advised Ms. Mullen on September 28, 2016 that the roster submission deadline for the basketball league was October 25, 2016 and that if there not a girl's team to form

a St. Theresa school team, efforts would be made to place St. Theresa School girls on a neighboring team.

Ms. Mullen denies this conversation took place and claims that she was never advised of a deadline. Thus, there is a material issue of fact on this issue central to this case. Plaintiff also argues that St. Theresa's offers co-ed clinics. However, there is no evidence in the record that co-ed clinics are comparable to CYO league play. Additionally, the CYO league is run by the Archdiocese, not St. Theresa's, and thus the relevance of St. Theresa's co-ed clinics in interpreting league rules is unclear at this early stage.

Ms. Mullen certifies that she first learned from another parent that the deadline to form a girls team had passed and she immediately asked that she be permitted to solicit the late formation of a girls team as in prior years. Her request was refused and she then requested that S.P. be placed on the St. Theresa's 7th grade boy's team. Ms. Mullen requested S.P.'s placement on the St. Theresa's boy's team because of S.P.'s deep sense of loyalty to St. Theresa's and because of her desire for S.P. to participate in school spirit. She did not want S.P. to play for a neighboring school team as provided by league rules.

Plaintiff's legal position presented to this Court is founded on the theory that there is no CYO league rule which prohibits S.P. from playing on the boy's team and that in the absence of such a rule she must be permitted to play for the boy's team. However, Plaintiff offered no law, rule, or regulation that demonstrates a settled legal right to play on a boy's team based in the absence of a rule barring girls from playing on boys' teams.

Plaintiff claims the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1 *et. seq.*, requires Plaintiff to be placed on the boy's team. However, N.J.S.A. 10:5-5(l) exempts application of NJLAD to religious organizations. See Romeo v. Seton Hall Uni., 378 N.J. Super.

2

. 384 (App. Div. 2005). Plaintiff further asserts that he believes St. Theresa School is receiving public funds and is therefore subject to Title IX., and that Title IX requires she be allowed to play on a boy's team. There is no evidence that public funds are being used in a manner relevant to this case. Furthermore, it appears at this early stage that Title IX does not apply. S.P. had an opportunity to play on another same sex team in the league for a neighboring parish as reflected in league rules. Furthermore, Title IX does not apply to contact sports such as basketball. 45 <u>C.F.R.</u> § 86.41(b).

Assuming S.P.'s application should have been accepted after the October 25 deadline, there is a significant question as to whether S.P.'s addition to the boy's team at St. Theresa's would be the appropriate remedy. Had this application been filed prior to the commencement of league play, the appropriate remedy may well have been to allow the late formation of a St. Theresa's girls's team. However, only six games are left to be played by St. Theresa's boy's team at this time and the failure to make a timely application to this Court for injunctive relief to form a girl's team would have waived that rights. Moreover, if Plaintiff wishes for S.P. to play in the league, case law suggests the appropriate remedy would be for S.P. to play for a girl's team for a neighboring parish school in accordance with CYO League rules where a small school like St. Theresa's cannot field a team. <u>Donovan Cert.</u>, Ex. C., League Rules, Section 1. Plaintiff chose not to pursue these remedies and instead states he does not want S.P. to play for a neighboring girl's team because she should have the advantage of St. Theresa's school spirit and only wants S.P. to play for the St. Theresa's boy's team.

Even assuming there is a settled legal right, Plaintiff has not satisfied the other <u>Crowe</u> factors by clear and convincing evidence. Defendant has failed to demonstrate irreparable harm by clear and convincing evidence since there is a fact issue as to whether the harm visited upon Plaintiff was the result of Plaintiff submitting S.P.'s roster application beyond the league deadline.

3

Additionally, Plaintiff did not seek to play on a neighboring girl's team as provided by league rules and there is a significant question as to whether Plaintiff's conduct is the cause of the harm alleged.

Additionally, in balancing the equities, Defendant Archdiocese is administering a CYO league with more than 1000 students and 100 teams. Given the few number of games remaining, and the harm to S.P. by not participating in those games, an injunction should not be issued at this time based on the limited record before the Court. Notably, Plaintiff seeks an injunction which would allow S.P. to be exempt from the league rule which requires her to play for a neighboring parish is there are not enough students at St. Theresa's to form a team. Plaintiff has not presented sufficient facts to demonstrate by clear and convincing evidence that league rules should be followed.

Much of Plaintiff's position was developed in her reply certification filed two (2) days prior to the return date. Defendants have not had an opportunity to respond to several of Plaintiff's legal theories.

At this early stage, the Court cannot grant Plaintiff's application, the merits of which may be established by a more well developed record.

## FACTS:

S.P. is a 12-year-old 7th grade student at St. Theresa's ("STS") School in Kenilworth, New Jersey. She has attended the school for nine years beginning with kindergarten. St. Theresa's fields various sports teams which play in an interscholastic CYO league with other parochial schools under the umbrella of the Archdiocese of Newark. See Amended Verified Complaint ("Am. Ver. Compl.") at ¶ 3. On or about September 19, 2016, STS sent a letter to all the students' families informing them of the impending basketball season for interleague play in a league formed by Defendant Archdiocese of Newark. The forms to be filled out on behalf of the students contained

instructions to fill out the forms immediately and return them ASAP. See Certification of Anh Bui ("Bui Cert.") ¶ 7-9, Ex. B; Def. Opp. Br. at 2. Defendants allege the rosters needed to be submitted no later than October 25, 2016 to Mr. Donovan, the Associate Director of Youth Ministry and the UCNJ CYO League Coordinator for the league coordinated by the Defendant Archdiocese of Newark. See Certification of Richard Donovan ("Donovan Cert") ¶ 12, Ex. C., Section 1.

On September 28, 2016, Ms. Mullen, mother of S.P., called Mr. Donovan to discuss the basketball season. See Certification of Theresa E. Mullen ("Mullen Cert.") dated January 2, 2017 ¶ 79. There is a factual dispute regarding this telephone call. Ms. Mullen asserts that deadlines and coaching positions were not discussed. Mullen Cert. ¶ 80. On the other hand, Mr. Donovan certifies Ms. Mullen was informed by him that the roster submission deadline for the basketball league was October 25, 2016 and that if there were not enough girls to form a St. Theresa's team, efforts would be made to place the girls on a neighboring parish's girls team in the same league. Donovan Cert. ¶ 18-23. Mr. Donovan further states that he told Ms. Mullen that finding a neighboring girls team on which to place the students would require additional time to plan and coordinate and that she should not wait until the last minute to submit her forms. Id.

