# Exhibit B

SUPERIOR COURT OF NEW JERSEY
CHANCERY DIVISION,
GENERAL EQUITY PART
ESSEX COUNTY
DOCKET NO. ESX-C-000248-16
APP. DIV. NO. _____

SCOTT PHILLIPS,                  :

        Plaintiff,            :          TRANSCRIPT

    v.                           :             OF

ARCHDIOCESE OF NEWARK and        :     DECISION OF THE COURT
ST. THERESA'S SCHOOL,            :

        Defendants.           :

                Place:   Wilentz Justice Complex
                       212 Washington Street
                       Newark, NJ 07102

                Date:    August 14, 2017

BEFORE:

    HONORABLE DONALD A. KESSLER, J.S.C.

TRANSCRIPT ORDERED BY:

    CHRISTOPHER H. WESTRICK, ESQUIRE (Carella, Byrne,
    Cecchi, Olstein, Brody & Agnello, P.C.)

APPEARANCES:

    SUSAN B. McCREA, ESQUIRE (Sole Practitioner)
    Attorney for the Plaintiff

    CHRISTOPHER H. WESTRICK, ESQUIRE
    JOHN V. KELLY, III, ESQUIRE (Carella, Byrne,
    Cecchi, Olstein, Brody & Agnello, P.C.)
    Attorneys for the Defendants

        Transcribers:  Terry L. DeMarco, AD/T 566
                     Holly Tisseyre, AD/T 682

        Agency:        KLJ Transcription Service, LLC
                     P.O. Box 8627
                     Saddle Brook, NJ  07663
                     (201) 703-1670
                     (201) 703-5623 (fax)

                     Digitally Recorded
                     Operator - Patricia Jackson

### I N D E X

<u>BY THE COURT</u>:                                    <u>PAGE</u>

   Findings of Fact & Conclusions of Law . . . . . . . 3

3

```
 1                 (Trial commenced at 1:51 p.m.)
 2            THE COURT:  Please be seated.
 3            Okay.  This is the matter of Phillips versus
 4  The Archdiocese of Newark.
 5            Counsel, your appearances for the record?
 6            MS. McCREA:  Good afternoon, Your Honor.
 7  Susan McCrea on behalf of plaintiff.
 8            MR. WESTRICK:  Good afternoon, Your Honor.
 9  Christopher Westrick and John Kelly from Carella Byrne
10  on behalf of defendants.
11            THE COURT:  Okay.  Everyone can be seated.
12            Okay.  The Court is going to deliver its
13  opinion now.  It is my hope that I won't have to step
14  off the bench for a break, but it's possible I may.
15  We'll see how it goes.
16            Okay.  For the purpose of my decision, the
17  pertinent facts are, as follows:
18            Saint Theresa's R.C. Church is a New Jersey
19  religious corporation, incorporated under Title 16 of
20  the New Jersey Statutes and it is located at 541
21  Washington Avenue, Kenilworth, New Jersey.  Saint
22  Theresa's operates as a catholic parish, fulfilling
23  the spiritual needs of parishioners.  Saint Theresa's
24  was formed exclusively for religious, charitable and
25  educational purposes.
```

4

```
 1            Saint Theresa's operates a religious school,
 2  STS -- Saint Theresa's School, which will be referred
 3  to as STS -- which educates primary school children
 4  with respect to their academic and spiritual
 5  educational needs.  STS educates children from
 6  kindergarten through 8th grade, and also operates a
 7  preschool program.
 8            The Roman Catholic Archdiocese of Newark is
 9  a not-for-profit corporation comprised of parishes,
10  schools and other related entities operating in Essex,
11  Bergen, Hudson and Union Counties.  The Archdiocese
12  was formed exclusively for religious, charitable and
13  educational purposes.  Saint Theresa's Church and its
14  operations, including STS, are governed by the
15  Archdiocese of Newark.  The Archdiocese of Newark
16  provides pastoral services for approximately 1.3 to
17  1.6 million parishioners.
18            Plaintiff Scott Phillips, his wife Theresa
19  Mullen, their two children, S.P. -- two daughters,
20  S.P. and K.P., and son, B.P., are parishioners of
21  Saint Theresa's parish.  Mr. Phillips and his wife
22  have been parishioners at Saint Theresa's for 17
23  years.  They have -- their three children -- B.P., age
24  15; S.P., age 13; and K.P., age 11 -- have all
25  attended primary elementary school at SPS -- I'm sorry
```

5

```
 1    -- STS from preschool through their entire elementary
 2    school education.  B.P. now attends Seton Hall Prep.
 3    S.P.  has completed the 7th grade and K.P. has
 4    completed the 5th grade last June.
 5            Mr. Phillips and Ms. Mullen were married 17
 6    years ago at Saint Theresa's.  They have been active
 7    members of the parish regularly attending services and
 8    having developed a personal relationship with a
 9    recently-retired pastor, Father Joe Bejgrowicz.
10            The Phillips children were baptized at the
11    church and have volunteered to be alter servers
12    throughout the years.  S.P. and K.P. have a number of
13    friends, relationships with teachers, and a
14    comfortable familiarity with Saint Theresa's School.
15    They have volunteered to participate in many school
16    activities.  In S.P.'s case, she has been elected
17    student council treasurer and has played on sports
18    teams in the CYO league with other STS children in
19    sports, such as basketball, volleyball and softball.
20            On December 2, 2016, plaintiff Scott
21    Phillips, on behalf of his daughter, S.P., and his
22    son, B.P., filed a complaint before this Court
23    alleging several claims against the defendants.  The
24    complaint alleges bullying and harassment of S.P.,
25    failure by STS administrators to address sexually
```

6

```
 1    inappropriate behavior, threat of violence with a
 2    knife, exclusion of S.P. and another child at a school
 3    sponsored trunk-or-treat event, and victimization of
 4    S.P.
 5            Plaintiff's complaint also alleges that his
 6    son, B.P., was an outstanding student at STS.  He
 7    claims his son was in the running to become
 8    valedictorian of his class.  Both Mr. Phillips and his
 9    wife, Ms. Mullen, testified at trial that B.P.
10    received a subjective grade from S.P.'s home room
11    teacher, the lowest grade he received during his
12    education at STS.  They claim the grade was lowered,
13    because S.P. was mistreated and bullied by the
14    teacher.  They complained that the grade by S.P.'s
15    biased home room teacher affected B.P.'s ability to
16    become valedictorian and, therefore, he became the
17    salutatorian, rather than the valedictorian of his
18    class.  Ms. Mullen testified that she sought a
19    justification of this grade so she could explain these
20    circumstances to B.P., but never got a satisfactory
21    response.
22            Plaintiff's complaint further alleges that,
23    beginning in early 2016, S.T. [sic] made numerous
24    complaints to her home room teacher about
25    inappropriate sexual behavior and harassing behavior
```

7

1    taking place in the classroom.  According to plaintiff
2    and Ms. Mullen, S.P. was thwarted for a period of time
3    by her home  room teacher from reported this behavior.
4    Somewhat later, another teacher allowed S.P. to report
5    her complaint about the sexual and harassing
6    misconduct to the principal.  Plaintiff claims that
7    S.P. continued  to report ongoing inappropriate
8    behavior, principally by other male students, and
9    claims that she was taunted  by STS personnel, parents
10   and other students.
11         Plaintiff and Ms. Mullen also testified at
12   one point S.P. was threatened with a weapon and shown
13   a picture of a non-STS student holding a gun.
14   Plaintiff and Ms. Mullen also reported that they
15   believed that she was taunted by another STS parent
16   and excluded from participating in the school -- STS
17   parents' school sponsored trunk-or-treat event at one
18   of the  car locations for that event.
19         Mr. Phillips and Ms. Mullen claimed during
20   their testimony that SPS -- that S.P. was re-victimized
21   by STS and Archdiocese personnel, who did nothing to
22   respond to her complaints.  At trial, Mr. Phillips and
23   Ms. Mullen testified they went to Saint Theresa's
24   School on a number of occasions to address the
25   improper conduct and the actions against their children

8

1    at the school.
2         Ms. Mullen testified that she obtained --
3    attempted to obtain resolution of her concerns from
4    STS administrators.  After her perceived failure of
5    school administrators to address these concerns, she
6    worked her way up the chain of Archdiocese personnel
7    to address her concerns and have them appropriate --
8    appropriately remedied.  She testified that she wrote,
9    had meetings, and/or telephone conversations with the
10   Archdiocese superintendent of school, Dr. Margaret
11   Dames, and the assistant superintendent overseeing STS
12   school, Sister Patricia Butler.  She also wrote to
13   Cardinal Tobin, the archbishop of Newark, to seek his
14   aid in addressing her concerns.
15         Plaintiff claims that defendants, through
16   their authorized representatives, engaged in a pattern
17   of retaliatory activity as a result of efforts by S.P.
18   and her parents to protect S.P. in school and from
19   abuse by teachers and other parents.  They further
20   believe that appropriate steps had not been taken to
21   address their concerns which affected S.P.'s
22   education, as well as the education of their other
23   children.
24         The Archdiocese operates a CYO basketball
25   league.  The league has over 100 teams and 1,000

9

```
 1   participants in separate boys and girls leagues for
 2   the 2016-2017 season.  At the beginning of the season,
 3   an insufficient number of girls volunteered to play on
 4   the girls' basketball team in S.P.'s age group.
 5   Therefore, STS was unable to field a girls' team in
 6   that age group for the CYO league.
 7        Ms. Mullen requested the league officials
 8   allow S.P. to play on the boys' team in her age group,
 9   since there was no girls' team in that age group.  She
10   also requested, based on seniority as a coach, that
11   she be appointed head coach of the boys' team and that
12   the team's coach assume the role of assistant coach.
13   Her request was denied by Richard Donovan, the
14   administrator of the league.  Plaintiff and Ms. Mullen
15   asked other Archdiocese representatives to reverse Mr.
16   Donovan's decision, but they refused.
17        Plaintiff and Ms. Mullen testified that the
18   decision to exclude S.P. from the basketball team was
19   also retaliation for their complaints and S.P.'s
20   complaint about the bullying and harassing behavior
21   she experienced.  They also argue that S.P.'s exclusion
22   from the boys' basketball team was discriminatory and
23   was not prohibited by league rules.
24        At the time that the complaint was filed,
25   December 2, 2016, plaintiff sought an interlocutory
```

10

```
 1   injunction allowing defendants -- compelling
 2   defendants to allow S.P. to play on the STS CYO boys
 3   basketball team.  The complaint also sought removal of
 4   unspecified personnel, damages and recision of federal
 5   funding of Saint Theresa's sports program if such
 6   funding was made under Title 9 of the federal anti-
 7   discrimination laws.
 8        On February 1, 2017, STS expelled S.P. and
 9   K.P. from STS.  The Appellate Division stayed the
10   expulsion on February 2, 2016 and remanded this matter
11   to this Court for a determination as to whether the
12   expulsion should be permitted.
13        On February 15, 2017, Cardinal Tobin
14   rescinded the expulsion.
15        On February 17, 2017, this Court ordered
16   that S.P. be allowed to play on the boys basketball
17   team.
18        Discord arose between many members of the
19   STS community and the Phillips family, resulting in an
20   online petition seeking their removal.  There were
21   also various Facebook posts in which various members
22   of the community objected to their participation in
23   the STS community.
24        On March 1, 2017, plaintiff and Ms. Mullen
25   made a motion to amend the complaint in this case to
```

11

1   have more than 80 defendants affiliated with the STS
2   community joined as a part of the complaint and adding
3   Ms. Mullen as a complaint -- plaintiff.  This Court
4   dismissed most of the amended complaint.  In the time
5   it arrived before this Court, there was actually a
6   third amended complaint.  And that denial was made
7   without prejudice to repleading and refiling that
8   pleading.
9            On April 2, 2017, the Archdiocese issued a
10  letter through Dr. Dames refusing to re-enroll S.P.
11  and K.P. at STS for the 2017-2018 school year.
12           Plaintiff amended his lawsuit claiming
13  breach of contract and that the non-re-enrollment was
14  retaliation for his efforts to seek to protect his
15  children.
16           Defendants, the Archdiocese of Newark and
17  Saint Theresa's, claim the non-re-enrollment of the
18  children was an ecclesiastical decision which was
19  based on the inability of Saint Theresa's School to
20  function peacefully.  Specifically, they claim the
21  aggression of Mr. Phillips and Ms. Mullen, as parents,
22  interfered with the peace and tranquility of the
23  school community and inhibited the school from
24  realizing its ecclesiastical mission.
25           Defendants further claim that they had a

12

1   secular right to deny re-enrollment to the children
2   because of disruptive behavior of their parents.
3   Defendants point out that the enrollment contracts
4   between the defend -- between Saint Theresa's School
5   and other parents are one-year contracts which are
6   separately entered into each year and they would be
7   the same contract that would also be offered to Mr.
8   Phillips and Ms. Mullen.  Defendants claim they had no
9   legal obligation to enter a new one-year contract with
10  Mr. Phillips and Ms. Mullen to re-enroll S.P. and K.P.
11  for the upcoming academic year starting on September
12  6th.
13           In analyzing this case, the more detailed
14  factual -- a more detailed factual background is
15  necessary and warrants consideration.  Specifically,
16  the following:
17           In or around May 2016, S.P. complained to
18  her mother that she witnessed inappropriate behavior,
19  such as gyrating and sexually offensive comments by
20  boys in her class.  She also indicated she was
21  threatened with a knife.  S.P. told her mother about
22  inappropriate words and classroom talk, much of which
23  was of an inappropriate sexual nature.  Ms. Mullen set
24  up a meeting with the school's principal, Sister
25  Hélène Godin.