The Amended Verified Complaint attaches an email to Exhibit A from Richard Donovan to Anh Bui dated October 19, 2016 stating that the latest date to submit "confirmed teams" to be entered in the league by schools including St. Theresa's. The email indicated that "THERE WOULD BE ABSOLUTELY NO WIGGLE ROOM to add teams ... after the October 25, 2016 date." Donovan Cert., Ex. C., Section 1. S.P.'s mother, Ms. Mullen, denies that she was advised by Mr. Donovan of the October 25, 2016 deadline or the October 19, 2016 email.

An application on behalf of one female student, not S.P., was timely submitted to play basketball at St. Theresa's. Bui Cert. ¶ 11-13. However, Mr. Donovan certifies there were not

5

enough girls registered to form a St. Theresa team by the October 25, 2016 deadline. The application forms for S.P. to play in the league were submitted on November 1, 2016, seven days after the October 25, 2016 deadline. Id. ¶ 13.

Ms. Mullen certifies that on October 31, 2016 she learned from another parent that the girl's basketball team at St. Theresa's was cancelled. After learning this information, she asked Mr. Donovan that she be allowed to recruit enough girls to build a girl's team. Mullen Cert. ¶ 90. The prior year, Ms. Mullen certifies that she was allowed to build the girls after the deadline passed. Id. ¶ 97. CYO Director Donovan refused that request. On the same day, after the request to form a girl's team was denied, Ms. Mullen requested that S.P. be placed on the boy's team at St. Theresa's School.

Mr. Donovan, according to his certification, advised Ms. Mullen by text message that the deadline for signing up for league teams passed. He pointed out that the league has over 1000 players and more than 100 teams. Donovan Cert., Ex. 5. He certified to exhibit 5 of his statement which provides the content of text messages dated October 31, 2016 in which Ms. Mullen was advised that the deadline has passed, Ms. Mullen acknowledges receiving those text messages.

Both the Archdioceses and Ms. Mullen agree that, prior to the deadline for submitting applications, Defendant Archdiocese was willing to allow S.P. to play on a girl's team for another school in the league if there were not enough girls to field a team at St. Theresa's. However, because the deadlines had passed and Mr. Donovan, on behalf of the league, would not allow St. Theresa's to form a 7th grade girl's team, Ms. Mullen requested that the league place her on the St. Theresa's boys team, and to allow Ms. Mullen to serve as co-head coach of the boy's team. Donovan Cert. ¶ 29-40; Am. Ver. Compl. ¶ 9.

Plaintiffs and Ms. Mullen indicated that they wanted S.P. to play on the boy's team for her own school, St. Theresa's, and not for another school because of S.P.'s sense of loyalty to St. Theresa's and desire because of school spirit involved with playing for her school's team. Plaintiff further claims that S.P. would likely be the best player on the boy's team.

Plaintiff further asserts that last year, in the 2015-2016 season Ms. Mullen requested an extension of time to get the requisite number of girls to play, and assert that the request was granted by Mr. Donovan. Pl. Reply Br. at 2; Mullen Cert. Ex. CC; Donovan Cert. Ex. 5. Mr. Donovan denied Plaintiffs' request for the team to be formed in season beginning in 2016. Pl. Reply Br. at 2.

Ms. Mullen certifies that Defendants' actions were motivated by personal animus. According to Ms. Mullen's certification, conflicts between her and Mr. Bui, St. Theresa's athletic director, began in the fall of 2015 when she had disagreements with him regarding days to be set aside for girl's practice time slots and days being given to the boys and other coaching issues. These disagreements occurred both by telephone and in emails. Mullen Cert. ¶ 45. On November 4, 2015, Ms. Mullen met with the then-principal of St. Theresa's about the practice day issue and other issues. On November 6, Plaintiff received an email from St. Thersa's AD Bui cancelling the girl's season. Mullen Cert. ¶ 50. She spoke to the Archdiocese CYO Director, Mr. Donovan, who told her that only three girls were willing to play and that fives girls had dropped off the team. Mullen Cert. ¶ 55. Mr. Donovan then extended the deadline. Mullen Cert. ¶ 56. By November 9, 2015 the team was formed. Mullen Cert. ¶ 56. However, Ms. Mullen claims that regular practice days and time issues for girls still remained. Ms. Mullen certified that she believed that "AD Bui purposely tried to dismantle the team" when she went to the St. Theresa's principal with concerns on November 4, 2015. In paragraph 103 of her certification, Ms. Mullen referenced a November

7

1, 2016 email in which Mr. Donovan stated that she should be "whipped and chased out" for seeking reconsideration for S.P. to play for her school showing Mr. Donovan's animus against her.

Mr. Donovan also certifies to conduct which reflects animus between parties. He claims that on November 1, he was confronted by Plaintiff in the parking lot while he was picking up his children from St. Theresa's, and he "aggressively" asked what Mr. Donovan would do to fix the problem since Plaintiff believed S.P. had the right to play basketball for her school. <u>Donovan Cert.</u> ¶ 36.

In October and November 2016, Defendants, through Mr. Donovan and Mr. Bui, informed Ms. Mullen that her forms were submitted late and rejected, and further that there were not a sufficient number of players to field a team for St. Theresa's. <u>Donovan Cert.</u> Exs. 5-6; <u>Bui Cert.</u> ¶ 11-16; <u>Am. Ver. Compl.</u> ¶ 11, Ex. B. On November 8, 2016, Ms. Mullen, S.P.'s mother, was informed in writing that league rules prohibit girls from playing on the boy's team. <u>Id.</u> To this end, Ms. Mullen was advised that the league has separate boys and girl's divisions on which there are separate boys and girls teams. <u>Am. Ver. Compl.</u>, Ex. A. Ms. Mullen, however, stated that the league did not prohibit girls from playing on boys' teams and that in the absence of such rules, she believed S.P. had the right to play on the boy's team. Ms. Mullen points out that nothing in the denial letter states that the application was late. However, as referenced above, Ms. Mullen was advised by text message from Mr. Donovan on October 31, 2016 that the application on behalf of S.P. was late.