13

```
 1          Sister Hélène had been a Catholic school
 2   principal for nearly 30 years and was a member of the
 3   Salesian order.  The Salesian educational philosophy
 4   under which Sister Hélène administered STS was, quote,
 5   "reason, religion and kindness," unquote.  She
 6   understood her mission to develop the whole child body
 7   and soul.
 8          At the time of the meeting, Sister Hélène
 9   served as principal for approximately six years.  She
10   testified that as soon as this issue was brought to
11   her, she spoke to the teacher involved and she also
12   contacted the local police to report the threat of the
13   use of the knife.  Plaintiff scheduled -- Mr. Phillips
14   scheduled appointments with Sister Hélène later that
15   month.  Sister -- as did Ms. Mullen.  Sister Hélène
16   investigated the sexual allegations, imposed what she
17   deemed to be appropriate discipline upon the offending
18   students.  Because discipline upon the offending
19   students was confidential to that minor and the
20   student's family, the discipline taken was not shared
21   with Ms. Mullen.
22          Later that month, Ms. Mullen had an
23   interaction with B.P.'s teacher, home room teacher,
24   Sister Juliet (phonetic), who was also -- Ms. Mullen
25   complained that, as a result of the interaction, that
```

14

```
 1   S.P. had with Sister Juliet (phonetic), her son B.P.
 2   received a grade of 74 on a test and he also received
 3   an 85 percent score on a test in which he answered 14
 4   out of 15 questions correctly.
 5          Ms. Mullen acknowledged that the mathematical
 6   difference on the 85 percent test grade may be
 7   attributable to the weight of the answers.  Ms. Mullen
 8   claims she was compelled to pursue the grading issue,
 9   because she could not get an adequate response to
10   enable -- to explain -- her to explain to B.P. why the
11   grade was not higher.
12          Sister Hélène met with Ms. Mullen about this
13   issue at the end of may.  On June 1, 2016, Mr. Phillips
14   then met with Sister Hélène about B.P. achieving the
15   status of valedictorian of his class.  Mr. Phillips
16   claimed that he wanted to know in advance how the
17   valedictorian calculation would be arrived at, since
18   the previous year there was a .01 percent difference
19   between the valedictorian and the salutatorian.  He
20   also claimed that he told Sister Hélène that he needed
21   this information advanced of the announcement of the
22   valedictorian since his son and the son of close
23   friends were the top students.  He, therefore, wanted
24   to avoid conflict with the other family, who were
25   personal friends.
```

15

1    Sister Hélène testified that Mr. Phillips
2  threatened her that if B.P. was not named
3  valedictorian, Ms. Mullen would analyze every grade
4  and the school better have a good explanation for that
5  decision.  Sister Hélène agreed that B.P. was a strong
6  student, but pointed out that there were other bright
7  students in the class.  She testified that the meeting
8  ended with Mr. Phillips stating he hoped the
9  conversation was not useless.  Mr. Phillips claims
10  Sister Hélène promised to let him know in advance of
11  the announcement of the valedictorian award.
12    On June 3rd, two days later, the grades were
13  tabulated and B.P. earned the honor of salutatorian.
14  Sister Hélène called Mr. Phillips about his son
15  receiving the honor of salutatorian.  According to
16  Sister Hélène, plaintiff responded by voicing his
17  outrage that he did not get notice in advance and
18  called her a son of a bitch.  Sister Hélène indicated
19  that she found the words, tone and content of the June
20  3 conversation to be threatening, bullying and
21  demeaning.  Plaintiff denied the use of the phrase son
22  of a bitch, but indicated he was upset.
23    During her testimony, Sister Hélène was
24  visibly shaking -- shaken when she was recalling the
25  events in the entirety of the discussions about the

16

1  valedictorian issue.  Her demeanor on the stand
2  indicated that her feelings of being intimidated were
3  credible, because, as the Court indicated, she did
4  seem, even while testifying about it, to be shaken.
5  Sister Hélène testified that she stepped down as
6  principal and claimed that she lost confidence as a
7  result of this hostility.
8    Mr. -- plaintiff offered testimony to
9  minimize his conduct, claiming that Sister Hélène did
10  not keep her word and he admitted he was angry.  His
11  testimony seemed to be contradictory.  He said she
12  broke her word, but said she was not a liar.  Her --
13  his -- Mr. Phillips' efforts to parse words in
14  explanation supported Sister Hélène's view of his
15  hostility.
16    On June 3, 2016, Ms. Mullen had another
17  meeting with Sister Hélène in which she -- in which
18  Sister Hélène explained the decision.  Ms. Mullen was
19  not satisfied with the efforts of Sister Hélène to
20  address her concerns.
21    On June 6, 2016, Ms. Mullen wrote to Dr.
22  Margaret Dames, superintendent of the Archdiocese
23  schools.  Dr. Dames acts as the chief administrator of
24  the network of Archdiocese schools, overseeing more
25  than 90 primary and secondary schools which the

17

1    Archdiocese operates.  The Archdiocese educates over
2    30,000 students.  Dr. Dames reports directly to the
3    Archbishop, Cardinal Tobin, about the operation of the
4    Archdiocese schools.  Cardinal Tobin relies on her
5    management and is rarely involved in individual student
6    decisions, because of the number of issues that he
7    needs to oversee.
8           Ms. Mullen complained in her June 6th letter
9    referenced above that there was a pattern of behavior
10   that negatively affected S.P., resulting in S.P. being
11   re-victimized and her son, B.P., being negatively
12   affected.  In her letter, she -- both Dr. Dames and
13   Sister Hélène explained how they resolved each of
14   these issues.
15          The first issue raised was that a picture
16   was shown to S.P. of a gun by a non -- a male non-
17   student at STS who was frequenting STS property.  In
18   her testimony, Dr. Dames explained that the incident
19   was reported to the local police immediately.  In
20   contrast, Ms. Mullen testified that neither she nor
21   her husband, a retired Kenilworth police captain,
22   reported the matter to the Kenilworth Police
23   Department.  Dr. Dames appears to have taken
24   appropriate steps in her discretion to resolve the
25   problem and there was no testimony at trial that this

18

1    problem ever resurfaced.
2           The second issue was Ms. Mullen reported
3    that there were sexually inappropriate behavior of
4    boys gyrating on desks and boys making sexually
5    inappropriate statements to girl students.  Ms. Mullen
6    testified that the boys made offending sexual comments
7    and were the perpetrators.  Ms. Mullen testified that
8    other parents also made appointments with Sister
9    Hélène to express outrage about this behavior.  At
10   trial, Ms. Mullen clarified that two boys were
11   involved.  Sister Hélène and Dr. Dames testified that
12   appropriate discipline was imposed.  The boys are
13   minors.  The discipline was not discussed with Ms.
14   Mullen.
15          Ms. Mullen was asked for an interview with
16   S.P. by the administration, but that interview was
17   refused, claiming that it would re-victimize her.  And
18   she also refused to identify the offending boys,
19   saying that information was already known to Sister
20   Hélène.  It escapes the Court to understand why, if
21   this information was known, it couldn't be provided to
22   make sure there was no error.  Ms. Mullen agreed that
23   her cross-examination that the offending conduct did
24   not occur during the following school year and,
25   therefore, that conduct likewise appeared to be

19

1    appropriately remedied.
2            In her letter, as a third grievance, Ms.
3    Mullen complained about a substitute teacher's
4    inappropriate conduct.  That conduct was likewise
5    addressed by the teacher being removed from the
6    substitute teacher's list.
7            The fourth issue addressed, which was the
8    heart of a series of letters, complained about B.P.'s
9    grade and plaintiff and Ms. -- and Mr. Phillips and
10   Ms. Mullen's dissatisfaction that they were not
11   informed of the valedictorian selection prior to its
12   announcement.  In that letter, contrary to Mr.
13   Phillips' testimony, Ms. Mullen stated that plaintiff
14   could not believe that Sister Hélène lied to her --
15   lied to him.  In his testimony, Mr. Mullen
16   specifically -- Mr. Phillips specifically said --
17   refused to say that he was lied to.  Ms. Mullen
18   indicated that she  and her husband met with Sister
19   Hélène, but were not satisfied with the answer.  Ms.
20   Mullen concluded her June 6th letter stating, quote:
21            "By way of this letter, I am requesting an
22       immediate meeting with the Archdiocese before
23       graduation tomorrow evening.  I am requesting the
24       written policy of how the
25       valedictorian/salutatorian is computed be

20

1        provided to me, including how the advanced math
2        class is weighted, together with exactly how it
3        was calculated this year, with backup figures, so
4        that I can confirm that it was accurately done."
5            And that letter is, I believe, P-23A in
6    evidence.
7            Ms. Mullen couched her request in terms of
8    giving closure to her son for not being named
9    valedictorian.  However, the demand of an immediate
10   meeting, the otherwise argumentative remarks made by
11   Mr. Phillips in his meeting and phone call with Dr. --
12   with Sister Hélène, were an effort to control the
13   grading process and to change the valedictorian award.
14   The Court is satisfied that Dr. Dames and Sister
15   Hélène were exercising appropriate judgment and were
16   not required to respond to angry micro management.
17           Parenthetically, the Court notes that the
18   Phillips' complaints about these matters were rooted
19   in advancing their son's best interests.  Their
20   complaint about S.P.'s experiences were likewise
21   rooted in S.P.'s best interests.  However, Mr. Phillips
22   and Ms. Mullen appeared to lost objectivity and sought
23   the resolution of their grievances by taking an
24   extremely confrontational approach, rather than a
25   conciliatory approach.

1    In response to Ms. Mullen's letter, Dr.
2  Dames assigned the investigation of Ms. Mullen's June
3  6th complaints to one of her superintendents, Sister
4  Patricia Butler.  Dr. -- as mentioned above, Dr. Dames
5  oversees the education of approximately 30,000
6  students.  Therefore, she relies on associate
7  superintendents, including Sister Butler.
8    Ms. Mullen spoke to Sister Butler on June 7,
9  2016.  Ms. Mullen sent a further letter to Sister
10 Butler on June 8, 2016 and that letter likewise
11 complained about the valedictorian selection.  In her
12 letter, Ms. Mullen stated, quote:
13    "Once again, I am requesting the written
14    policy of how the valedictorian/salutatorian is
15    computed to be provided to me, including how the
16    advanced math class is weighted, together with
17    exactly how it was calculated this year, with
18    backup figures, so that I can confirm that it was
19    accurately done."  Unquote.
20    Ms. Mullen's letter went on to state, quote:
21    "If the Archdiocese refuses to give me this
22    information, I remind STS and the Archdiocese by
23    way of this letter that both have been put on
24    notice to preserve all requested materials, in
25    the event they are not voluntarily given to me,

1    and that additional action needs to be taken."
2    This letter characterizes actions of Saint
3  Theresa's School as being bullying and harassment of
4  her family and characterizes that behavior as, quote,
5  "deplorable," unquote, and that is -- that letter is
6  joint ex -- Plaintiff's Exhibit 23-2B, I believe.
7  However, in making such claims, Ms. Mullen failed to
8  appreciate the way in which her words would be
9  received by religious educators and did not consider
10 that her efforts to protect her son had gone too far.
11    Sister Butler requested on June 13th the
12 students' names responsible for the inappropriate
13 behavior and, as mentioned before, Ms. Mullen would
14 not provide that information.
15    On June 15, 2016, Ms. Mullen wrote to Dr.
16 Dames complaining she did not have closure on the
17 valedictorian issue.  At the end of her letter, she
18 stated, quote:  "Please be advised that if no response
19 by week's end, I will have no other choice than to
20 take this matter to the next level.  I hope this is
21 not necessary."  Period, unquote.  And that's P-23-2C.
22    On June 27, having received Sister Butler's
23 June 13th correspondence, Ms. Mullen wrote to Sister
24 Butler stating she would not provide the names of the
25 boys who engaged in sexually inappropriate behavior,

23

1   even though she said the information could be obtained
2   from Sister Hélène and was obviously known to her.
3           In the fall of 2016, at the beginning of the
4   school year, the registration period for CYO basketball
5   began.  Several girls who were on S.P.'s basketball
6   team in the prior year at STS had graduated and there
7   were not enough girls to form a girls' team at STS for
8   S.P.'s age group for the season -- for the 2016-2017
9   league year.
10          Applications for participation were sent to
11  students on September 19, 2016.  Richard Donovan, the
12  associate director of the league, claimed he advised
13  Ms. Mullen on September 28, 2016 that the roster
14  submission deadline for the league was October 25th
15  and that if there were not enough applicants to form a
16  STS girls' team, efforts would be made to place Saint
17  Theresa's girl students on a neighboring team.
18          Ms. Mullen denied this conversation ever
19  took place and claimed she was not advised of a
20  deadline.  Ms. Mullen claimed that she first learned
21  from another parent that the deadline from -- to form
22  a girls' team had passed and she immediately asked
23  that she be permitted to solicit the late formation of
24  a girls' team, as she was allowed to do in the prior
25  year.  Her request was refused and she then requested

24

1   that S.P. be placed on the Saint Theresa's 7th grade
2   boys' team.  Ms. Mullen requested S.P.'s placement on
3   the boys' team, because of S.P.'s deep sense of
4   loyalty to STS and because of her desire to
5   participate in the school spirit of STS.  She did not
6   want S.P. to play for a neighboring girls' school
7   team.
8           Ms. Mullen claimed that applications were
9   accepted from two boys to play on the boys' team after
10  the deadline and that CYO rules did not prohibit S.P.
11  from playing on the boys' team.  Mr. Donovan, the
12  league director, denied her request.  Mr. Donovan also
13  was an STS parent, but was functioning in the capacity
14  as league director, an entirely different role.
15          On October 18, 2016, S.P.'s sister, K.P.,
16  received a written warning notice from her gym
17  teacher, Brittany Dvorscak.  According to Ms. Dvorscak,
18  students were told to stop talking in the hallway or
19  they would receive a warning notice.  While Ms.
20  Dvorscak was not -- did not testify at trial, the
21  Court got testimony from witnesses on both sides about
22  this incident.  On her way back from gym class, Ms.
23  Dvorscak advised Deacon Joe that K.P. continued to
24  talk.  She received a written warning notice for
25  excessive talking.