The CYO basketball season takes place during an approximate three (3) month period, with the season ending in February 2017. <u>Am. Ver. Compl.</u> ¶ 15. As of the time of the application before the Court on January 5, 2016, six boys league games were remaining this season. Both parties cite various rules promulgated by the CYO. Those rules do not address the issue of girls playing on

boy's teams. The CYO website states "There are separate divisions for both the girls and the boys in three divisions, Red, White and Blue based on the playing experience of the team roster." Donovan Cert. ¶ 16, Ex. 3. Section 1 of the CYO Athletics Handbook further states that, "the Archdiocesan Civil Youth Ministry may grant permission individually for participation [to play in the league] of a catholic child from a parish too small to host a CYO program. They will be placed in the geographically closest parish to them that does in fact host a CYO Programs."

Defendants point to the CYO Youth Basketball League JV and Varsity Division 2016-2017 League Rules which reflect that Mr. Donovan, as the League Coordinator, maintains the final decision making authority for participation in the league. Specifically, those rules state:

> FINAL DECISION
> Any issue that might arise during the season, not noted as a rule or by-law or in print of any kind in this league, will be decided by the Coordinator of this league and this the Coordinator's decision will be final.
> Associate Director
> Donovan Cert., Ex. 1 at page 7.

The CYO Athletics Handbook sets forth the role of the Mr. Donovan, the Associate Director. The Handbook states, in pertinent part:

> Associate Director
> An Associate Director from the Office of Youth and Young Adult Ministry will oversee all Athletic Programs and will be the one to make any final decisions on any grievances or issues that might arise due to eligibility, etc.
> Donovan Cert., Ex. 2, page 1.

Based on the terms of the Handbook and League Rules, Mr. Donovan states his final decision making authority was set forth in writing and that his decision to refuse the late application of S.P. to participate on the boy's team was within his discretion.

On the basis of these rules, Mr. Donovan believes that he has the right to make final decisions about the league. Although Mr. Donovan allowed the late formation of girls teams at St. Theresa's in prior years, he claims he acted reasonably by advising Ms. Mullen of the deadline for

forming the team and made attempts by making announcements in the parish and by soliciting

religious school students attending St. Theresa's services in prior years to help St. Theresa's form

a team. Donovan Cert., ¶ 27. Ms. Mullen claims that Mr. Donovan's actions in the years from 2013

through 2015 undermine his claims in prior years.

Plaintiff claims that the CYO Rules are "guided by the overriding rule of the 'common

sense rules of fair play.'" Specifically, the following portion of the CYO Athletic Handbook Rules

cited.

> THE OVERRIDING RULE OF OUR ATHELTIC PROGRAM
> We are all working with young people. Although there are specific and thorough
> guildelines named herein, we always are within the general rule that all of our
> actions are to be guided by the common sense rules of fair play. Also, it makes our
> jobs easier if we constantly keep in mind that we are here for the youth as models
> of Jesus Christ to be emulated.
> Id.

Plaintiff claims that allowing S.P. to play on the boy's team is consonant with the rules of

fair play. Plaintiff also argues that the deadline to add players to the roster shall be the day before

the first league game of that team. On that basis, Plaintiff argues that S.P. could have been added

to the boy's team roster in a timely fashion. The CYO Athletics Handbook states:

> Section 7: Roster
> Adding players to Roster: the deadline for adding players to the roster shall be the
> day before the first league game of that team. Youth who move into the parish after
> the deadline may be added to the roster. All eligibility requirements and documents
> must be presented to the Archdiocesan office prior to player participation.

Plaintiff also points out that St. Theresa School has a non-discrimination policy in the K-8

Parent-Student Handbook 2016-2017, which states:

> "Saint Theresa School admits students of any race, color, and national and ethnic
> origin to all the rights, privileges, programs and activities generally accorded or
> made available to students at the school. Saint Theresa School does not discriminate
> on the basis of race, color, national and ethnic origin, gender, and disability in the
> administration of its educational policies, admission policies, or athletic and other

school-administered programs under the applicable regulation of Title IX of the Educational Amendments of 1972."
Pl. Br. 12/15/16, Ex. A, page 3.

The next paragraph of the Hand Book, however, states that "This handbook is not intended and should not be considered to create any additional rights for students or their parents/guardians."

There is no evidence in the record that the Archdiocese has adopted a policy regarding gender discrimination in the operation of the basketball league similar to the St. Theresa policy referenced above. According to Plaintiff's papers, S.P. would need the permission of both St. Theresa's School and the league to be added to a boy's team roster.

## PROCEDURAL HISTORY

The issue as originally presented to the Court was S.P.'s right to play basketball on St. Theresa's 7th grade boy's basketball team since the league would not allow St. Theresa's to form a girls team for the current season. This Court was concerned that S.P. have a fair opportunity to play basketball and therefore entertained several applications by the Plaintiff.

On December 2, 2016, Plaintiff filed a Verified Complaint and Order to Show Cause for emergent relief in this Court. On the same date, this Court denied Plaintiff's Order to Show Cause with attached reasons reflecting, among other reasons, that the papers filed did not demonstrate a substantial likelihood of success on the merits or immediate irreparable harm by clear and convincing evidence and for failure to properly brief the issues. On December 9, 2016, Plaintiff filed an amended Order to Show Cause and an Amended Verified Complaint. In a telephone hearing, on December 12, 2016, this Court ruled that the December 9 submission was deficient for, among other reasons, the failure to demonstrate a settled legal right and a likelihood of success on the merits. In the first two (2) submissions, the Court was not provided with sufficient briefing

or factual materials demonstrating that Defendants should be ordered to allow S.P. to play on the boy's team. The court was provided with little information regarding the applicable league and school rules and the factual background preceding the application to the Court. At the request of Ms. McCrea, Plaintiff's counsel, the Court permitted Ms. McCrea to supplement her December 9 submission rather than denying Plaintiff's second application and requiring an entirely new submission. Ms. McCrea made a third submission on December 15, 2016. On December 15, the Court in a conference call indicated that it would hear the issue addressed by the moving papers and set down a schedule.

Upon further review of the December 15, 2016 submission, this Court initiated a conference call on December 16, 2016 to address an attachment to the December 15 papers which suggested that girls are allowed to play on boys CYO teams under the circumstances of this case. During that call, the Court was advised that the papers reflected that the rules attached to Plaintiff's December 15 submission allowing girls playing on boy's teams were rules for a New York CYO League. This Court was advised of the import of the submission of the New York Rules, which the Court did not fully understand. During this call on December 16, Ms. McCrea made a further argument based on the language of the student handbook that St. Theresa's promised to protect against gender discrimination. The Court agreed to expedite this matter so that it could fully consider whether an injunction should be issued at this early stage in the litigation to determine the impact of the language in the student handbook, an issue not fully briefed by the Plaintiff. On December 16, 2016, Plaintiff emailed a supplemental letter to the Court as a fourth submission to the Court.