25

1    Mr. Phillips testified that K.P. never
2  received a prior warning and was very upset.  Ms.
3  Dvorscak met with Mr. Phillips and explained the
4  events.  Mr. Phillips challenged her and asked the
5  warning notice to be withdrawn.  A discussion ensued
6  and Mr. Phillips and Deacon Joe also discussed -- with
7  the principal, discussed the situation and at Deacon
8  Joe's request, the warning notice was withdrawn and
9  Ms. Dvorscak agreed that if K.P. received another
10  notice, that she would hand it directly to Mr.
11  Phillips.  And this is yet another example of
12  grievances that the Phillips family had that the
13  school responded to.
14    On October 28, 2016, there was an STS-
15  sponsored, quote, trunk-or-treat, unquote, event.
16  This annual event revolves around parents decorating
17  their cars and dispensing candy, having their personal
18  cars function as the equivalent of a Halloween home.
19  According to Ms. Mullen, S.P. came home from the
20  trunk-or-treat car event complaining that she was
21  belittled at one location by one of the parents,
22  reducing her to tears.
23    On November 4, 2016, Ms. Mullen wrote a
24  letter to the principal, Deacon Joe Caporaso, claiming
25  -- complaining about the actions of the parent at the

26

1  trunk-or-treat event and also complaining about the
2  rejection of S.P.'s basketball registration forms.  In
3  her correspondence, she pointed out that she had met
4  with Deacon Joe earlier in October to discuss the
5  difficulty of fielding a girls basketball team the
6  prior year.  Deacon Joe characterized this meeting as
7  a history lesson on STS's girls basketball.  Based on
8  that information that she previously provided to
9  Deacon Joe, Ms. Mullen expressed her belief that the
10  late registration should be accepted and also
11  complained about STS's [sic] treatment at the trunk-or-
12  treat.
13    After receiving the e-mail, Deacon Joe met
14  with Ms. Mullen and suggested she try to work out the
15  trunk-or-treat problem with the offending parent via
16  direct conversation with that parent.  In fact, at
17  trial, Deacon Joe testified that the two parents had
18  different versions of the story and he believed that
19  it would be more appropriate for the parents to work
20  this out between themselves.  He also indicated he had
21  no knowledge about the sports program and no interest
22  in sports programs, and that Ms. Mullen should reach
23  out to league officials.
24    On November 8, 2016, Ms. Mullen wrote to Dr.
25  Dames and Sister Butler complaining that S.P. had been

27

```
1    re-victimized at the trunk-or-treat event and
2    requested an immediate investigation into CYO -- into
3    the CYO basketball league director's conduct in
4    thwarting S.P's participation on the boys' team, since
5    there was no girls' team.  She also indicated she
6    wanted to be named as head coach of the boys' team.
7    She demanded a written response from STS and the
8    Archdiocese.  At the end of the letter, she stated,
9    quote:  "If I fail to receive a response by the close
10   of business tomorrow, I will have no other but
11   to take all the aforementioned to the next level,"
12   unquote.  P-23-2E.
13           On November 18, 2016, Ms. Mullen wrote to
14   Dr. Dames stating she would -- she was making a final
15   request for a meeting and concluded the letter by
16   saying, quote:  "If a meeting is not scheduled by the
17   close of business today, I will have no choice but to
18   file the appropriate legal work on Monday, which I
19   hope is not necessary," unquote.
20           On November 22, 2016, plaintiff and Ms.
21   Mullen met with Sister Butler and Dr. Dames.  At the
22   meeting, in view of the impending litigation, Dr. Dames
23   recommended the Phillips' attorney reach out to the
24   Archdiocese attorney to attempt to come to the res --
25   to a resolution.  It appeared at the meeting that a
```

28

```
1    resolution was not possible and that the matter may
2    well come to litigation.  It was the hope that if the
3    attorneys were to talk to each other, the litigation
4    could be avoided.
5           On December 2, 2016, plaintiff filed the
6    initial complaint in this matter, seeking, among other
7    things, that S.P. be permitted to play basketball on
8    the boys' team.
9           Shortly after the complaint, Mr. Phillips
10   called his boyhood friend, Kevin Kernan, a sports
11   writer for the New York Post.  Plaintiff testified
12   that he thought that S.P.'s desire to play on  the
13   boys' team was a human interest story which would
14   appeal to the press.  He stated he wanted the story to
15   get out accurately and, therefore, contacted his
16   boyhood friend, Mr. Kernan.
17           In his testimony, Mr. Phillips conceded that
18   Mr. Kernan is a highly respected and widely read
19   sports writer.  Mr. Phillips denied contacting the
20   newspaper to obtain leverage; however, he admitted
21   that he freely made himself and his children available
22   to other media outlets for interviews.  Mr. Phillips
23   refused to acknowledge that the press attention could
24   have a negative effect on the Saint Theresa's community
25   and that the public attention from the basketball
```

29

1  dispute was a cause for concern for the community,
2  including the administrator -- its teachers, the
3  administrators and families.
4          The information that defendants received
5  from parents and/or administrators was that the press
6  coverage initiated by Mr. Phillips was disrupting the
7  peaceful operation of the school -- Catholic school
8  community.
9          During this case, the Court agreed it would
10 not hear testimony of individuals communicating about
11 this matter with the defendants.  Rather, this Court
12 said it would hear testimony about this information to
13 obtain evidence as to the perception that defendants
14 had about these complaints and the action that was
15 resulted from those reports.  And in so doing, this
16 Court relied on Carmona v. Resorts International Hotel,
17 189 N.J. 354, 376 (2007) and Toto versus Princeton
18 Township, 404 N.J.Super. 604, 619 (Appellate Division
19 2009).
20         On February 1, 2016, defendants made a
21 decision to expel the children from Saint Theresa's
22 School.  The expulsion letter was delivered to
23 plaintiff by defendants' counsel by an e-mail sent
24 after office hours.  Defendants' counsel advised
25 plaintiff's counsel that he children were expelled and

30

1  should not return to school the next day.
2          The February 1 letter was issued by Dr. Dames
3  and indicated that S.P. and K.P. would be asked not to
4  return to the school.  In her letter, Dr. Dames stated
5  that on August 30, 2016, plaintiff executed an
6  acknowledgment accepting the rules and regulations of
7  the school.  Dr. Dames' letter pointed out that the
8  student handbook stated that, quote:  "If a parent
9  implicates Saint Theresa's in a legal matter or names
10 Saint Theresa's School as defendants in a civil
11 matter, the parents/guardians will be requested to
12 remove their children immediately from the school."
13 Period, unquote.  Exhibit J-1.
14         Plaintiff and Ms. Mullen received the e-mail
15 from their attorney while they were attending a New
16 York Liberty Basketball Team practice with S.P. and
17 one of her friends.  They claim that the manner and
18 timing of the expulsion was a further act of
19 retaliation precipitated by plaintiff actively
20 pursuing a litigation seeking S.P.'s right to play
21 basketball on the boys' team.
22         The next morning, plaintiff and Ms. Mullen
23 brought the children to Saint Theresa's School.  Mr.
24 Phillips left Ms. Mullen, S.P. and K.P. at the school.
25 He then brought B.P. to Seton Hall Prep.  Shortly

31

1   thereafter, Deacon Joe, the principal, asked Ms.
2   Mullen to meet with him in the office to discuss the
3   expulsion, since he did not want to address the matter
4   publicly, but preferred to do so in private.  He was
5   accompanied at the meeting by Father Joe, the pastor
6   of Saint Theresa's Church, and Father Vincent.
7         Ms. Mullen was asked to leave the by Deacon
8   Joe.  She refused.  Deacon Joe then read a statement
9   to Ms. Mullen prepared by defendants' counsel stating
10  that the children were expelled from school, that Ms.
11  Mullen must leave the school grounds, and that if she
12  did not leave the building, that trespass charges
13  would be brought against her.  Ms. Mullen refused to
14  leave the building, stating, among other things, that
15  she would not leave without a court order and without
16  an explanation upon which the expulsion was based.
17  Ms. Mullen did not leave the building immediately, but
18  left the building eventually.  A trespass complaint
19  was signed by Father Joe.
20        Plaintiff presented testimony from Mark
21  Bergamotto, a close personal friend and STS parent,
22  about the events of February 2.  Mr. Bergamotto's
23  testimony was wholly incredible.  He testified he
24  parked his car strategically to watch the events of
25  February 2.  His testimony appeared to be calculated

32

1   and could not be believed.
2         On February 2, 2016 [sic], the Archdiocese
3   issued a press release indicating the student handbook
4   contained a provision that students would be expelled
5   immediately if the parents initiated litigation
6   against STS and that Mr. Phillips agreed in writing to
7   this term in the handbook.
8         The trespass incident is a truly unfortunate
9   part of this case.  There is little doubt that, in
10  this instance, both parties could have exercised
11  better judgment.  Neither side took the initiative to
12  first discuss this matter off the school grounds.
13  Sadly, the Phillips children, S.P. and K.P., were
14  brought to school by her [sic] parents that day and
15  witnessed some of these unfortunately events.  Both
16  parties should have taken responsibility for the
17  position in which the Phillips children were placed.
18        Plaintiff filed an application with the
19  Court to stay the expulsion of S.P. and K.P.  The
20  removal of the children from the school was enjoined
21  by the entry of a stay issued by the Appellate
22  Division.  That order enjoined the removal pending a
23  hearing by this Court and remanded the matter to this
24  Court to determine whether the removal should be
25  authorized or should be vacated.

33

```
 1              On February 2, 2016 [sic], the Phillips
 2    children -- or February 3, 2016 [sic], the Phillips
 3    children returned to school.
 4              Cardinal Tobin was installed as Archbishop
 5    of Newark beginning in January 2017.  He read about
 6    the expulsion of the Phillips children in a newspaper
 7    and also read that some girls had been playing on a
 8    boys CYO team, resulting in that team's exclusion from
 9    further play in the boys basketball league.  Cardinal
10    Tobin perceived S.P.'s expulsion to be based on her
11    desire to play basketball.  He believed that decision
12    was misplaced.  He expressed sympathy for S.P., due in
13    part to the fact that he has eight sisters and several
14    nieces.  He also learned that the coed team forfeited
15    games in the boys' league for violation of the league
16    rules.  He reversed the exclusion of the coed team
17    from playing in the boys' league.  He further learned
18    that S.P. and K.P.'s expulsion was based on a student
19    handbook provision that a student could be expelled if
20    parents were bringing a lawsuit against the defendants.
21    He did not agree with that policy and asked the
22    handbook provision to be eliminated.
23              On or about February 17, 2017, this Court
24    entered an order compelling the addition of S.P. to
25    the 7th grade boys' team, a decision founded in large
```

34

```
 1    part on the fact that the Court -- this Court learned
 2    that girls were permitted to play on another boys'
 3    team in the CYO league.  Initially, this Court had
 4    been advised that there were only separate boys' and
 5    girls' teams participating in the CYO league.  Based
 6    on this evidence, the Court denied the initial
 7    application to allow S.P. to play on the boys' team.
 8    After the additional information was provided to the
 9    Court that girls were playing on a boys' team in the
10    league, this Court changed its ruling and ordered that
11    S.P. be allowed to play basketball on the boys' team
12    for the remainder of the current season.
13              Plaintiff points out that this Court was
14    provided with false submissions in and around December
15    2016 that no girl played on any boy team -- boys' team.
16    However, the individual responsible for this
17    information, Mr. Donovan, was not a witness in this
18    case, thus whether [sic] the incorrect information
19    provided with this -- with respect to an earlier issue
20    was not the subject matter of testimony in the hearing
21    on the re-enrollment issue.
22              On February 15, 2017, Cardinal Tobin issued
23    a press release in which he rescinded the expulsion of
24    S.P. and K.P.  The press release also state the coed
25    team would be allowed to finish its play in the boys'
```

35

1   league for the current season.
2           Deacon Joe testified at trial that a
3   disruptive atmosphere at STS intensified dramatically
4   after S.P. and K.P. returned to school in February.
5   He received verbal and written communication from STS
6   parents expressing concerns about the disruptive
7   atmosphere at school, which other STS parents perceived
8   was caused by the Phillips family.
9           The STS parents were concerned about the
10  disruption caused by the lawsuit over basketball, the
11  intense media attention that followed, and the
12  disruptive effect of the reinstatement of the children
13  by the Court.  Some of the parents who wrote to Deacon
14  Joe complaining that [sic] the Phillips family wanted
15  to remain anonymous out of alleged fear of retribution
16  by the Phillips family.
17          As mentioned previously, the Court did not
18  consider this evidence as to whether or not it was
19  truthful, this -- rather, this evidence was reviewed
20  to determine what action was taken by the defendants
21  as a result of this information.
22          Deacon Joe testified that on the day of the
23  expulsion, news vans had been parked adjacent to the
24  school grounds of the church and had also been parked
25  there on other occasions.  He stated that a 2nd grader

36

1   -- all because of this case, the Phillips' case.  He
2   stated that a 2nd grader expressed her desire not to
3   attend STS in the future because of the presence of
4   news vans.  Another student asked to be dismissed
5   through the back door, rather than the front door,
6   because of the news vans' presence.
7           He also pointed out that several parents
8   signed an online petition voicing their concerns about
9   the uproar created by this information -- by this
10  litigation.  The petition itself, which was placed in
11  evidence by the plaintiffs, was signed by dozens of
12  individuals who complained about comments to the media
13  and what they perceived to be disparaging remarks
14  about the school and its students, and the overall
15  disruption that they felt the public attention of this
16  litigation was causing.
17          Plaintiffs stated that -- or were of the
18  belief that the petition was endorsed by STS, but I
19  will get to it a little later.  Actually, Sister --
20  Dr. Dames specifically tried to stop the petition and
21  neither STS nor the Archdiocese have any power to take
22  down that petition.  What they did about is, Dr. Dames
23  asked members of the community not to sign it anymore
24  and teachers were told by Deacon Joe and by Dr. Dames
25  that they were not to sign such a petition going

37

1   forward.  So, they did try to act.  They were also
2   told that any Facebook -- the teachers were told not
3   to post negative facebook posts and members of the
4   community were likewise asked to stop such behavior.
5           Given the controversy which arose at the
6   time the Phillips children returned to school, Dr.
7   Dames, as superintendent of schools, decided to hold
8   parent meetings at STS to calm down the situation and
9   to refocus all the parents on the mission of the
10  school to educate the children in a loving and
11  nurturing environment.  Dr. Dames wanted to restore a
12  tranquil and cooperative environment.  For that
13  reason, she scheduled listening sessions for February
14  22, 2017.  Dr. Dames first met with approximately 14
15  teachers.  The -- she then met with parents in groups
16  of ten.  It was her goal to bring the focus of the
17  school back to joy and optimism, consistent with its
18  ecclesiastical mission.
19          Ms. Mullen attended the first listening
20  session on February 22.  At those -- the listening
21  sessions, Dr. Dames asked for the online petition to
22  be stopped from everyone who was at the -- at those
23  listening sessions, and when -- and she also learned
24  at those sessions for the first time that there were
25  Facebook posts, and she also asked for the negative

38

1   Facebook posts to stop.
2           It was her aim in having this meeting to
3   calm tensions and restore harmony in the school
4   between all parents and teachers, including Ms. Mullen
5   and Mr. Phillips.  She asked for the cooperation of
6   the school community on refocusing their attention to
7   create a positive environment.  Dr. Dames urged the
8   parents to be positive and to stop negative
9   interactions, so the educational mission could move
10  forward.
11          On the very next day, February 23, 2017, Ms.
12  Mullen wrote to Cardinal Tobin complaining that she
13  and her family had been victims of negative statements
14  by Mr. Donovan, the director of the CYO, negative
15  Facebook posts by STS parents and the online petition
16  by various STS parents and teachers.  Ms. Mullen asked
17  for an opportunity to meet privately with Cardinal
18  Tobin to discuss her concerns and, quote, "if at all
19  possible, before the new set of legal papers are to be
20  filed on March 1, 2017."  Thus, she gave Cardinal
21  Tobin an ultimatum that if he did not meet with her
22  within the next six days, and presumably satisfy her
23  concerns, further litigation would follow.  Cardinal
24  Tobin claimed he never saw this letter prior to trial.
25          Plaintiff and Ms. Mullen filed the motion to