Defendants submitted opposition to the Order to Show Cause on December 20, 2016 to meet the Court's expedited schedule. Because of the lengthiness of that submission, Plaintiff

requested additional time to file a reply. This Court, with the consent of Defendants, extended the time for Plaintiff's reply to January 3, 2017 and scheduled a hearing on January 5, 2017. Plaintiff filed its fifth submission, reply papers on January 3, 2017, two days before the return date. The reply certification contained information previously not provided to the Court. Defendant did not have an opportunity to reply to those papers.

As the foregoing schedule demonstrates, the Court endeavored to provide Plaintiff with every opportunity to set forth the need for the extraordinary remedy of a preliminary injunction in this matter. Unfortunately, for the reasons to be discussed herein, the Court believed that there is not sufficient evidence to enter a preliminary injunction on the record before it.

The Court has provided Plaintiff with numerous opportunities to file papers and thoroughly present his application for emergent relief. Despite the numerous opportunities to supplement the filings, the Court has not been presented with a sufficient record to grant the exordinary relief of an injunction at this early stage of the proceedings. This ruling, however, does not preclude Plaintiff from building a record to seek redress for the alleged wrongs visited upon him and S.P. in the future.

## I.    STANDARD PRELIMINARY INJUNCTIVE RELIEF:

Injunctions are granted sparingly and only when the high standard of clear and convincing evidence has been met. The law regarding preliminary injunctive relief was established in the seminal case of <u>Crowe v. DeGioia</u>, 90 <u>N.J.</u> 126 (1982). In <u>Crowe</u>, the Supreme Court of New Jersey established the four essential criteria applicants must demonstrate when seeking preliminary injunctive relief: (1) that there is a reasonable probability of success on the merits; (2) that the legal rights underlying the applicant's claims are well settled; (3) that immediate and irreparable harm will result in the absence of a preliminary injunction; and (4) a balancing of the relative hardships to the parties weighs in favor of granting the sought relief. <u>Crowe</u>, <u>supra</u>, 90 <u>N.J.</u> at 132-34.

The party seeking preliminary injunctive relief "has the burden to prove each of the <u>Crowe</u> factors by clear and convincing evidence." <u>Garden State Equality v. Dow</u>, 216 <u>N.J.</u> 314, 320 (2013) (citing <u>Brown v. City of Paterson</u>, 424 <u>N.J. Super.</u> 176, 183 (App.Div.2012)). As the Courts of this state have long recognized, "the reason we consider whether a movant's right to injunctive relief is clear 'doubtless lies in the fact that an interlocutory injunction is so drastic a remedy.'" <u>Waste Management of New Jersey, Inc. v. Morris County Mun. Utilities Authority</u>, 433 <u>N.J. Super.</u> 445, 453 (App. Div. 2013)(quoting <u>Gen. Elec. Co. v. Gem Vacuum Stores, Inc.</u>, 36 <u>N.J. Super.</u> 234, 236 (App. Div.1955)).

Importantly, however, "our courts have also long recognized 'there are exceptions, as where the subject matter of the litigation would be destroyed or substantially impaired if a preliminary injunction did not issue.'" <u>Waste Management</u>, supra, 433 <u>N.J. Super.</u> at 453 (quoting <u>Gen. Elec. Co.</u>, <u>supra</u>, 36 N.J. Super. at 237). Accordingly then, courts "may take a less rigid view of the <u>Crowe</u> factors and the general rule that **all** factors favor injunctive relief when the interlocutory injunction is merely designed to preserve the <u>status quo</u>." <u>Id.</u>, at 453 (quoting <u>Waste Management of New Jersey, Inc. v. Union County Utilities Authority</u>, 399 <u>N.J. Super.</u> 508, 534 (App.Div. 2008)) (emphasis added).

Where injunctions are sought to alter the <u>status quo</u>, as in this case, plaintiffs must strictly establish all of the <u>Crowe</u> factors by clear and convincing evidence. <u>Waste Management of New Jersey v. Morris County Mun. Utilities Authority</u>, 443 <u>N.J. Super.</u> at 453 (App. Div. 2013); <u>McKenzie v. Corzine</u>, 396 <u>N.J. Super.</u> 405 (App. Div. 2007).

In this case, Plaintiffs seek to alter the <u>status quo</u> by affirmatively permitting S.P. to play on the 7th grade boys basketball team at St. Theresa School, a circumstance which does not now

14

exist. In this case, Plaintiff on behalf of S.P. seeks the extraordinary relief at this early stage of the litigation that S.P. be allowed to play on boy's team.

It is important to emphasize that Plaintiff and his wife were willing to have S.P. play on a girls team for St. Theresa School and that S.P. was offered the opportunity to play for another girls team in the league if a sufficient number of girls could not be fielded to form a girls team at St. Theresa's. Nonetheless, Plaintiff sought the right for S.P. to play on the boy's team so that she could participate in St. Theresa's school spirit.

i.    **Reasonable Probability of Succeeding on the Merits**

The material facts supporting preliminary injunctive relief must be uncontroverted and must not be dependent on conclusory statements. Ispahani v. Allied Domecq Retailing United States, 320 N.J. Super. 494, 498-99 (App. Div. 1999). Plaintiff must demonstrate that there is a reasonable probability of eventual success on the merits. Zoning Bd. of Adjustment v. Service Electric Cable Television, Inc., 198 N.J. Super. 370, 378-79 (App. Div. 1985). A preliminary injunction should not be issued where Defendant controverts under oath material facts alleged by Plaintiff. Anders v. Greenlands Corp, 31 N.J. Super. 329, 338 (Ch. Div. 1954).

There are a number of material controverted facts in this case which demonstrate that a reasonable probability of success on the merits cannot be established by clear and convincing evidence at this time. The Court is now being asked to change the status quo in this case where the facts are in doubt. The case law cited above clearly demonstrates that the status quo should not be altered where the material facts are controverted.

A threshold issue has been raised in this matter as to whether S.P.'s participation in the league is barred by the failure to submit a timely application to play in the league. Defendants claim that Plaintiff's case is fatally flawed because S.P. did not submit an application to participate

in the league by the October 25, 2016 deadline. There are several contested issues of material fact surrounding S.P.'s submission of S.P.'s forms and the applicable deadlines.