39

```
 1    amend the complaint, seeking to add Ms. Mullen as a
 2    plaintiff and suing at least 80 individuals associated
 3    with the STS community and Archdiocese personnel,
 4    including Father Joe and Dr. Dames.
 5             `        Dr. Dames testified that the filing of the
 6    lawsuit showed that there was not going to be an easy
 7    resolution of the dispute between the parties.  Her
 8    testimony subjected [sic] that her objective to calm
 9    the controversy was undermined by Mr. Phillips and Ms.
10    Mullen filing this amended lawsuit.
11             After the filing of the lawsuit, the uproar
12    at STS intensified.  Deacon Joe observed the new
13    lawsuit and ongoing presence of the press continued to
14    cause disruption at the school and interfered with its
15    normal functioning.  He understood that parents,
16    teachers and students were fearful because of their
17    interactions with the Phillips family and were fearful
18    of reprisals.
19             Again, as I indicated, this testimony was
20    not considered for the truth of the matter, but in
21    terms of the conduct that it caused on the part of
22    Deacon Joe.
23             Deacon Joe likewise testified that he was
24    intimidated by the Phillips family.  He recommended to
25    Dr. Dames, superintendent of the schools, and Reverend
```

40

```
 1    Monsignor Thomas Nydegger, the vicar general and
 2    moderator of the curiae of the Archdiocese, that the
 3    Phillips family not be allowed to re-enroll S.P. and
 4    K.P. for the following school year.
 5             Reverend Monsignor Nydegger acts as second
 6    in command in the administration of the ecclesiastical
 7    and secular activities of the Archdiocese.  It is
 8    hardly unusual -- highly unusual for Monsignor Nydegger
 9    or Cardinal Tobin to be consulted about school
10    decisions.
11             Both Dr. Dames and Monsignor Nydegger
12    concluded that the actions taken by Mr. Phillips and
13    Ms. Mullen escalating the lawsuit and by adding new
14    claims against the Archdiocese, suing STS employees
15    and volunteers -- and this was more -- I'm sorry.  I
16    take that back.  This was more about Monsignor
17    Nydegger's testimony, not Dr. Dames.  And that suing
18    80 individuals for expressing their opinion was
19    inconsistent with the Catholic mission of STS and
20    undermined its pastoral objectives.  He, therefore,
21    recommended to Cardinal Tobin that he decide -- that
22    he endorsed the decision not to re-enroll S.P. and
23    K.P.  Dr. Dames, likewise, made such a recommendation.
24             Cardinal Tobin testified that he learned
25    about the proposed expansion of the lawsuit.  He also
```

41

1    learned from Sister Hélène of the incredible pressure
2    she and faculty were under as a result of the conduct
3    of the Phillips family.  Cardinal Tobin stated that he
4    did not know about the extent of the controversy at
5    the school when he rescinded the February expulsion
6    and at this later time, after the recommendation was
7    made to him not to re-enroll, he -- he got -- he
8    received much more information about what happened
9    earlier.
10          At the time that Cardinal Tobin rescinded
11   the expulsion, he assumed the expulsion was because of
12   a dispute over basketball.  He learned in the recent
13   meetings that the problem was not basketball, but
14   rather that plaintiff's actions had upset the
15   tranquility of the school.  When he saw the litigation
16   expanded, Cardinal Tobin was astounded.  He became
17   aware of letters written by parents complaining about
18   the Phillips family and came to understand the
19   detrimental effect of the aggressive steps taken by
20   Mr. Phillips and Ms. Mullen.
21          In reinstating the children earlier, it was
22   Cardinal Tobin's aim that the children would be
23   integrated in the school and everyone would move on.
24   He was -- he felt that the profoundly expanded
25   litigation was inconsistent with his decision to

42

1    rescind the expulsion.
2          Cardinal Tobin does not get involved in day-
3    to-day decisions of the Archdiocese school.  He
4    testified that it is impractical or impossible for him
5    to oversee more than 90 Catholic primary and secondary
6    schools.  Therefore, there is a school superintendent,
7    Dr. Dames, who oversee the operations.
8          Cardinal Tobin believed in making his
9    decision, the peace and tran -- that the tranquility
10   and well-being of the STS community necessitated his
11   decision.  He indicated that the decision was not
12   intended to be punitive and he was considering the
13   well-being of the entire community.  He emphasized
14   that only a serious reason would get him to approve
15   the decision.
16          On March 22, 2017, the Archdiocese issued a
17   press release indicating a lawsuit had been filed
18   against the Archdiocese and STS and they intended to
19   defend, quote, "this baseless lawsuit," unquote.  The
20   statement was placed in the backpack of each student.
21   Plaintiff and Ms. Mullen claimed that this -- the
22   placement of the press release in the backpacks was an
23   effort to target and embarrass their children.
24   Archdiocese witnesses indicate that the statement was
25   sent out to members who wanted to know how the issue

43

1   was being handled.  The statement was also posted on
2   the wall of the church, which the plaintiff and Ms.
3   Mullen claimed was embarrassing and traumatizing to
4   their children.  However, other press releases were
5   also posted in the church.
6           Further, more significantly, the Court is
7   puzzled how Mr. Phillips and Ms. Mullen could not see
8   that their escalation of this controversy would not
9   generate a reaction.  Defendants were in need to let
10  the parishioners know how it will respond to a very
11  controversial matter.  Based on the credible testimony
12  of Deacon Joe and Dr. Dames's sincere concerns about
13  the uproar in the STS community, it is evident that
14  the press release was aimed at letting the STS
15  community know that the defendants would protect the
16  members of that community.
17          It should be noted that Deacon Joe was
18  forthright in his testimony and his testimony also
19  indicated that he was visibly shaken by these events.
20  He testified that in his many years as a school
21  administrator he had not witnessed such an intense
22  controversy.
23          Dr. Dames, a seasoned administrator with 30
24  years of experience, likewise testified her perception
25  of the uproar caused by the Phillips family by writing

44

1   letters and expressions was the most extreme
2   controversy she had ever witnessed.
3           On June 29, 2017, plaintiff filed a motion
4   to compel defendants to re-enroll S.P. and K.P. at
5   STS.  A hearing was held before the Court on June 29th.
6   After the hearing, the Court entered an order
7   scheduling a plenary hearing.
8           On June 29th, the Archdiocese issued a press
9   release referencing the motion and the attacks made by
10  plaintiff and Ms. Mullen in the court papers.
11          On June 29th, the Archdiocese issued a
12  further press release reflecting its disappointment of
13  the scheduling of a plenary hearing and expressing
14  optimism that it would prevail in defeating plaintiff's
15  re-enrollment application.
16          The statements -- these statements were
17  published in the Archdiocese bulletin.  Plaintiff
18  claims that publication of these documents, in which
19  the Archdiocese publicly defended itself against the
20  plaintiff action, re-victimized their family.
21  Unfortunately, blinded by the desire to protect their
22  children, the plaintiff and Ms. Mullen could only see
23  their point of view and did not consider the reaction
24  that their actions would cause.  They also failed to
25  see how the confrontational manner in which they

45

1    voiced their concerns would be perceived.
2              It is important to emphasize that the
3    decision not to re-enroll S.P. and K.P. had nothing to
4    do with the successful efforts of plaintiff to allow
5    S.P. to play basketball for the team.  That decision
6    was a product of the controversy.  And I will address
7    that specifically later in my decision the reasons why
8    I believe that the refusal to re-enroll the children
9    was totally unrelated to the Court's decision on the
10   basketball issue.
11             On June 11, 2017, Deacon Joe wrote a letter
12   indicating that Saint Theresa's School fully agrees
13   with and endorses the ecclesiastical decision regarding
14   the denial of S.P. and K.P.'s re-enrollment for the
15   2017-2018 school year, as set forth in the April 3
16   correspondence written by Dr. Dames which indicated
17   the children would not be re-enrolled.  Both letters
18   were sent to Mr. Phillips and Ms. Mullen.
19             The Court is convinced that Mr. Phillips and
20   Ms. Mullen were attempting to act in their children's
21   best interests.  Unfortunately, Mr. Phillips and Ms.
22   Mullen, out of love for their children, chose an
23   extremely confrontational approach and did not
24   evaluate the circumstances objectively.  Sister Hélène,
25   Deacon Joe, Sister Butler, and Dr. Dames all attempted

46

1    to respond to their concerns.  Both Mr. Phillips and
2    Ms. Mullen did not objectively absorb the efforts
3    being made to address their concerns.  They
4    intensified, rather than resolved problems.  In fact,
5    many of the complaints they referenced were about
6    previously resolved issues.  Rather than moving on
7    from resolved issues, they piled issues on top of
8    resolved issues.
9              On April 3, 2017, as the Court indicated, an
10   ultimate decision was made to decline to re-enroll
11   them in the school.  The STS community has about 80
12   families and about 200 students.  The Archdiocese and
13   STS determined the need to be mindful of the pastoral
14   needs of the entire STS community.  Defendants
15   ultimately took steps to control the disruptive
16   atmosphere that Mr. Phillips and Ms. Mullen created.
17             Now, I'd like to turn to the applicable
18   legal principles.  And to get to those, I also need to
19   do somewhat of a -- some legal analysis.
20             On or about March 1, 2017, plaintiff filed
21   an amended complaint.  Thereafter, the Court directed
22   plaintiff to amend and supplement its complaint to
23   address the non-re-enrollment issue which came up
24   after the filing of the amended complaint.  As
25   indicated previously, in that complaint plaintiff and

47

```
 1    Ms. Mullen, who was to be added as a plaintiff, sought
 2    to add approximately 80 individuals, including STS
 3    employees, parents of STS students, and members of the
 4    STS community for expressing opinions concerning the
 5    lawsuit.
 6              On April 3, 2016 [sic], Dr. Dames,
 7    superintendent of schools, wrote a letter informing
 8    Ms. Mullen and Mr. Phillips that K.P. and S.P.'s
 9    re-registration application would not be accepted for
10    the upcoming 2017-2018 school year.  Her letter
11    states, as follows:
12              "Dear Mr. Phillips and Judge [sic] Mullen:
13              The Saint Theresa's School mission statement
14         provides Saint Theresa's School -- Catholic
15         School and the Archdiocese of Newark is dedicated
16         to the cultivation of academic excellence and the
17         spiritual social and emotional growth of each
18         student.  Our school nurtures an environment of
19         cultural diversity in which a caring faculty,
20         through the implementation of the education
21         system of Saint John Bosco, based upon reason,
22         religion and love and kindness, seeks to develop
23         each student to his/her potential.  With Christ
24         and Mary as our examples, the Saint Theresa's
25         community grows [sic] in a family atmosphere in
```

48

```
 1         which each individual experiences respect,
 2         challenge, responsibility and exceptional love.
 3              Actions and events initiated by you over
 4         the last several months have directly interfered
 5         with the fulfillment of this mission, not only
 6         for Saint Theresa's School, but for also for its
 7         administrators, staffs, students and parents.  In
 8         order to restore the promise of a 'family
 9         atmosphere' characterized by 'respect, challenge,
10         responsibility and exception love,' Saint
11         Theresa's School will not be able to accept
12         enrollment for the 2017-18 school year.
13              The decision has been made in this time in
14         order to allow sufficient time for you to make
15         alternate arrangements for -- alternative
16         arrangements for next year.  We wish good luck
17         with -- the children good luck with their future
18         endeavors.  Thank you."
19              And that is, I believe, J-3 in evidence.
20              The non-re-enrollment decision was made
21    after the February 22nd listening sessions and after
22    efforts had been made to return to a spirit of peace
23    and tranquility in the community.  And the lawsuit
24    that ensued and the ongoing press coverage that was
25    generated upset that peace and tranquility.
```

49

```
1              Religious educational institutions have a
2     constitutionally protected right to be free from civil
3     court interference.  This argument is rooted in the
4     United States Supreme Court's decision in Watkins v.
5     Jones, 80 U.S. 679 (1871).  In Watson, the Supreme
6     Court considered judicial involvement in a church's
7     property dispute.  The court was asked to determine
8     whether a certain sect of the church had control over
9     church property.  The Supreme Court said that civil
10    courts were not allowed to interfere in this property
11    dispute and this case resulted in the following
12    landmark principle.  And this is a quote.
13              "All who unite themselves to such a body do
14         so with an implied consent to this government,
15         and are bound to submit to it.  But it would be a
16         vain consent and would lead to the total
17         subversion of such religious bodies if anyone
18         aggrieved by one of their decisions could appeal
19         to the secular courts and have them reversed.  It
20         is of the essence of these religious unions, and
21         of their right to establish tribunals for the
22         decision of questions arising among themselves,
23         that those decisions should be binding in all
24         cases of ecclesiastical cognizance, subject only
25         to such appeals as the organism itself provides
```

50

```
1          for."
2              And I believe that's from page 729 of that
3     decision.
4              The rule announced by the court in Watson
5     was, unless neutral principles of law apply, judicial
6     decisions of ecclesiastical doctrine is banned under
7     the First Amendment.  The -- this rule was diluted in
8     Gonzalez versus Roman Catholic Archbishop of Manila,
9     280 U.S. 1, where the court stated -- the Supreme --
10    the United States Supreme Court stated, quote:
11             "In the absence of fraud, collusion, or
12         arbitrariness, the decisions of the proper church
13         tribunals on matters purely ecclesiastical,
14         although affecting civil rights, are accepted in
15         litigation before the secular courts as
16         conclusive, because the parties in interest made
17         them so by contract or otherwise."
18             The -- this ruling was later modified by the
19    Supreme Court in Serbian Eastern Orthodox for the
20    United States of America and Canada versus
21    Milivojevich, 426 U.S. 696 (1976).  In that case, the
22    Court modified the way it looked at these cases and
23    said, quote:
24             "Whether or not there is room for 'marginal
25         civil court review' under the narrow rubrics of
```