Plaintiff has provided a certification from Scott Phillips stating that S.P.'s basketball application forms were timely submitted. See Certification of Scott Phillips dated December 9, 2016 ("Phillips Cert.") ¶ 5. On the other hand, Defendants provide two certifications, from Mr. Bui and Mr. Donovan, stating that plaintiff's application was late and past the filing deadline. Bui Cert. ¶ 11-6; Donovan Cert. 29-40, Exs. 5-6.

There is a contested issue of fact surrounding the details of a telephone call on September 28, 2016 between Ms. Mullen and Mr. Donovan. Ms. Mullen states that deadlines and coaching positions were not discussed prior to the season beginning. Mullen Cert. ¶ 80, 82. On the other hand, Mr. Donovan's certification states that he informed Ms. Mullen of the October 25, 2016 deadline during that call. Donovan Cert. ¶ 20-23. Mr. Donovan further certifies that he informed Ms. Mullen during that call that efforts would be made to place S.P. on a neighboring parish's girls team in the event there were not enough girls to form a team at St. Theresa, and to make sure to submit the forms in advance of the deadline to ensure placement on a different team. Id. Ms. Mullen disagrees that these representations were made at that time. However, she claims she later rejected the opportunity for S.P. to play for another girls team in the league. Based on the conflicting submissions, a material issue of fact is present as to whether Plaintiff timely submitted an application for S.P. to play in the CYO league.

In his reply, Plaintiff raises an issue regarding paid fall co-ed basketball clinics in grades 5-8 at St. Theresa. Pl. Reply at 11-12. Specifically, Plaintiff indicates that the availability of co-ed clinics belie the claim that girls should not be allowed to play on the boys team. However, the papers filed before the Court do not establish the similarities and differences between these clinics

and play in the CYO league. Thus, the Court does not have sufficient evidence to assess the significance of this issue at this early stage. Plaintiff also submitted Ms. Mullen's certification which states that St. Theresa's softball team played on a public field. However, it is unclear how that fact relates to a CYO basketball league. Since these issues were raised in Plaintiff's reply, Defendants have not been afforded the opportunity to rebut or defend said claims and the Court cannot order the extraordinary remedy of a preliminary injunction without a fully developed record.

Other important facts are not developed here. Ms. Mullen's certifies that personal animus was exhibited by Mr. Bui with respect to issues with the girls team in 2015 and that Mr. Donovan exhibited his animus in a 2016 email. If the events herein are driven by personal animus rather than a discriminatory intent, a prima facie case of discrimination is not established.

S.P. was offered an opportunity to play for a girls team for a neighboring school in the CYO league. There is not adequate development in the record demonstrating the problems with playing for a neighboring team. The issue regarding the right to play for a neighboring team require further development.

In short, there are a number of material facts which require development to evaluate Plaintiff's claim and an injunction should not be issued changing the status quo where, as here, material facts are in dispute. Crowe v. DeGioia, supra; Mckenzie v. Corzine, supra.

ii.   **Plaintiff has failed to Establish a Well Settled Legal Right based on the record at this time.**

Temporary injunctive relief is an extraordinary remedy, to be used sparingly and only when the proven equities establish a clear need for the requested injunctive relief. Crowe v. DeGioia, 90 N.J. 126, 132-34 (1982). "The power to issue injunctions is the strongest weapon at the command of the Court of equity and its use therefore requires the exercise of great caution, deliberation, and

sound discretion." Light v. Nat'l Dyeing and Printing Co., 140 N.J. Eq. 506, 510 (Ch. 1947); see also Waste Management, 399 N.J. Super. 508, 538 (App. Div. 2008). "[T]emporary relief should be withheld when the legal right underlying the plaintiff's claim is unsettled." Crowe v. DeGioia, 90 N.J. supra at 133. An interlocutory injunction should not be entered if a plaintiff's rights are not clear as a matter of law. General Electric Co. v. Gem Vacuum Stores, Inc., 36 N.J. Super. 234, 237 (App. Div. 1955).

The existence of a settled legal right has not been established by the Plaintiff on the record at this early stage. Plaintiff does not fully address how Defendant's status as a religious organization impacts Plaintiff's cause of action. The legal theories supporting Plaintiff's case are without merit or lack full development. While the Court endeavored to provide multiple opportunities to Plaintiff to develop its case, at this early stage the record to date fails to establish a settled legal right by clear and convincing evidence.

Plaintiff argues that in the absence of any CYO rule or St. Theresa School rule barring girls from playing on the boy's team, Plaintiff has established a prima facie case of wrongdoing. Pl. Br. 12/15 at 4-5*. However, Plaintiff provides no case law, no statute, or no regulation which requires that S.P. be placed on a boy's team in the absence of a rule that prohibits S.P.'s participation on a team. Plaintiff cites to New York CYO rule that allows girls to play on boys' teams. Such an affirmative rule does not exist here and Plaintiff cannot prove her claim by the absence of a rule prohibiting S.P.'s participation on a boys' team or by an affirmative rule of another league.

Plaintiff's complaint sets forth two discrimination claims. (1) that the New Jersey Law Against Discrimination ("NJLAD") requires S.P. to be permitted to play on the boy's basketball team. Pl. Compl. ¶ 35. at 4. (2) Defendant's refusal to allow S.P. to play on the boys team violates federal rules under Title IX. Id.

Plaintiff cites <u>De Milio v. Schrager</u>, 285 <u>N.J. Super.</u> 183, 198 (Law Div. 1995) in support of the proposition that Defendants have the burden to show that they can refuse the request that S.P. play on the St. Theresa's boy's team. This case is inapposite. <u>De Milio</u> stands for the proposition, not at issue here, that where a <u>prima facie</u> case of wrongdoing under a settled legal theory developed by case law, statute or regulation is established, under certain circumstances, the burden of proof shifts from Plaintiff to Defendant after the <u>prima facie</u> case is established. Plaintiff cites no case, statute, or regulation which establishes a <u>prima facie</u> case here. Plaintiff cites no authority that concludes the mere absence of a league establishes a <u>prima facie</u> case and this theory is without any legal support.

### A.   NJLAD

The submissions made to this Court at this early stage do not demonstrate that S.P. has a settled legal right under the New Jersey Law Against Discrimination, <u>N.J.S.A.</u> 10:5-1 *et seq.* NJLAD provides that "all persons shall have the opportunity... to obtain all the accommodations, advantages, facilities, and privileges of any place of public accommodation, ... without discrimination because of ... sex .... subject only to conditions and limitations applicable alike to all persons." <u>Wazeerud-Din v. Goodwill Home & Missions, Inc.</u>, 325 <u>N.J. Super.</u> 3, 8-9 (App. Div. 1999) (citing <u>N.J.S.A.</u> 10:5-4).