51

```
 1              'fraud' or 'collusion' when church tribunals act
 2              in bad faith for secular reasons [sic], no
 3              'arbitrariness' exception -- in the sense of an
 4              inquiry whether the decisions of the highest
 5              ecclesiastical tribunal of a hierarchical church
 6              complied with church laws and regulations -- is
 7              consistent with the constitutional mandate that
 8              civil courts are bound to accept the decisions of
 9              the highest judicatories of a religious
10              organization of hierarchical polity on matters of
11              discipline, faith, internal organization, or
12              ecclesiastical [sic], custom, or rule [sic]."
13                   Essentially, that -- unquote.  That's at
14      page 713 of that case.
15                   As a result, the Supreme Court eliminated
16      the arbitrariness exception to the rule that civil
17      courts are prohibited from adjudicating religious
18      disputes.  The Court has not revisited whether
19      ecclesiastical -- whether civil courts can review
20      ecclesiastical decisions for fraud or collusion, but
21      they can't review them for arbitrariness.  That's what
22      the case says.
23                   Since then, there has been further
24      litigation about this issue before the various circuit
25      -- federal Circuit Courts of Appeals and in many state
```

52

```
 1      courts.  A split of authority has developed with
 2      respect to state breach of contract and tort claims.
 3      Some courts have held that if an ecclesiastical issue
 4      underlies some of  the claims, such a breach of
 5      contract claim, all of the claims should be dismissed,
 6      thereby precluding civil courts from exercising
 7      jurisdiction over any of those claims.  Gaston versus
 8      Diocese of Allentown, 712 Atlantic Second. 757, which
 9      is, I believe, a Pennsylvania Supreme Court case from
10      1998.
11                   In that case, students at a Catholic school
12      were expelled.  The archdiocese and the -- were --
13      were sued and the principal were sued in tort for
14      negligence and intentional infliction of emotional
15      distress.  And the court dismissed the complaint on
16      jurisdictional grounds, stating that the action was an
17      attempt to involve civil courts in an ecclesiastical
18      custom or rule, as upheld by the bishop of the Roman
19      Catholic Church.
20                   There are cases in which personnel decisions
21      can be reviewed by civil courts and there are cases
22      where an employment matter can be looked at as a
23      secular matter.  One of such cases is Scharon v. Saint
24      Luke's Episcopal Presbyterian Hospitals, 929 Fed.
25      Second 360 (8th Circuit 1991).
```

53

```
 1              In this case, there are two counts in the
 2      amended -- in the third amended complaint which
 3      survived the motion to dismiss.  The second count
 4      indicated that the defendants, Archdiocese and STS, in
 5      refusing to re-enroll the children were in breach of
 6      contract, it violated the handbook.  And that count
 7      eight of the complaint indicated that they were
 8      wrongfully and improperly expelled in April 2017 in
 9      retaliation for the verified complaint, and in breach
10      of contract, and that they also waived the provisions
11      of the handbook.
12              The case law throughout the country seems to
13      support the notion that Catholic high schools for the
14      most part should be -- that their ecclesiastical
15      decisions should be followed.  Following -- and
16      recently, the -- there is a Pennsylvania case,
17      Chestnut Hill College v. Pennsylvania Human Relations
18      Commission, 158 Atlantic Third 251, which is a
19      decision made by the Commonwealth Court of Pennsylvania
20      on April 7, 2017.  In that case on page 259, the court
21      stated as follows:
22              "Following Lemon versus Kurtzman, 403 U.S.
23          602 (1971), this Court was persuaded that
24          parochial high schools were an integral part of
25          the Catholic mission, as 'a powerful vehicle for
```

54

```
 1          transmitting the Catholic faith to the next
 2          generation.'  In so doing, we emphasized that the
 3          religious" --
 4              And in that case, they cited from Roman
 5      Catholic Archdiocese versus Pennsylvania Human
 6      Relations Commission, 548 Atlantic Second 328, which
 7      is also a Pennsylvania Commonwealth decision from
 8      1988.  It went on to say that:
 9              "In so doing, we emphasized that the
10          religious character of the parochial school --
11          schools based on" -- "they [sic] emphasized the
12          religious character of parochial schools based on
13          several factors.  They [sic] noted non-Catholic
14          students were required to take religious [sic]
15          classes and to attend Catholic services as a
16          condition of attending [sic].  We reasoned that
17          'parochial schools constituted an integral part
18          of the religious mission of the Catholic church
19          and this process of inculcating religious
20          doctrine, is, of course, enhanced by the
21          impressionable age of the pupils, in primary
22          schools particularly."
23              And in the Chestnut Hill case, the court
24      indicated that the principles relating to Catholic
25      high schools did not apply to colleges, but in drawing
```

1   the contrast between these two organizations, they --
2   the court said that, while there are material
3   differences between parochial primary and secondary
4   schools and college:
5           First, parochial schools educated children,
6   not students who typically reach the age of majority,
7   such which is the case with colleges.
8           Second, parochial schools were governed and
9   operated by the Roman Catholic Archdiocese of
10  Philadelphia, college is by one-fifth, plus one,
11  comprised of the Sisters of Saint Joseph's.
12          Third, Catholic instruction was a required
13  part of the curriculum at the parochial schools and
14  attending Catholic classes and masses was a condition
15  of attending the schools.  College, by contrast, does
16  not require attendance at religious services and
17  religious instruction is available, but not required.
18          And the essence of the reasoning of that
19  case and of other cases is that Catholic high schools,
20  because they are unique in their mission, are of a
21  religious nature.
22          The establishment clause of the First
23  Amendment provides that Congress, quote, "shall make
24  no law respecting an establishment of religion."
25          Pursuant to Lemon versus Kurtzman, 403 U.S.

1   602 (1971), the stated action must have -- must (1)
2   have a secular purpose; (2) have a primary effect that
3   neither advances nor inhibits religion; and (3) not
4   foster excessive government entanglement with
5   religion.
6           With respect to this third criterion, the
7   determination of whether there is excessive
8   entanglement with church and state is conducted
9   through both substantive and procedural context.
10          Substantive entanglement -- McKelvey v.
11  Pierce, 173 N.J. 26, 41 to 42 (2002).  Subjective [sic]
12  entanglement occurs when courts intrude into a
13  church's freedom to select, discipline or terminate
14  its ministers.  Procedural entanglement occurs when
15  the state and church are matched against each other in
16  a protracted adversarial proceeding.  Procedural
17  entanglement recognizes a church's substantive
18  freedoms and the impact of judicial intervention,
19  including extensive oversight of church activities.
20          In her letter, Dr. Dames articulated that
21  the re-enrollment decision was made for religious
22  reasons.  This Court does not have the authority to
23  meddle in that decision, as it was based upon
24  ecclesiastical considerations.  Cardinal Tobin
25  testified he was the ultimate decision-maker of the

57

```
1    non-re-enrollment decision.  He made that decision
2    because he felt it was necessary to restore the peace
3    and tranquility of the school community, an
4    ecclesiastical decision made for the benefit of
5    achieving the school's mission.
6              In making this decision, he had the input of
7    Dr. Dames and Reverend Nydegger.  These trusted
8    administrators consulted with him in making this
9    decision for faith-based reasons.  As discussed
10   earlier, he explained his faith-based rationale at
11   trial.  On cross-examination, plaintiff's counsel
12   asked Cardinal Tobin if he was aware of the sexual
13   issues and the alleged harassment and bullying,
14   harassment and -- and the harassment and intimidation
15   of S.P.  A number of these issues were resolved prior
16   to Dr. Dames meeting with Cardinal Tobin, albeit not
17   to Mr. Phillips' and Ms. Mullen's satisfaction.
18             If Cardinal Tobin did not make his decision
19   on correct information, plaintiffs' remedy would be to
20   go back to Cardinal Tobin as reflected in the
21   handbook, J-3.  Specifically, the handbook states on
22   page 16 that with respect to an appeal to an expulsion
23   decision, quote, "The written request must be made to
24   the principal within five business days from the date
25   of official communication by school administrators of
```

58

```
1    the disciplinary decision.  Failure to request a
2    hearing within these five business days forfeits the
3    right to a hearing," unquote.  And this is in the
4    expulsion section of the handbook.  This faith-based
5    decision was made by church officials, and any appeal
6    of that should have been made to church officials, not
7    to this Court.
8              Plaintiff cites no case law which would
9    allow this Court to interfere with the church's
10   ecclesiastical mission.  The Court knows there's no
11   case law that would give this Court the authority to
12   intrude upon such a decision because the ecclesiastical
13   decision-maker did not know all the facts which
14   plaintiff wanted the decision-maker to know.
15             The Court would be remiss if it did not
16   emphasize that the plaintiffs' 2016 issues were
17   resolved as to sexual misconduct and bullying, thus,
18   plaintiffs' position, to the extent that it raises
19   these issues time and again, seems to serve little
20   purpose.  While plaintiff and Ms. Mullen feel bullied
21   and harassed by the reaction of the St. Theresa's
22   community by posting the online petition, Facebook
23   posts and the like, they ignore that they chose to air
24   this matter out publicly.  They now complain about the
25   reaction it has caused.
```

59

```
 1          Cardinal Tobin, Reverend Monsignor Nydegger,
 2    Dr. Dames, Principal Deacon Joe, and former principal
 3    Sister Helene testified credibly that their efforts
 4    were rooted in an effort to maintain peace and
 5    tranquility in the faith-based community.  Dr. Dames
 6    wanted to stop this controversy on all sides, and on
 7    February 22nd she met with everyone, including Ms.
 8    Mullen, for that specific purpose.  Plaintiff chose to
 9    pursue their grievances aggressively and in the most
10    confrontational manner.  The church officials' decision
11    was based in attempting to restore its faith-based
12    mission, the faith-based mission of its community.
13    The Court does not have the jurisdiction to question
14    these faith-based decisions.
15          This Court's view of this matter is
16    supported by a number of out-of-state cases, various
17    out-of-state cases.  For example, in Calvary Christian
18    Schools v. Huffstuttler, 367 Arkansas 117 (2006), a
19    student was dis-enrolled from a religious school due
20    to the actions of his parents.  The Supreme Court of
21    Arkansas held that the Court were without jurisdiction
22    to rule on any of these claims arising out of this
23    enrollment.  Specifically, the Court found that this
24    enrollment was due to the parents' failure to comply
25    with Matthew 18 principles in the school's handbook.
```

60

```
 1          The reasons included in the dis-enrollment
 2    letter reflected the school's ecclesiastical
 3    philosophy.  The Court held that any and -- claims
 4    arising out of a dis-enrollment would therefore
 5    require the Court to determine whether the plaintiff --
 6    the plaintiffs did or did not comply with Matthew 18.
 7    This Court dis -- therefore, the Court dismissed the
 8    claims for lack of jurisdiction.  In this case, the
 9    decision was based upon following the educational
10    system of Saint John Bosco, based upon reason,
11    religion, and loving kindness, and on the philosophy
12    imparted upon the Catholic-based community by Christ
13    and Mary, and that is not a decision for this Court to
14    make.
15          Likewise, in Gaston v. Diocese of Allentown,
16    which was discussed earlier, 712 A.2d 757, Pennsylvania
17    Superior Court 1998, a Catholic school expelled the
18    plaintiff's son and daughter after the principal felt
19    threatened during an interaction with the plaintiff's
20    father regarding a curriculum dispute.  The plaintiffs
21    brought the claim intentional and negligent infliction
22    of emotional distress.  The Court held, quote, "The
23    question here, however, is not a property or
24    contractual dispute.  It is a claim that hits a tort
25    law but is based upon an expulsion decision.  Ratified
```

61

1   by the Bishop, it is our opinion not receptive to
2   application of neutral principles of law.  The
3   Catholics' disciplinary code and review of expulsion
4   involves matter of church doctrine."  Likewise, in
5   this case, the expulsion decision involved matters of
6   church doctrine.
7        Similarly, in In re St. Thomas High School,
8   495 SW.3d 500, Texas Appellate Court 2016, a Texas
9   appeals court ruled that the Court lacked jurisdiction
10  to hear a case whether parents of a student's alleged
11  sexual harassment against their son's teacher along
12  with other highly charged, slanderous accusations
13  after a dispute over a low grade.  The school
14  investigated and found the claims to be unfounded, and
15  the parent later admitted they were unfounded.
16        As a result, the school expelled the child
17  because it would have been impossible -- difficult if
18  not impossible for the teachers to educate the student
19  without fear of similar retribution by the parents.
20  The parents then sued for breach of contract, specific
21  performance and injunctive relief.  The Court
22  determined the decision was a result of a Catholic
23  school's management of its internal affairs and held,
24  quote, "If judicial resolution as a claim will
25  interfere with a church's management of its internal


62

1   affairs or encroach upon the church's internal
2   governance, the Court may not exercise jurisdiction
3   over the claim."
4        It bears emphasizing in this case that the
5   children in this case were expelled because -- not
6   because of their conduct but because of the conduct of
7   their parents, which interfered with the mission of
8   the church, and this Court is not authorized under law
9   to meddle in such activities.
10        In addition to the ecclesiastical reasons,
11  which standing alone would be a sufficient basis for
12  this Court to deny the request to rescind the non-re-
13  enrollment, there are also secular reasons to do this.
14  Either of these reasons on their own would be
15  independent reasons to uphold the non-re-enrollment
16  decision.  Plaintiff seeks an order compelling the re-
17  enrollment of S.P. and K.P. for the academic year
18  commencing September 6, 2017.
19        In the third amended complaint, the factual
20  basis for this request is made starting with paragraph
21  88 of the amended complaint.  The complaint reads as
22  follows: 88.  On or about January 2017, after this
23  lawsuit was pending, plaintiffs were invited to return
24  to STS and were given registration packets for the
25  2017/2018 school year.  On or about February 17, 2017,

63

```
 1    and after the expulsion was rescinded, the Court ruled
 2    that S.P. had the settled legal right to play
 3    basketball.
 4           On or about March 22, 2017, STS handed every
 5    student another press release from defendant
 6    Archdiocese regarding the instant lawsuit.  This press
 7    release -- in 91 -- this press release was also
 8    published and remains on the Archdiocese website and
 9    was done to intimidate, bully, harass, shame,
10    humiliate, and/or embarrass the plaintiffs and were
11    retaliatory.
12           92.  Plaintiff, S.P. and K.P. registered for
13    the 2017/2018 school year.  93.  The registration
14    application was rejected by STS by a letter dated
15    April 7th, 2017, and received by Scott Phillips on
16    April 11th, 2017, stating in pertinent part, quote,
17    "Your registration is being returned to you pursuant
18    to the letter which you received most recently by
19    certified mail," unquote.
20           94.  The letter in question was sent by the
21    Archdiocese months after the lawsuit was pending, and
22    it refers to the mission statement in the STS handbook
23    and states in pertinent part, "Actions of -- and
24    events initiated by you over the past several months
25    have directly interfered with the fulfillment of the
```