Plaintiff cites to two cases in his moving papers to support his claim that Defendant's refusal to allow S.P. to play on the boy's team violates NJLAD, <u>Balsley v. North Hunterdon Regional High School</u>, 225 <u>N.J. Super.</u> 221, 224 (1988) and <u>Nat'l Org. for Women Essex Cty. Chapter v. Little League Baseball, Inc.</u>, 127 <u>N.J. Super.</u> 522 (App. Div. 1974).

The <u>Balsley</u> case cited by Plaintiff only addressed and decided the issue of counsel fees and did not analyze the underlying claim of discrimination. In <u>Balsley</u>, an administrative law judge

permitted a 15-year-old female public high school student to try out for the boy's football team pending a final hearing on the student's right to compete, tryout, and qualify to play on the boy's football team. Balsley v. North Hunterdon Regional High School, 225 N.J. Super. 221, 224 (1988). The Balsley plaintiff sued the High School under N.J.S.A. 18A:36-20, the 14th Amendment of the constitution, Art. 1, Section 1 of the New Jersey Constitution, and Title IX and the regulations therewith, and 42 U.S.C. § 1983. Id. The parties consented to an order converting the interim restraints into permanent ones. The Balsley plaintiff, then over defendants' objection, moved to amend her petition "to include as a basis for the award of relief the provisions of New Jersey's Law Against Discrimination" for the purpose of seeking counsel fees which the ALJ granted. Id. at 225. Thus, the substantive decision in Balsley could not have possibly been brought under NJLAD since NJLAD was only raised after the parties entered into a consent order for permanent restraints. The Balsley case therefore does not provide any support for Plaintiff's NJLAD argument.

This Court was not provided with the Administrative Law Judge's opinion in Balsley and therefore no argument was presented by the Plaintiff as to how the reasoning of that decision supports the present application. In Balsley, the defendant was a public school and the administrative law hearing took place to facilitate a decision by the Commissioner of Education. The appellate division in Balsley noted that public schools under the supervision of the Commissioner "are specifically a place of public accommodation under the Law Against Discrimination." Id. at 227 (citing Hinfey v. Matawan Regional Bd. of Educ., 77 N.J. 514, 523 (1978).

Here, unlike the public school in Balsley, St. Theresa's is a private catholic school which is not "a place of public accommodation" under NJLAD. N.J.S.A. 10:5-5(l). Since the present case

involves a private catholic school, and the lack of information this Court has about the ALJ's decision, the Balsley case provides no support to Plaintiff's contention that Defendants violated NJLAD through its refusal to allow S.P. to play on the boy's team.

Plaintiff also cites to Nat'l Org. for Women Essex Cty. Chapter v. Little League Baseball, Inc., 127 N.J. Super. 522 (App. Div. 1974) to support his claim that NJLAD applies to this case. In Little League, a 12-year-old girl was denied the opportunity to play little league baseball and brought a law suit alleging violations of NJLAD in the Division on Civil Rights. The plaintiff sought relief under N.J.S.A. 10:5-12(f), which prohibits the denial by the operator of any "place of public accommodation" of its "accommodations, advantages, facilities, or privileges" on the basis of her sex. Id. at 526. The appellate court affirmed the hearing officer's conclusion that Little League was a place of public accommodation within NJLAD, holding that "Little League is a public accommodation because the invitation is open to children in the community at large, with no restriction (other than sex) whatever." Id. at 531. The Court noted the public nature of Little League, that the playing areas are available to the league ordinarily without charge in public areas, and the open invitation to all boys in the local community in making its determination that Little League was a place of public accommodation thereby under the umbrella of NJLAD. Id. at 530-31.

Plaintiff argues that Little League demonstrates that NJLAD applied to Little League due to its use of public parks and fields, and that Defendants in the instant case use public parks and fields for its softball team. Pl. Br. 12/15/16 at 2-3. In support, Plaintiff notes that S.P. played on the St. Theresa's softball team last season, which practiced at the public high school last season, and St. Theresa's home softball field is a public park. Pl. Br. 12/15/16 at 3. The Court is not persuaded with Plaintiff's interpretation of Little League. This case relates to basketball not

softball, and the Court does not have a fully developed record explaining how the softball league is relevant to this case or why the alleged use of softball fields has any bearing on a case involving basketball.

In the case at bar, Defendants are private religious organizations, and therefore do not constitute places of public accommodation under NJLAD. Here, unlike Little League, the basketball league takes place at parochial schools in the local parishes of the Defendant Archdiocese and not in a public park.

Pursuant to N.J.S.A. 10:5-5(l), NJLAD specifically exempts religious organizations such as the Archdiocese and St. Theresa School. NJLAD states:

> "Nothing herein contained shall be construed to include or to apply to any institution, bona fide club, or place of accommodation, which is in its nature distinctly private; nor shall anything herein contained apply to any educational facility operated or maintained by a bona fide religious or sectarian institution."
> N.J.S.A. 10:5-5 (l).

"Although churches, seminaries and religious programs are not expressly excluded from the definition of place of public accommodation, the legislature clearly did not intend to subject such facilities and activities to LAD.... [A] church or other religious institution does not ordinarily solicit the general public's participation, which is a principal characteristic of public accommodations." Wazeerud-Din v. Goodwill Home & Missions, Inc., 325 N.J. Super. 3, 10 (App. Div. 1999). Thus, "[t]he conclusion that religious facilities and activities are not public accommodations is also supported by the Division on Civil Rights' long-standing position, ... that the LAD does not 'regulate or control religious worship, beliefs, governance, practice or liturgical norms.'" Id.

Romeo v. Seton Hall University, 378 N.J. Super. 384 (App. Div. 2005) supports the conclusion that NJLAD does not apply to programs sponsored by religious institutions. Plaintiff's

argument was also based on the non-discrimination policy in St. Theresa's student handbook. The Romeo case demonstrates that this general anti-discrimination policy does not negate the exemption of religious organizations from the application of NJLAD to its programs and activities. In Romeo, plaintiff, a gay student, claimed a violation of NJLAD due to the University's refusal to allow him to create a gay extracurricular club and also claimed breach of the University's Non Discrimination Policy. Id. at 387-88. The Vice President of the University denied his application. The student then filed suit.