64

```
 1    mission, not only for St. Theresa's School, but also
 2    for many of its administrative staff, students, and
 3    parents," unquote.  95.  No specific actions are
 4    described.  96.  The only actions taken by plaintiffs
 5    were to file the instant lawsuit and amendments to
 6    same.
 7           97.  These letters by the Archdiocese,
 8    church, and/or STS, after the Court ruled that S.P.
 9    would -- had settled legal rights to play basketball
10    and among other things after the Court ruled, that the
11    settled legal right arose under Title IX.
12           98.  Defendant, Archdiocese, church, and/or
13    STS, by waiting months before sending this April
14    letter and by inviting K.P. and -- S.P. and K.P. to
15    return, waived its right to refuse admission to S.P.
16    and K.P. for the 2017/2018 year.  This April letter
17    from the Archdiocese is another form of expulsion for
18    filing the instant lawsuit, which violates public
19    policy despite the fact that there is no mention of
20    expulsion in the letter.
21           In count two of the complaint, it is alleged
22    that the defendants Archdiocese and/or STS, in refusing
23    to properly address the issues raised by plaintiff and
24    by expelling S.P. and K.P., are in breach of contract
25    and/or in violation of the provisions of the STS
```

65

1   handbook and have acted in bad faith.  That count asks
2   for specific performance, monetary sanctions, and
3   other relief.
4         Paragraph eight of the complaint indicates
5   that the Archdiocese and/or STS improperly expelled
6   S.P. and K.P. in -- (who was not a plaintiff in this
7   action at the time in February 2017), close
8   parentheses, and again, in April 2017, in retaliation
9   for filing the verified complaint and are in breach of
10  contract.  Defendant also waived the provision in the
11  STS handbook, and this provision is against public
12  policy.  And this count also seeks specific performance
13  and damages.
14        Plaintiffs' application essentially seeks an
15  injunction for specific performance of an agreement to
16  re-enroll the children.  Equitable relief in the form
17  of a permanent injunction is an extraordinary remedy.
18  Quote, "Permanent injunction requires proof that the
19  applicant's legal right to such legal right has been
20  established and the injunction is necessary to prevent
21  a continuing irreparable harm," Verna v. Links at
22  Valleybrook Neighborhood Association, 371 NJ Super. 77,
23  89 (App. Div. 2004).
24        "Whether a permanent injunction should be
25  granted is within the sound discretion of the trial

66

1   court," Sheppard v. Township of Frankford, 261 NJ
2   Super. 5, 9 (App. Div. 1992).  "Such relief, though,
3   must not be more extensive than is reasonably required
4   to protect the parties' interest in whose favors it is
5   issued," Verna v. Links, 371 NJ Super. at 89.
6         An injunction -- the circumstances in which
7   an injunction may be issued is discussed extensively
8   in Van Name v. Federal Deposit Insurance Corporation,
9   130 NJ Eq. 433 (Ch. Div. 1941).  Although this case is
10  an old case, it sets out time-honored precepts which
11  have been followed by this Court and other courts of
12  equity.  At pages 442 to 443, the Court lays out the
13  following principles.
14        An injunction is not granted as a matter of
15  right, but is -- its granting or refusal rests in the
16  sound discretion of the Court under the circumstances
17  and the facts of the particular case.  It is a strong
18  arm of equity.  There is no power the exercise of
19  which is more delicate, which requires greater
20  caution, deliberation, and sound discretion, and which
21  is more dangerous in a doubtful case than the issuing
22  of an injunction.
23        The remedy of an injunction is an
24  extraordinary one and may not be awarded to any suitor
25  unless and until his right to it is established by

```
 1   clear and convincing testimony free of all reasonable
 2   doubts.  If the complain -- a complainant's asserted
 3   right is doubtful or disputed, equity will move
 4   cautiously before determining to grant remedy by
 5   injunction.
 6          In determining an application for a
 7   permanent injunctive relief, the Court should be
 8   guided by the following comprehensive list of factors,
 9   and in this case some of these factors but not all of
10   them applied to this case.  Those factors set forth in
11   the Sheppard case are, one, the character of the
12   interest to be protected; two, the relative adequacy
13   of the injunction to the plaintiff as compared to --
14   with other remedies; the unreasonable delay in
15   bringing the suit for any unrelated misconduct by
16   plaintiff by the comparison of the hardship to
17   plaintiff if release is denied and hardship to
18   defendant if relief is granted; six, the interests of
19   others, including the public; and seven, the
20   practicality of framing in order for judgment,
21   Sheppard, 261 NJ Super. at 10, reciting the
22   restatement of 27.
23          In this case, the plaintiff seeks, in
24   paragraphs two and eight, specific performan -- a
25   decree of specific performance of the -- of what they
```

68

```
 1   perceive to be the right to re-enrollment.  In the --
 2   granting specific performance by a decree of
 3   injunction is also addressed in Van Name v. FDIC, 130
 4   NJ Eq. 433 at page 443.  There, the Court says an
 5   injunction to restrain a breach of contract often
 6   operates as and affects all the purposes of a decree
 7   for a specific performance.  As a general rule, to
 8   enjoin one from violating a contract is an indirect
 9   method of enforcing its affirmative provisions.  The
10   jurisdiction exercised in the substance is the same,
11   and the general rules apply in one case as the other.
12          Courts of equity will not interfere to
13   decree specific performance except in cases where it
14   would be strictly equitable to make such a decree.
15   The power of injunction committed to this Court is a
16   delicate and a most important power and should always
17   be exercised with caution, to prevent, not to do
18   mischief, to protect and sustain, not to render
19   enjoyment of property, of rights in property which are
20   uncertain.
21          Specific performance is a discretionary
22   remedy resting on equitable principles and requiring
23   the Court to appraise the respective conduct of
24   parties, Friendship Manor, Inc. v. Greiman, 244 NJ
25   Super. 104, 113 (App. Div. 1990), cert. denied 126 NJ
```

69

```
 1      321 (1991).  Thus, it is explained by the Supreme
 2      Court in Stehr v. Sawyer, 40 NJ 352, 357 (1963), that
 3      the party asking the aid of the Court must stand in
 4      conscientious relation to his adversary.  His conduct
 5      in the matter must be fair, just, and equitable, not
 6      sharp or aiming at unfair advantage.  The relief itself
 7      must not be harsh or oppressive.  In short, it must be
 8      clear that the claim is an equitable one.
 9              Here, the Court cannot ignore the conduct of
10      the defendants.  The defendants, as previously stated
11      by the Court, decided to make -- take the most
12      confrontational approach, an approach inconsistent
13      with the goals and objectives of the -- a faith-based
14      community.  They made the affirmative choice to go to
15      the press and to make this matter public.  They made
16      the affirmative choice to sue 80 -- more than 80
17      individuals in a community that has approximately 80
18      families.
19              And their actions are harsh and oppressive,
20      and they are not entitled to specific performance.
21      And there is no automatic right to specific
22      performance.  The -- a court must make a complete
23      evaluation of the complaint, of the claims asserted,
24      the defenses raised, the hardships imposed on the
25      parties, the fairness and reasonableness of both
```

70

```
 1      parties' conduct, and the availability of other
 2      remedies before determining whether to grant such
 3      relief, Marioni v. 94 Broadway, Inc., 374 NJ Super.
 4      588, 598 to 99 (App. Div. 2005), cert. denied 183 NJ
 5      591 (2005).  And quoting from that case at that page,
 6      in general, to establish a right to the remedy of
 7      specific performance, a plaintiff must demonstrate
 8      that the contract is valid and enforceable at law and
 9      that an order compelling specific performance will not
10      be harsh or oppressive.
11              In Cohen, Estate of Cohen ex rel. Perelman v.
12      Booth Computers, 421 NJ Super. 134, 149 to 50, (App.
13      Div.), cert. denied 208 NJ (2011), the Court stated,
14      quote, "To establish a right of specific performance,
15      the party seeking relief must demonstrate that the
16      contract in question is valid and enforceable and that
17      the terms of the contract are clear."
18              Here, there is no binding contract between
19      the plaintiff and the defendants for the 2017/2018
20      school year.  Thus, because there is no contract,
21      there is no legal contractual right to specifically
22      enforce.  Plaintiffs do not cite -- plaintiff does not
23      cite any case which requires defendants to enter into
24      a new contract for the 2017/2018 school year to educate
25      S.P. and K.P.  Defendants have refused to enroll S.P.
```

71

```
 1    and K.P. for the next academic year starting September
 2    6.  This Court cannot specifically enforce a contract,
 3    because there is no contract to enforce.  Even if a
 4    contract could be found by a review of the 2016/2017
 5    student handbook, no enforceable right for re-
 6    enrollment could be developed based on that agreement
 7    under the facts of this case, and I will explore that
 8    next.  It should be observed at the outset -- okay,
 9    that's fine.  That's all I need.
10              THE CLERK:  Okay.
11              THE COURT:  It should be observed at the
12    outset that the children were re-enrolled not because
13    of the conduct -- of their conduct, but because of the
14    conduct of their parents.  There is no dispute that
15    the children's behavior in any way caused the non-re-
16    enrollment decision.  An examination of the contract
17    demonstrates that there are several provisions which
18    give defendants the right not to re-enroll S.P. and
19    K.P.
20              In analyzing this principle, the Court first
21    turns to the fact that there is an acknowledgment and
22    receipt of the parent student handbook by Mr. Phillips.
23    In that acknowledge -- in that acknowledgment, Mr.
24    Phillips acknowledged that the handbook is binding on
25    students and parents during the current academic year.
```

72

```
 1    Thus, the terms of this contract were binding on him
 2    and he agreed that that would be the case.  He further
 3    signed the statement saying I understand my
 4    responsibility to support the school policies it has
 5    established.
 6              Looking at the contract itself, the contract
 7    states -- the handbook states on page 14, "Actions
 8    that violate the law, threaten or cause harm to
 9    another student or staff, disrupt or impede the
10    welfare and progress of the school community, or bring
11    discredit to the school will not be tolerated."
12              Clearly, there was an agreement.  Although
13    it applied students, it certainly is a fair implication
14    applied to parents that they would not disrupt or
15    impede the welfare and progress of the school
16    community and the publicity, which was started with
17    Mr. Kernan, and which no one has -- no one in this
18    case has testified in any way that the defendants did
19    anything to encourage this publicity.  Deacon Joe
20    specifically testified they didn't, and the -- but
21    those wheels were set in motion by the plaintiffs, and
22    the plaintiffs also chose to appear publicly in
23    various media outlets, making their children available
24    for such interviews.  And thus, at least in the minds
25    of the school community -- and it's in letters, it's
```

73

```
 1    in the petition which the plaintiff put in evidence,
 2    and in other documents, that this generated a concern
 3    on the parents' behalf that it was interfering with
 4    the school's mission and it was disrupting the school.
 5            The further disruption of -- which caused
 6    further controversy is suing 80 individuals in the
 7    school community also.  While it's -- certainly, an
 8    individual has the right to sue, lawsuits can have
 9    consequences, and there is no case law that says that
10    I -- that this Court knows of that seeking damages
11    from 80 individuals in the school community would not
12    -- could not result in some kind of reaction to that
13    if it creates an uproar in that community.
14            The handbook goes on to say on page 14, "If
15    a student's behavior is generally disruptive or -- and
16    uncooperative, it will be necessary to ask the parents
17    to choose another school for the child.  We cannot
18    sacrifice the education of the whole class because of
19    the disruptive behavior of one student.  And the same
20    would apply as to the disruptive behavior of parents.
21            Now, in this case there is a continuum of
22    conduct with meetings with various school individuals,
23    Sister Helene, Deacon Joe and others where they were
24    shaken by the aggressive conduct of the plaintiffs.
25    So there were actions far beyond just the publicity
```

74

```
 1    that caused this.  And one only need to look at the
 2    letters written by Ms. Mullen which threatened time
 3    and time again that if she didn't get her way, that
 4    there would be consequences.  And those -- the tone of
 5    those letters, as well as the tone of Mr. Phillips'
 6    meeting with Sister Helene when he was very
 7    confrontational with her, was to control the
 8    situation.
 9            One has to wonder why it was so important
10    for an eighth grader to be valedictorian of the class
11    that you would upset several people in the school
12    community over this issue.  And while it was all
13    framed in terms of giving closure to B.P. that's
14    disingenuous.  It's just plainly disingenuous, all of
15    which has to weigh in the decision.
16            And what's most important of all is that, if
17    you turn to the statements of Cardinal Tobin, what he
18    was ultimately concerned about -- and he was the
19    ultimate decision-maker -- he was concerned about the
20    peace and tranquility of the community being upset,
21    and he had to make a difficult decision, one family
22    which was disrupting the community versus the welfare
23    of the entire community.  And this Court is not --
24    even on a secular basis, that is a matter within the
25    discretion of the school.
```

75

```
1          There are other provisions in the handbook
2     that likewise apply.  The handbook goes on, on page 14,
3     to say, "It is expected that the judgment of school
4     authorities concerning the discipline of the students
5     will be respected and supported by parents and
6     guardians."  The decisions of this school were not
7     respected by parents and guardians.  In fact, rather,
8     they were met with letters threatening consequences if
9     the decisions weren't changed.  It wasn't enough to
10    discuss them, and there were many times when a
11    discussion led to a change, but if the discussion
12    turned out the way that these plaint -- that Mr.
13    Phillips or Ms. Mullen didn't like, then the
14    individuals who made those decisions were threatened.
15         The handbook goes on to say, quote, on page
16    14 -- I'm quoting this -- "If conflict arises, parents
17    and guardians are expected to discuss the problem
18    privately, and those concerned, and not in front of
19    students or other parents or guardians."  Here, it was
20    more than just private.  There was an airing out of
21    this matter in the press and making very public, which
22    was contrary to the faith-based purpose of this school
23    educating Catholic youth.
24         Turning to page 16 of the handbook, with
25    reference to expulsion, the handbook says, "Expulsion
```

76

```
1     is a permanent removal of the student from school.
2     However, if in the sole determination of the school a
3     student's conduct or activity reflects such grave
4     discredit on the school or otherwise presents a
5     definite impediment to the welfare and progress of the
6     school community, the student may be expelled without
7     the school's having taken prior disciplinary measures."
8          In this case, while the actions weren't by
9     the student, those concepts apply equally to the
10    parents, and these parents -- these issues were so
11    grave in the judgment of the school, in the judgment
12    of Reverend Monsignor Nydegger, Dr. Dames, Sister
13    Helene, Deacon Joe, and ultimately the Cardinal, that
14    they had to take steps.  And, as I indicated earlier,
15    there was an appellate mechanism in the handbook.  So
16    from a procedural basis, the plaintiffs waived that
17    process and did not exhaust the remedies.
18         Because in that paragraph, it says, quote,
19    "A written request must be made to the principal within
20    five business days from the date of official
21    communication by the school administrators of the
22    disciplinary decision.  Failure to request a hearing
23    within these five business days forfeits the right to
24    a hearing."  So, and that is in the expulsion
25    paragraph.  So they forfeited their right to a hearing
```

77

under the terms of the contract which the plaintiffs
want to enforce.  So even if that is a contract, they
don't have any contractual rights.  And even if they
do have the rights, they have violated numerous
portions of the contract.