The plaintiff in Romeo claimed a right to create a gay extracurricular club at Seton Hall University. He argued that his rights under NJLAD were violated and that he was protected by the non-discriminatory policy in the student handbook. The student handbook provided:

> "No person may be denied employment or related benefits or admission to the University or to any of its programs or activities, either academic or nonacademic, curricular or extracurricular, because race, color, religion, age, national origin, gender, sexual orientation, handicap and disability, or veteran status."
> Id. at 389.

The Appellate Court rejected his claim, relying on the handbook, reasoning "it is not disputed that Seton Hall qualifies as an educational facility operated by a bona fide religious institution. Thus, by its very terms, the provisions of the LAD... do not apply to such religiously affiliated institutions." Romeo, 378 N.J. Super. at 389. Significantly, the Appellate Division ruled that "the exemption in NJSA 10:5-5(l) of the LAD cannot be waived [by a general discrimination waiver in a student handbook]."

Seton Hall argued that the dismissal of Romeo's claim was required by NJLAD, N.J.S.A. 10:5-5(l), which provides "nor shall anything herein contained apply to any education facility operated or maintained by a bona fide religious or sectarian institution." Romeo claimed that Seton Hall waived the NJLAD exemption by its Non Discrimination Policy in its student handbook.

The Appellate Division ruled that a student handbook adopting a non-discrimination policy cannot waive the religious exemption of the NJLAD. The court noted that our courts have utilized Title VII case law for guidance in interpreting the NJLAD. Craig v. Suburban Cablevision, Inc., 140 N.J. 623 (1995). The court in Romeo noted in Little v. Weurl, 929 F.2d 944 (3d Cir. 1991), the Third Circuit discussed the waiver of a religious exemption in the Title VII context.

The court reasoning relied on Little, which held, "once Congress stated that 'this title shall not apply' to religiously-motivated employment decisions by religious organizations, no act by Little [the plaintiff] or the Parish [the defendant] could expand the statute's scope." Id. at 390 (citing Little v. Wuerl, 929 F.2d 944, 951 (3d Cir. 1991). Based on various federal and state cases, the Romeo court held that NJLAD cannot be waived and even if it could be waived, a general non-discrimination policy, such as the Seton Hall policy cited above, is insufficient to constitute a waiver. Romeo, 378 N.J. Super. at 391-92.

The Romeo and Wazeerud-Din cases demonstrate that the Archdiocese and St. Theresa's, as religious organizations, are exempted from the NJLAD prohibition against discrimination. The Romeo case further reflects that the general waiver in the student handbook by St. Theresa's that it will not discriminate against its students on the basis of gender is not enforceable under NJLAD. Moreover, as noted above, since the Archdiocese is a distinct legal entity from St. Theresa's, the provisions of the manual, even if applicable, would not apply to the overall management of the CYO league. The Romeo case also reflects that the CYO league rules cited by Plaintiff such as the overriding rule, on which Plaintiff relies, do not supersede the NJLAD, even if it was read to allow girls to play on boys' teams.

24

Plaintiff fails to cite to the particular statutory provision within NJLAD or case interpreting NJLAD which support its position. Accordingly, Plaintiff has not established a settled legal right under NJLAD at this early stage.

### B.   Title IX

Plaintiff's argument regarding Title IX likewise does not establish a settled legal right. Title IX of the Education Amendments Act "prohibits discrimination on the basis of sex by educational institutions receiving federal funding. 20 U.S.C. § 1681(a)." Mercer v. Duke University, 190 F.3d 643, 645 (4th Cir. 1999). There is no evidence that Defendants receive federal funding and therefore it has not been established that Title IX applies to the case. However, assuming Defendants receive federal funding, relevant regulations and case law reflects that Title IX does not apply to the contact sport of basketball under the circumstances of this case.

The regulations under Title IX aim to provide "equal opportunity in educational programs without discrimination on the basis of sex." O'Connor v. Bd. of Ed. Of Sch. Dist. No. 23, 645 F.2d 578, 582 (7th Cir. 1981); 20 U.S.C. 1681-83 (1976). The regulations set forth by the United States Department of Health, Education, and Welfare concerning sex discrimination in athletics explicitly excludes the sport of basketball from the purview of Title IX. The regulation states:

> (b) *Separate Teams*. Notwithstanding the requirements of paragraph (a) of this section, **a recipient may operate or sponsor separate teams for members of each sex** where selection for such teams is based upon competitive skill **or the activity involved is a contact sport.** However, where a recipient operates or sponsors a team in a particular sport for members of one sex but operates no such team for members of the other sex, and athletic opportunities for members of that sex have previously been limited, members of the excluded sex must be allowed to try-out for the team offered **unless the sport involved is a contact sport.** For the purpose of this part, **contact sports include** boxing, wrestling, rugby, ice hockey, football, **basketball** and other sports the purpose of major activity of which involves bodily contact.
> 45 C.F.R. § 86.41(b)(1981) (emphasis added).

25

Pursuant to the regulation, when the sport in question is a contact sport as defined in the provision, separate teams are permitted in compliance with Title IX and the regulations thereunder. The above-cited regulation specifically delineates basketball, among others, as a contact sport. Therefore, Defendants are permitted to maintain separate teams for boys and girls basketball at St. Theresa School.

Plaintiff claims that Defendants violated Title IX through their refusal to allow S.P. to play on the boy's 7th grade boy's basketball team, but fails to cite to the regulatory provision under which she is seeking relief. Significantly, league rules provide that if small schools cannot field enough players, a student may play on a neighboring team. Plaintiff does not want to follow this rule.

In O'Connor v. Bd. of Ed. Of Sch. Dist., 545 F.Supp. 378 (N.D. Ill. 1982), an 11-year-old female 6th grade public school student sought to play on the boys basketball team at MacArthur Junior High School in Illinois. After defendants refused to allow her to try out for the boys team, her parents filed suit seeking injunctive relief to permit her to try out for the boys team. Plaintiff claimed two causes of action; violation of the equal protection clause of the fourteenth amendment (a claim not asserted in this case) and violation of Title IX of the Education Amendments of 1972. Id. at 381-82. The injunction was initially granted. On appeal, the 7th Circuit issued a stay. Id. at 378. After the Supreme Court lifted the stay, the 7th Circuit reversed the injunctive relief and remanded the case back to the trial court. Ultimately, defendants moved for summary judgment, which was granted by the trial court. O'Connor, 545 F. Supp. At 384. The O'Connor court relied on 45 C.F.R. § 86.41 in its denial of plaintiff's claim under Title IX, holding that defendants have not violated Title IX and its accompanying regulations because a girls team was available at plaintiff's school on which she could play basketball. Id. at 383-84.