The contract also indicates at the very
beginning in the purpose and use of this handbook,
states specifically, "The principal has discretion to
take actions other than those specified in the
handbook."  So the principal would have the power to
recommend expulsion based on the conduct of the
parents because this -- the handbook itself is --
provides him with such discretion.  So when viewed
from a contractual perspective, just looking at the
very terms of the contract itself, there is a
contractual basis for the non-re-enrollment, if one
was required.

The plaintiff has taken the position that
there was a pretext, there was a smokescreen, that the
-- this decision was made because of basketball,
because of bullying and harassment and intimidation of
the plaintiffs and the children and Ms. Mullen, and
this Court is persuaded, and I can't emphasize this
enough, that the decision to not re-enroll the
children has nothing at all to do with basketball.  It

78

is plainly not related.  And I'll give that reason in
a moment.

But in order to get to that decision, I need
to break down the events in this case into various
phases, because I think by looking at the phases one by
one it allows better analysis of the circumstances.
The first phase is the phase prior to any controversy
regarding basketball, and in that phase there were
issues about the alleged inappropriate sexual behavior
which was addressed, the substitute teacher that was
addressed, the issue with a gun which was addressed,
and the valedictorian issue, which was addressed but
not to the satisfaction of the plaintiffs.

But everything doesn't have to be to the
plaintiffs' satisfaction.  Somehow there's a
suggestion if it's not the plaintiffs' way, it's not
the right way.  And that's not the way any institution
has to operate.  The second phase is the basketball
phase.  The -- in the basketball phase the action was
taken by Mr. Donovan as commissioner, and there is no
doubt that there was a certification filed, which was
wrong.  It was false.  But that did not have a bearing
on this hearing.  I don't -- and there should not be
confusion between the two.

I don't know why Mr. Donovan gave false

1   testimony.  That's not an issue in this case.  He did
2   give false testimony, and this Court took action
3   because of it and change -- as the Court originally
4   would not allow S.P. to play basketball, when it got
5   the correct information, this Court allowed her to
6   play basketball.  So that problem was remedied.  But
7   then in that time, this Court -- Mr. Phillips made the
8   decision that he had an interesting human interest
9   story and he wanted his side to get out publicly.  To
10  this -- at this time, I still don't understand why he
11  had to get it out publicly.  He didn't even tell the
12  Court why it had to be gotten out publicly in a news
13  story.
14          This Court can certainly say that its
15  decision would not be affected by the press, because
16  this Court only makes decisions based what -- on
17  what's presented to it in this courtroom.  And when it
18  was told -- when this Court learned in this courtroom
19  that there were other girls playing on boys' teams,
20  this Court didn't need to know anymore and was able to
21  make its own independent decision with the facts.  And
22  that's how this Court's supposed to decide cases, on
23  the facts that occur in this courtroom.
24          So the Court has not had it explained to it
25  why this had to be aired out publicly.  And given the

1   nature of the various letters that were written by Ms.
2   Mullen threatening the school, it at least seems that
3   the argument that the public attention was done for
4   leverage, because there has been no other applic --
5   explanation.  But if you link those letters or the
6   publicity, it leads to an inescapable conclusion.
7           The next phase was the expulsion and
8   reinstatement.  The expulsion letter came out on
9   February 1.  The Appellate Division ordered the re-
10  enrollment of the children, I think it was on February
11  2.  It may have been the first.  A press release was
12  issued by the Archdiocese on that day, saying that
13  they had the right to expel under the terms of the
14  handbook for bringing litigation.  Ultimately, that
15  issue was sent back to this Court.
16          But what is significant is even while the
17  basketball issue was pending before this Court,
18  regardless of how it was decided, Cardinal Tobin
19  ordered the children be re-enrolled in the school.  So
20  it had nothing to do with basketball, because if
21  Cardinal Tobin was concerned that the pending motion
22  about basketball was going to be decided, he wouldn't
23  have re-enrolled the children.  So it totally escapes
24  the Court and defies the Court's imagination how, in
25  the slightest way, the decisions that were made by

81

1   Cardinal Tobin could have been related to the
2   basketball.  In fact, he did the opposite.  When he
3   found out that there were girls playing on a boys'
4   team, he said, "I don't want the league games
5   forfeited."  So that argument is just not supported by
6   the record.
7          So then, when the children returned to
8   school -- and this is probably the most significant
9   phase to me -- there was an immediate uproar at the
10   school.  There were Facebook posts, there was the
11   online petition.  There was a fair amount of discord
12   and upset in the school community because of all of
13   what individuals in the school viewed as negative
14   publicity.
15          This Court would be the first to acknowledge
16   that not everyone joined in the sentiments of those
17   individuals who felt that the Phillips family went too
18   far.  There were families who supported the family,
19   and there was a witness before this Court, although I
20   didn't accept his testimony, was clearly supportive of
21   the family.  And I accept the fact that there were
22   families that supported the Phillips family.  Ms.
23   Mullen testified about those families, and that does
24   strike the Court as being believable.
25          But the one inescapable conclusion for the

82

1   Court is that this was a very polarizing event.  And
2   the polarizing event became worse when 80 individuals
3   in the school community were sued.  But that didn't
4   happen -- the context in which that happened is very
5   important.  When the children returned to school, the
6   Court, two days after Cardinal Tobin made the decision
7   on the 15th to avoid this Court making any decision on
8   the -- on whether the expulsion could stand or not, he
9   said -- essentially said to this Court, "You don't
10   have to bother.  I'm going to let them stay this
11   year."  This Court then, on the 17th, two days later,
12   made the decision to let S.P. play basketball on the
13   boys' team.
14          Dr. Dames -- and this is the most significant
15   event to me, most significant of all -- Dr. Dames
16   scheduled a series of listening sessions with STS
17   parents on February 22.  Those listening sessions were
18   scheduled for five days after this Court made its
19   decision on the basketball.  Now let's look at what
20   Dr. Dames wanted to do with those listening sessions.
21   Did she want to kick the Phillips family out?  No.
22   She wanted to do the opposite.  She wanted everyone in
23   the community to stop attacking each other.  She
24   specifically told -- five days after the basketball
25   decision, she told parents, "Don't post on the online

83

1  petition."  Teachers were forbidden from posting on it.
2  She told parents, "Don't make the Facebook posts."
3          So the idea that this had anything to do with
4  basketball is derailed by the very conduct that was
5  taken.  At those meetings, and Ms. Mullen attended the
6  first meeting, Dr. Dames said, let's move on, let's
7  move back to peace and harmony and tranquility.  Let's
8  make this the same faith-based community that's made
9  this a wonderful place for all the children.  Let's
10  make it, continue -- these are my words, not hers.
11  But let's continue to make it this wonderful community
12  that the children can enjoy and thrive in and get the
13  benefit of the faith-based mission that we have.
14          So what happens the next day?  What happens
15  the very next day?  The very next day, Ms. Mullen
16  hand-delivers to the Cardinal a letter saying, if you
17  don't meet with me in six days, I'm going to sue the --
18  I'm going to sue everybody.  So you've got six days,
19  Cardinal.  Now, you know, not taking into consideration
20  how busy his schedule is and the responsibilities that
21  he has for somewhere in the neighborhood of 1.3 to 1.6
22  million Catholic lives.  To demand that the Cardinal
23  meet with her in six days or it -- or a lawsuit would
24  be filed is relevant to the Court in the sense that it
25  is a reflection of an overly aggressive approach where

84

1  a family has a range of alternatives to solve a
2  problem and they choose, of all the range of
3  alternatives, the most controversial, the most
4  incendiary alternative.
5          Now, I'm mindful of the fact that the
6  Cardinal did not get that letter, did not see that
7  letter.  But it bespeaks an intent and a purpose by
8  the -- by Mr. Phillips and Ms. Mullen.  And this case
9  is all about stopping that intent and purpose.  Then,
10  six days later, the lawsuit was filed, on March 1, as
11  promised.  80 -- more than 80 individuals in the
12  community were sued in this very small community,
13  creating a further uproar.
14          At that point, Reverend Monsignor Nydegger,
15  who doesn't function in this area, he doesn't oversee
16  the schools, he's got a lot more responsibility,
17  starts paying attention to this and comes to the
18  conclusion that this is a threat to the mission of the
19  community, and that's one of his central purposes as
20  vicar general and -- and I might get this wrong
21  because I'm doing it from memory -- keeper of the
22  curiae.  But he's got this religious mission that he's
23  trying to make certain will be honored by the
24  community.  And for that reason, for those faith-based
25  reasons he testified about why he got involved.  Dr.

85

```
 1    Dames was likewise motivated by that, and certainly
 2    the Cardinal's testimony cannot be refuted, that that
 3    is -- that he felt he had to react.
 4              But the point is that if they wanted to do
 5    it for these reasons, the Cardinal wouldn't have
 6    reinstated and Dr. Dames wouldn't hold the meeting to
 7    calm everyone down to get to the sense of community.
 8    But essentially, what the Phillips family did by
 9    writing a letter the next day and suing a few days
10    letter is saying, "We're not interested in calming
11    things down.  We're going to keep the controversy
12    going."  So, and I think the tone is what's important
13    to look at.  Not the substance, the tone.
14              Now, there has been discussions during this
15    case that the plaintiff has taken the position that
16    the expulsion letter, which was written by -- or the
17    non-re-enrollment letter, which was written by Dr.
18    Dames, is not proper because the Archdiocese does not
19    have standing .  The testimony of Monsignor Nydegger,
20    of Dr. Dames about ACES, about the nature of the
21    agreement between the Archdiocese and how they oversee
22    the community of -- does this individual need some
23    water?  Ask him if he needs some water.
24              UNIDENTIFIED SPEAKER:  Oh.  Oh, no.  Thank
25    you, sir.  Sorry, Your Honor.
```

86

```
 1              THE COURT:  you want to get him some water?
 2    Somebody get him some water.  You --
 3              Anyway, so the ACES agreement gives
 4    authority to the Archdiocese, the courts consider.
 5    But even if ACES doesn't, there's a superintendent of
 6    schools, there's a structure, it's a de facto
 7    structure.  To say that that's not the structure is to
 8    defy reality.
 9              But in an abundance of caution, this Court
10    had that letter written by the -- asked that a letter
11    be written by the school to verify that this had the
12    school's endorsement, and such a letter was written.
13    I've gotten and I received an objection to allow that
14    change many times in this case, and I indulged the
15    plaintiffs on a number of issues so that I could get
16    to the substance of this case and I'd get to the
17    merits.
18              Certainly, I overlooked the -- on a few
19    occasions their non-cooperation in depositions.  I
20    allowed the initial order to show cause to be amended
21    without the necessity of further papers, and did other
22    things to accommodate the plaintiffs.  And so I've
23    been criticized for giving the same consideration to
24    the defendants, but I always tried as best I could to
25    be fair to everybody, and I've said that several times.
```

87

```
 1              MR. WESTRICK:  Judge, would it be possible to
 2    take five minutes before we continue?
 3              THE COURT:  Yeah, we can.  I'm not that far
 4    from being finished --
 5              MR. WESTRICK:  Okay.
 6              THE COURT:  -- but we can take five minutes.
 7              MR. WESTRICK:  Thank you very much.
 8              THE COURT:  That's fine.  Okay, I'll be back
 9    in five minutes and I'll --
10              MR. WESTRICK:  Thank you, Judge.
11              THE COURT:  -- I'll wrap up then.
12         (Off the record from 4:32 p.m. to 4:43 p.m.)
13              COURT OFFICER:  Okay, everyone can be seated.
14              THE COURT:  So we're back on the record in
15    Phillips v. Archdiocese of Newark, C-248-16.  And I'll
16    hopefully now finish my opinion.  And I only have a
17    court reporter until six o'clock, so I need to try to
18    get this done.  So I think that the principal last
19    remaining issue is the issue of due process.
20              In Hernandez v. Don Bosco Preparatory School,
21    322 NJ Super. 1 (App. Div. 1999), plaintiff was a
22    student at Don Bosco Preparatory High School, a private
23    Catholic boys' school in Ramsey.  The student was
24    expelled for alleged misconduct which violated the --
25    the student was expelled for alleged misconduct which
```

88

```
 1    violated the student-parent handbook while the
 2    plaintiff was on disciplinary probation.  The
 3    misconduct included vandalism of a teacher's home,
 4    slashing of a teacher's tires, making prank calls to a
 5    teacher, allegedly selling illegal steroids, and
 6    allegedly urinating in a student's locker.
 7              The plaintiff, who was the student, and his
 8    parents met with the Don Bosco administration to
 9    discuss these incidents.  Thereafter, the Don Bosco
10    disciplinary committee convened to review the matter
11    and agreed that the student should be dismissed after
12    seeking an appeal.  The Don Bosco representatives met
13    again and plaintiff was asked to withdraw, and a letter
14    was written to that effect.
15              In Don Bosco, the Court established a two-
16    prong fundamental fairness test which private high
17    schools must follow when expelling students for
18    misconduct.  One, the private high school must adhere
19    to its own established procedures for dismissal, and
20    two, in executing the dismissal, the school must follow
21    a procedure that is fundamentally fair, Don Bosco, 322
22    NJ at 31 to 21.
23              In Don Bosco, the procedure that was followed
24    was a series of various meetings with the student and
25    the administration, and then a committee meeting of
```