26

Plaintiffs wanted their daughter to play on the boy's team because of her ability. However, the District Court found that because separate boys and girls teams were available, Title IX was not violated. In reaching their conclusion, the District Court reasoned that HEW in promulgating the regulations under Title IX did not intend for boys teams to be open to girls. Rather, it envisioned that institutions would take into account the interest and abilities of the other sex as to ensure equal opportunities. Thus, the court reasoned:

> "In response to the comments, while paragraph 86.41(a) remains substantially the same as its predecessor, the remainder of the athletics section has been changed. Paragraph 86.38(b) of the proposed regulation required an annual determination of student interest by a recipient. This provision was widely misinterpreted as requiring institutions to take an annual poll of the student body and to offer all sports in which a majority of the student body expressed interest and abolish those in which there is no interest. The Department's intent, however, is to require institutions to take the interests of both sexes into account in determining what sports to offer. As long as there is no discrimination against members of either sex, the institution may offer whatever sports it desires. The 'determination of student interest' provision has been removed. A new paragraph 86.41(c)(i) [sic] requires institutions to select 'sports and levels of competition which effectively accommodate the interest and abilities of members of both sexes.' In so doing, an institution should consider by a reasonable method it deems appropriate, the interest of both sexes."
> O'Connor, 545 F. Supp. at 383.

Here, the Archdiocese CYO league provided separate but equal opportunities for girls by allowing them to play for neighboring schools if there school could not field enough female players. Plaintiff has failed to show how this league rule runs afoul of Title IX by clear and convincing evidence.

Like the student in O'Connor, S.P. is a 7th grade girl seeking to play for the boy's basketball team at her school. However, league rules provide that S.P. may play for a neighboring girls school if her school cannot field enough female players to field a girls team.

Plaintiff argues that O'Connor should not be followed by this Court because the 7th grade girl in O'Connor had the opportunity to play on the girls team at her school. Plaintiff argues S.P.

was not provided that choice and therefore Defendant's reliance on O'Connor is misplaced. The Court is not persuaded by Plaintiff's interpretation of the O'Connor authority. A review of the record shows that S.P. was provided the opportunity to play her school's girls team, provided there were enough girls registered to field a team. Only one girl registered to play basketball this season, which left St. Theresa unable to field a girl's team. However, it is undisputed in this case that other girls teams in the league were available to S.P., not only her own school. Plaintiff only wants S.P. to play at her school, but provides no evidence or factual support explaining why it would be a hardship for S.P. to play for a neighboring parish's team. Thus, Plaintiff's attempt to distinguish this case appears to be without merit at this time.

### iii.   Immediate Irreparable Harm

The threat of immediate and irreparable harm is a necessary precondition to preliminary injunctive relief. Crowe, supra, 90 N.J. at 132. "It is axiomatic that injunctive relief should not be entered except when necessary to prevent substantial, immediate and irreparable harm." Garden State Equality v. Dow, 433 N.J. Super. 347, 351 (Law Div. 2013) aff'd, 216 N.J. 314 (2013)(internal citations omitted). Harm is generally considered irreparable where it cannot be redressed adequately by money damages alone. Id. at 133. Put differently the movant must have no adequate remedy at law. Subcarrier Communications, Inc. v. Day, 299 N.J. Super. 634, 638 (App.Div. 1997); see also Frank's GMC Truck Center v. General Motors Corp., 847 F.2d 100, 102 (3d. Cir. 1988) ("availability of adequate monetary damages belies a claim of irreparable injury"). Thus, purely economic injuries compensable by an award of money damages will not sustain a showing of irreparable harm. Subcarrier, supra, 299 N.J. Super. at 638.

Here, Plaintiffs allege that without the preliminary injunction, "S.P. will be deprived of her right to play basketball this season for the school she has attended for 9 years. Once the season

ends, this right will no longer exist and she can never get back this right." Pl. Reply Br.Pl. Reply Br. at 20-21. Plaintiff alleges playing for a different school is not comparable because "STS has, over the years, engendered a deep sense of loyalty and team spirit in its students." Pl. Br. dated December 15, 2016 at p. 4.

On the record here, there is a material factual issue as to whether the irreparable harm alleged may have been created by Plaintiff and his wife's actions on behalf of their daughter. Plaintiff wants S.P. only to play for St. Theresa's and not another team. However, S.P. has been given the right to play in the league. Plaintiff was willing for S.P. to play for a girl's team. No substantive reason other than a deep sense of loyalty and team spirit are offered as a reason for S.P.'s refusal to play for a neighboring school team. However, these claims conclusory statements in Plaintiff's latest submission are not developed nor is an adequate explanation provided to the Court as to why S.P. would be harmed if she plays for a neighboring school and not the school which she now attends.

In an application for preliminary relief, the burden is on the movant to prove each Crowe factor by clear and convincing evidence. Garden State Equality, supra 216 N.J. at 320.

Here, the Court finds that Plaintiff has failed to prove irreparable harm by clear and convincing evidence. Given the alleged availability of the option to play on a neighboring school's girl's basketball team in the same league, the Court is not persuaded that the alleged harm is irreparable. Despite Plaintiff's desire to play for her school's basketball team, Plaintiff has failed at this time to proffer a justification or an explanation as to why the option to play for a neighboring parish's girls basketball team is insufficient or unsatisfactory.

iv.     **Balancing the Equities**

Finally, in considering an application for preliminary injunctive relief, courts must balance the relative hardship to the parties in granting or denying the relief. Crowe, at 134. Put differently, the moving party must show that the hardship it stands to suffer if a preliminary injunction does not issue outweighs any hardship the non-moving party will suffer if a preliminary injunction does issue. Crowe, 90 N.J. at 134. The Archdiocese CYO league has more than one thousand (1000) players and one hundred (100) teams. At the time of the hearing, six games are remaining for the St. Theresa's boys team. In view of the material factual disputes in this case and the Plaintiff's failure to develop a settled legal right at this early stage, the harm to Defendants outweighs the harm which may be suffered by the Plaintiff.

The Court is mindful that S.P. has an opportunity to play basketball. In an abundance of caution and to ensure that S.P. was given every opportunity for her rights to be protected the Court has entertained many more submissions by Plaintiff in this case than ordinarily reviewed in other cases at this early stage. However, based on the record now before it, the Court cannot award the extraordinary relief of an interlocutory injunction.

The record at this point in time is not fully developed. Once a fully developed record is provided, this Court will be ready to analyze Plaintiff's claim.