89

```
 1    various representatives of the school and then with the
 2    appeal, a further meeting of that committee.  There was
 3    not a trial-type hearing where witnesses testified, and
 4    that kind of hearing, which is akin to the kind of
 5    process in this case, was found to be proper and to be
 6    a proper hearing, and it was also found to be
 7    fundamentally fair, as I indicated earlier.
 8              The parents aren't entitled to a hearing
 9    under the student handbook.  There is nothing in the
10    handbook that entitles the parents to a hearing for
11    their conduct.  And certainly, there are cases, both in
12    the ecclesiastical decisions, and I'll deal with a
13    secular decision in a moment, which -- fourth court,
14    fourth state -- which says that the parents -- the
15    expulsion based on parent conduct is not reviewable,
16    and doesn't require -- essentially, require due
17    process.
18              But even assuming that due process was
19    required, there was certainly a fair hearing of the
20    Phillips family grievances.  I've gone through all
21    those various meetings with Deacon Joe, Sister Helene,
22    Dr. Dames, Sister Butler.  They were able to talk to
23    people at all levels.  The -- there was a further
24    meeting, and I realize others attended the meeting, but
25    there was a meeting that Ms. Mullen attended where Dr.
```

90

```
 1    Dames asked everyone to restore the community to peace
 2    and tranquility, and in effect that request was
 3    ignored.
 4              And I think it's important, and probably the
 5    most important part of this, what Dr. Dames said is
 6    that the subsequent filing of the litigation showed
 7    that with respect to the continuum of conduct that the
 8    Court has addressed in its opinion, that it wasn't
 9    going to change.  And since it wasn't going to change,
10    the decision had to be made for the benefit of the
11    entire community.  And this decision had nothing to do
12    with the children.  It was all because of the parents.
13              So, essentially, Dr. Dames' efforts to
14    restore peace and tranquility in the community fell on
15    deaf ears.  You know, Dr. Dames was concerned that the
16    spiritual aspects of the community were being
17    destroyed.  And she wanted everyone, not just the
18    plaint -- Mr. Phillips and Ms. Mullen, but everyone in
19    the community, to stop.
20              And in terms of fundamental fairness,
21    everything has been heard.  But assuming that for the
22    sake of argument due process was not totally followed,
23    there was an appellate mechanism in the handbook, and
24    that remedy was not exhausted prior to coming to this
25    Court, so that any procedural right which the plaintiff
```

91

```
 1    may have had was waived.  They had five days to do it,
 2    they decided instead to come here.
 3              In -- now, in the Don Bosco case, starting on
 4    page 14, the Court said Don Bosco was clearly acting as
 5    a private organization, not as a state agency.  On page
 6    18, it went on to state a private primary or secondary
 7    school is generally considered a private association
 8    rather than the function of the state.  The procedural
 9    rights inherent in membership with private association
10    and the termination of membership are substantially
11    less than those of a public school or public university
12    student.  Membership in private organization attaches
13    somewhat different rights than, quote, "membership,"
14    unquote, in a private university.
15              The quote went on to say that membership in a
16    private organization receives the least procedural
17    protection in our judiciary.  Under all of these
18    circumstances, the Court finds that the manner in which
19    the Phillips grievances were addressed time and again
20    are fundament -- were fundamentally fair, and there was
21    an effort always to ameliorate their concerns, even up
22    to February 22nd, which was rejected -- which effort
23    was rejected the very next day.  And even though it may
24    have been in a meeting with others, it was rejected.
25              In Allen versus Casper, 87 Ohio App.3d 338,
```

92

```
 1    62 NE 367, Appellate District of Ohio (1993), an
 2    appeals court in Ohio affirmed the grant of summary
 3    judgment dismissing a parent's action against a private
 4    elementary school and officials because the school
 5    officials did not violate the parent's contractual
 6    rights and acted within its discretion when they
 7    expelled a child midyear -- oh, actually, children
 8    midyear based on the parent's failure to comply with
 9    the terms of the handbook.
10              In Allen, the plaintiff's daughter complained
11    of classmate's inappropriate behavior and conduct.  The
12    alleged improper behavior involved male classmate
13    inappropriately touching plaintiff's daughter and a
14    student with dental malformation inadvertently spraying
15    saliva on plaintiff's daughter.  Plaintiff's mother,
16    after contacting school administrators, was
17    dissatisfied with the private school's internal
18    handling of these incidents.  Plaintiff became angry
19    and called school administrators, quote, "un-Christian,
20    and accused them of working with the devil," unquote.
21    And that's -- during a meeting with the school
22    administrator, the pastor and the plaintiff, the mother
23    conceded that she insulted the administrator.  As a
24    result of the foregoing, the school administrator
25    determined that the parties could no longer develop a
```

```
 1   working relationship with plaintiff's family, and
 2   plaintiff was asked to remove the children from school.
 3          In affirming the trial court's grant of
 4   summary judgment, the Appellate Court ruled that the
 5   relationship between the plaintiff and the defendant
 6   private Catholic school and its administrators was a
 7   contractual relationship pursuant to the school's
 8   handbook and policies, and that those express terms may
 9   govern the circumstances under which a student may be
10   expelled.  The Court opined, quote, "because contracts
11   for private education have unique qualities, they are
12   to be construed in a manner which leaves school board
13   broad discretion to meet its educational and doctrinal
14   responsibilities.  Absent a clear abuse of discretion
15   by the school and the enforcement of its policies and
16   regulations, courts will not interfere with these
17   matters."
18          And the Allen case bears substantial
19   similarity to this case.  It would bear noting in this
20   case that when Reverend Monsignor Nydegger was about to
21   make his recommendation to the Cardinal, he spoke to
22   Deacon Joe, he spoke to Reverend Joe, he spoke to Dr.
23   Dames, and by speaking to all of these people, he was
24   convinced that the school's ecclesiastical mission had
25   been upset and that it had to be remedied.  And
```

94

```
 1   ultimately, when he and Dr. Dames went to the Cardinal,
 2   each and every event doesn't need to be known to the
 3   Cardinal.
 4          What was known to the Cardinal was that he
 5   extended his, as he put it, his mercy to this
 6   situation.  And as he said, he was astonished that it
 7   resulted in the reaction of the plaintiffs.  That's
 8   what he really needed to know.  And that reaction to
 9   the Cardinal was within a period of two weeks from the
10   time he did it.  There was no effort to be conciliatory
11   in that time period, there was only an effort to be
12   incendiary.  There was an effort -- there was a letter
13   written on the -- the decision was made on the 23rd.
14          A week later, on the -- I mean on the 15th.
15   A week later, on February 22nd, Dr. Dames had her
16   meeting, and then one day later, eight days from the
17   time the Cardinal extended his mercy, rather than
18   trying to find a way to be conciliatory, a threat of a
19   lawsuit was made, and -- even though he didn't know a
20   letter was written to him threatening that lawsuit, and
21   it was ultimately filed.
22          And it's really -- and in terms of his --
23   this is -- he didn't know about that letter.  So -- but
24   what he did know is he did know about the lawsuit being
25   filed two weeks after his decision was made, and he was
```

```
 1    truly disturbed that the peace and tranquility of the
 2    community was being upset so -- and these are my words,
 3    not his, but -- so soon after he made his decision.
 4    And the position that he would need to know more under
 5    these circumstances, when this circumstance was created
 6    by Mr. Phillips and Ms. Mullen, rings hollow.
 7              An issue was raised with respect to a waiver
 8    of the right to not -- of -- by the plaintiffs not to
 9    re-enroll the children.  And factually, that waiver
10    argument has no merit.  The application for re-
11    enrollment was sent out in January.  The application --
12    after the application was sent out, Cardinal Tobin
13    allowed the children to be re-enrolled.
14              But what also happened after that application
15    was sent out is that there were actions taken by the
16    publicizing of this case, at least according to what
17    the state of mind is of the Archdiocese
18    representatives, and there were actions taken with the
19    lawsuit, but -- and other action, and that the upset of
20    the community was intensified long after the
21    application was sent to the plaintiffs.  So the facts
22    had changed since the offer was extended.  And when the
23    re-enrollment application came to the attention of the
24    defendants' representatives under the circumstances
25    that existed then, they declined to accept that
```

```
 1    application.  There -- so there was no waiver by
 2    sending out the application, because it was sent out
 3    before all these activities.
 4              Now, there are some other equitable
 5    considerations which the Court would like to touch on
 6    briefly.  First of all, even if there was a legal right
 7    to success on the merits, which, by the way, as I said
 8    earlier, would have to be established both under the
 9    law of specific performance as well as under the law of
10    injunctive relief by clear and convincing evidence, and
11    the -- that the existence of a contractual right can't
12    be sustained by a preponderance of the evidence, no
13    less the clear and convincing evidence standard.  But
14    there are also other bases on which an injunction would
15    not be appropriate.
16              It is axiomatic -- quote, "It is axiomatic
17    that injunctive relief should not be entered except
18    when necessary to prevent substantial, immediate, and
19    irreparable harm," unquote, Garden State Equality v.
20    Dow, 433 NJ Super. 347, 351 (Law Division 2013), aff'd
21    216 NJ 214 (2013).  It is -- in the Don Bosco case, the
22    Court indicated that a student removed from a private
23    high school had immediate access to public schools for
24    education, thereby in effect mitigating any irreparable
25    harm, 322 NJ Super. at 614.  The Court would note that
```

1   beyond just having the availability of public
2   education, to the extent that religion is important,
3   CCD and other religious outlets are available, so there
4   are ways to avoid any irreparable harm in this case.
5           In terms of balancing the equities in this
6   case, because that's one of the things the Court should
7   also look at, the comparison of the hardship to
8   plaintiff if relief is denied and hardship to the
9   defendant if relief is granted, the Court is mindful of
10  the fact that St. Theresa's is the only school the
11  children have known.  The Court is troubled that it is
12  put in the position where the children, according to
13  Mr. Phillips -- and I accept this part of his testimony
14  -- would be heartbroken that they could not participate
15  in the only school community that they've ever known.
16          But I have to weigh against that the
17  disruption and the fracture of the community.  And when
18  I look at this from just a practical perspective, in
19  essence, the administration was on edge because of all
20  of these events.  The students were on edge.  The
21  parents were on edge.  If I allow the children to go
22  back, it is only going to continue to upset the peace
23  and harmony in this community.
24          And I also bear in mind that if the children
25  prefer not to go to public school, and I recognize this

1   is the last year of S.P.'s education at the school and
2   she's got her dance and her trip to Hershey Park and
3   all these events that she's been so looking forward to
4   for a period of time, that she may go to a different
5   Catholic school if she could, which would offer the
6   same kind of activities.  And, you know, she, from
7   everything that I've been told during this case, she
8   has adjusted to what's happened in this case, and I
9   would hope she would be able to adjust elsewhere, as
10  would K.P.  So that's an issue to me.
11          One of the other issues I have to look at is
12  whether an injunction would be adequate.  And in terms
13  of the adequacy of the injunction, the Court is
14  concerned about what's called the continuing
15  superintendents doctrine.  It's a doctrine that applies
16  in specific performance cases, and essentially what
17  that doctrine states is specific performance of a
18  contract will not be awarded, quote, "where the
19  execution of its decree for specific performance would
20  entail continuing and constant superintendence over a
21  considerable period of time," period, unquote,
22  Fleischer v. James Drug Stores, 1 NJ 139, 149 (1948).
23          How that's relevant in this case is the
24  following.  I have served on the bench for a
25  considerable period of time.  This is the single most

99

```
 1    contentious case in which I have ever been involved.  I
 2    have had more applications in this case then any other
 3    case I've been involved.  And before here, I sat in the
 4    Family Division, which is known for contentious
 5    litigation, because it has such a profound effect on
 6    people's lives.  But this too has a profound effect on
 7    children's lives, and it's something that I've always
 8    taken very seriously about this case.
 9              Before the trial in this case, there were
10    five applications for a stay of the Appellate Division.
11    Or there were three that were actually made, five that
12    were requested.  There have been other applications of
13    the Appellate Division in this case.  I've had numerous
14    applications.  I have taken phone call after phone call
15    after phone call in this case, during vacations of both
16    counsel, and there always seems to be a sense of
17    urgency about this case.  There is nothing that leads
18    this Court to believe that that, for lack of a better
19    word, hysteria is going to end once -- if I sent the
20    children back.  And I cannot -- this Court cannot be in
21    the position where it has to continually supervise what
22    goes on.
23              The brief filed by the plaintiff -- I
24    unfortunately brought all my papers back in chambers --
25    you know, characterized the defendants' conduct as
```

100

```
 1    deplorable.  You know, I believe the word "shameful"
 2    was used.  There were a number of incendiary words
 3    used.  I don't have any confidence that if I sent the
 4    children back that the contentious litigation would
 5    end.  So -- and it would be very difficult, and this
 6    also is in accordance with what's -- one of the things
 7    I have to decide -- would be very difficult for this
 8    Court to fashion an order that would prevent it.
 9              So, for all of the reasons that I've just
10    gone through, I am going to deny the application for
11    re-enrollment.  To -- stop.  Let me rephrase that.  I
12    am going to deny the application to restrain the re-
13    enrollment decision, and I'm going to allow the non-re-
14    enrollments decision to stand.  So I will enter an
15    order to that effect.  My law clerk is out today but
16    I'll get that order out quickly.  I'll have to get
17    somebody to help me with it tomorrow.  Okay.  With
18    that, the record's -- anything else, counsel?
19              MR. WESTRICK:  No, Your Honor.
20              THE COURT:  Okay.  With that, the record's
21    now closed.
22              MR. WESTRICK:  Thank you.
23              MS. McCREA:  Thank you.
24                 (Trial concluded at 5:12 p.m.)
25
```

101

```
 1                        CERTIFICATION
 2
 3        I, TERRY L. DeMARCO, the assigned transcriber, do
 4   hereby certify the foregoing transcript of proceedings
 5   from pages 1 through 56, line 19, on CourtSmart, Index
 6   No. from 1:51:18 to 3:30:07, is prepared to the best
 7   of my ability and in full compliance with the current
 8   Transcript Format for Judicial Proceedings and is a
 9   true and accurate compressed transcript of the
10   proceedings, as recorded.
11
12
13
14     /s/ Terry L. DeMarco              AD/T 566
15       Terry L. DeMarco                AOC Number
16
17
18     KLJ Transcription Service         08/30/17
19        Agency Name                      Date
20
21
22
23
24
25
```

102

```
 1                        CERTIFICATION
 2
 3        I, HOLLY TISSEYRE, the assigned transcriber, do
 4   hereby certify the foregoing transcript of proceedings
 5   on CourtSmart, Index Nos. from 3:30:07 to 5:12:34, is
 6   prepared to the best of my ability and in full
 7   compliance with the current Transcript Format for
 8   Judicial Proceedings and is a true and accurate
 9   compressed transcript of the proceedings, as recorded.
10
11
12     /s/ Holly Tisseyre                AD/T 682
13       Holly Tisseyre                  AOC Number
14
15
16     KLJ Transcription Service         8/30/17
17        Agency Name                      Date
18
19
20
21
22
23
24
25
```